UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

WAYNE R. SMITH,

                              Plaintiff,

                v.                                               6:24-CV-687
                                                                 (GTS/MJK)

ONEIDA COUNTY SHERIFF
DEPARTMENT, et al.,

                              Defendants.

_____

WAYNE R. SMITH, Plaintiff, pro se

MITCHELL J. KATZ, U.S. Magistrate Judge

TO THE HONORABLE GLENN T. SUDDABY, United States District Court Judge:

## ORDER and REPORT-RECOMMENDATION

Plaintiff commenced this action on May 20, 2024 by filing a complaint (Dkt. No. 1)

together with a motion for leave to proceed in forma pauperis (Dkt. No. 2). On June 7,

2024, plaintiff filed an amended complaint ("Amended Complaint") (Dkt. No. 4)

together with an amended motion for leave to proceed in forma pauperis ("Amended

IFP Application") (Dkt. No. 5). The Clerk has sent to the court for review the Amended

Complaint brought pursuant to 42  U.S.C.  § 1983 as well as the Amended IFP

Application.

1

## I.    <u>Amended IFP Application</u>

Plaintiff's Amended IFP Application declares that he is unable to pay the filing fee.  (Dkt. No. 5). After reviewing plaintiff's application, this court finds that he is financially eligible for IFP status.

However, in addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the Amended Complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915 (e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must consider whether the Amended Complaint lacks an arguable basis in law or in fact. *See Neitzke v. Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and 28 U.S.C. § 1915. Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources.  *See Neitzke*, 490 U.S. at 327; *see also Harkins v. Eldredge*, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to show liberality toward pro se litigants and must use extreme caution in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *See Fitzgerald v. First E. Seventh St. Tenants*

*Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint sua sponte even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555).

In addition, Fed. R. Civ. P. 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 does not require detailed factual allegations, it does "demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Houston v. Collerman*, No. 9:16-CV-1009 (BKS/ATB), 2016 WL 6267968, at *2 (N.D.N.Y. Oct. 26, 2016) (quoting *Ashcroft*, 556 U.S. at 678). A pleading that contains allegations that "'are so vague as to fail to give the defendants adequate notice of the claims against them' is subject to dismissal." *Id.* (citing *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009)).

## II.    <u>Amended Complaint</u>

The Amended Complaint alleges violations of plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983. (Dkt. No. 4).

Plaintiff alleges that he was assaulted at his residence on November 5, 2023 by a process server. (Amended Complaint at 4).[1] Specifically, plaintiff alleges that he

---

[1] The page references to the Amended Complaint are consistent with those assigned by CM/ECF.

instructed a process server to leave his property after the process server identified himself as a law enforcement officer, but the process server refused. (*Id.*). Plaintiff alleges that he did not see a badge or uniform identifying the process server as a police officer. (*Id.*). Plaintiff further alleges that he informed the process server that he had a "guard dog." (*Id.*). The process server proceeded to pull out a large can of mace as plaintiff "was getting 'Henry,' [plaintiff's] German Shep[p]ard[.]" (*Id.*).

Plaintiff alleges that he then proceeded to the front door with Henry on a leash. (*Id.*). When plaintiff opened the door, the process server sprayed plaintiff and his dog with mace and continued to do so, even after the door was shut. (*Id.*). Thereafter, plaintiff called 911 and two Oneida County Sheriff Deputies responded. (*Id*. at 5). Plaintiff recognized the female officer as Deputy Connelly but was unable to identify the male officer, whom plaintiff refers to in the Amended Complaint as Deputy John Doe. (*Id.*). After listening to plaintiff and the process server explain their respective "side[s]," the defendant deputies arrested plaintiff for menacing and harassment. (*Id.*). Plaintiff was issued an appearance ticket to appear in Westmoreland Town Court. (*Id*). Plaintiff further alleges that Deputies Connelly and Doe "refused to consider the camera footage available to them . . . at the scene." (*Id.*). According to plaintiff, the Oneida County District Attorney's Office dismissed the charges against him after reviewing the security camera footage of the incident. (*Id.*).

In his request for relief, plaintiff seeks $10,000,000 in damages for the "gross violation of [his] constitutional rights." (*Id.* at 6).

4

### III.   <u>Oneida County Sheriff Department</u>

The Oneida County Sheriff's Department is not a proper party to this action. "A police department cannot sue or be sued because it does not exist separate and apart from the municipality and does not have its own legal identity." *Baker v. Willett*, 42 F. Supp. 2d 192, 198 (N.D.N.Y. 1999) (dismissing claims against county sheriff's department) (citations omitted); *see also Jackson v. Cnty. of Nassau*, No. 07-CV-245, 2010 WL 335581, at *5 (E.D.N.Y. Jan. 22, 2010) ("Under New York law, departments which are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and cannot sue or be sued."); *La Grande v. Town of Bethlehem Police Dep't*, No. 08-CV-0738 (LEK/DRH), 2009 WL 2868231, at *2 (N.D.N.Y. Sept. 1, 2009) ("Since the Bethlehem Police Department cannot be sued pursuant to 42 U.S.C. § 1983, [the plaintiff's] [c]omplaint is dismissed as against the Town of Bethlehem Police Department."); *Jenkins v. Liadka*, No. 10-CV-1223 (GTS/DEP), 2012 WL 4052286, at *5 (N.D.N.Y. Sept. 13, 2012) ("Because the Syracuse Police Department is merely an administrative arm of the City of Syracuse, it is not a proper defendant.").

Even if plaintiff had sued the appropriate municipal entity – i.e. Oneida County – his allegations do not sufficiently allege *Monell* liability. When a plaintiff sues a municipality under § 1983, it is insufficient for the plaintiff to allege that one of the municipality's employees or agents engaged in some wrongdoing. The plaintiff must

demonstrate that the municipality itself caused the violation of the plaintiff's rights. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("A municipality or other local government may be liable under this section [1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978)); *see also Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011). Specifically, to state a § 1983 claim against a municipality, the plaintiff must allege facts showing (1) the existence of a municipal policy, custom, or practice, and (2) that the policy, custom, or practice caused the violation of the plaintiff's constitutional rights. *See Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997) (internal citations omitted).

For the foregoing reasons, the court recommends dismissing plaintiff's Amended Complaint as asserted against the Oneida County Sherriff's Department with prejudice. The court further recommends declining to interpret plaintiff's allegations to plausibly allege *Monell* liability against Oneida County, as plaintiff does not refer to any policy, custom, or practice by a municipality that caused a violation of his constitutional rights. However, in deference to plaintiff's pro se status, the court recommends that plaintiff be provided with an opportunity to amend his Amended Complaint to the extent he can, in good faith, assert a *Monell* claim against Oneida County, including allegations

suggesting that a county policy, custom, or practice caused any alleged constitutional violations.

## IV.   <u>Oneida County Sheriff Maciol</u>

It has long been established that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983[,]" and supervisory officials may not be held liable merely because they held a position of authority. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citations omitted); *see also Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *Grullon v. City of New Haven*, 720 F.3d 133, 138-39 (2d Cir. 2013). In *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995), the Second Circuit articulated standards for courts to use when determining personal involvement or supervisory liability.[2]

However, after the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662

---

[2] These factors were:
> (1) the defendant participated directly in the alleged constitutional violation;
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon*, 58 F.3d at 873.

(2009), the factors articulated in *Colon* were called into question. District courts, including the Northern District of New York[3] noted the possibility that the *Colon* factors were no longer viable. Eventually, the Second Circuit revised its standard for determining personal involvement or supervisory liability, finding that the *Colon* factors are no longer controlling and articulating the proper standard for the courts in this circuit to utilize. *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. at 676).

Joining other circuits, the Second Circuit held that, after *Iqbal*, there is no "special" rule for supervisory liability. *Id.*

> Instead, a plaintiff must plead and prove 'that each Government official defendant, through the official's own individual actions, has violated the Constitution.' *Iqbal*, 556 U.S. at 676 . . . 'The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary. *Id*. The violation must be established against the supervisory official directly.

*Id.* (quoting *Iqbal*, 556 U.S. at 676). The supervisor must have committed the violation him or herself, not by the supervision of others who committed the violation. *Id.* Likewise, the supervisor must personally display the requisite state of mind, depending on the violation at issue. *Id.*

---

[3] *See e.g. Vance v. State of New York*, No. 9:19-CV-748 (BKS/ATB), 2020 WL 7481585, at *3 & n.3 (N.D.N.Y. Nov. 30, 2020) (discussing cases), *report-recommendation adopted*, 2020 WL 7480955 (N.D.N.Y. Dec. 18, 2020).

Here, other than being listed as a named defendant, the Amended Complaint is devoid of any allegations against or that otherwise reference Robert Maciol. The fact that Robert Maciol is the Oneida County Sheriff, without more, does not mean that he was personally involved with the alleged violation/deprivation of plaintiff's constitutional rights by his subordinates. The court therefore recommends that the Amended Complaint be dismissed against Robert Maciol without prejudice.

## V.      **Fourth Amendment Rights/False Arrest/Imprisonment**

### A. Legal Standards

These three claims as asserted in the Amended Complaint are duplicative of one another. A section 1983 claim for false arrest or false imprisonment "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). "False arrest is simply false imprisonment accomplished by means of an unlawful arrest." *Jenkins v. City of N.Y.*, 478 F.3d 76, 88 n.10 (2d Cir. 2007). Such claims are one and the same because "[f]alse arrest and false imprisonment overlap; the former is a species of the latter." *Wallace v. Kato*, 549 U.S. 384, 388, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007). The elements of a Fourth Amendment false arrest/imprisonment claim under 42 U.S.C. § 1983 are the same as those for a false arrest claim under New York law. *Kraft v. City of New York*, 696 F. Supp. 2d 403, 418 (S.D.N.Y. 2010). The New York State standard for false arrest requires that: "'(1) the

9

defendants intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" *Sethi v. Nassau County*, No. 11-CV-6380, 2014 WL 2526620, at *3 (E.D.N.Y. June 3, 2014) (quoting *Jocks v. Tavernier*, 316 F.3d 128, 134-35 (2d Cir. 2003)). An arrest is privileged if it is based on probable cause. *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest.") (citations and quotations omitted).

### B. Analysis

Plaintiff has pled sufficient facts in the Amended Complaint to survive initial review as against defendant Deputies Connelly and Doe for false arrest/imprisonment.[4] The Amended Complaint alleges the circumstances leading to plaintiff's arrest, the charges ultimately brought against him because of the arrest, and arguably the status of the underlying criminal proceedings.[5]

---

[4] In making this determination this court makes no finding as to whether any claims would survive a properly supported motion to dismiss or one for summary judgment.

[5] In *Heck v. Humphrey*, 512 U.S. 477 (1994) the United States Supreme Court held that a section 1983 action seeking damages is not cognizable if a decision in favor of the plaintiff would necessarily invalidate a criminal conviction unless the conviction or sentence had been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or called into question by a federal habeas court. 512 U.S. at 486-87. Although the Amended Complaint alleges that the Oneida County District Attorney's office dismissed the menacing and harassment charges, plaintiff lists the Oneida County Jail as his current address. At this juncture, the court is recommending that plaintiff's false arrest claims survive initial review based on plaintiff's representation that the underlying charges relevant to this action have already been resolved in his favor. If it is later determined that plaintiff's charges are still pending to some extent, it is possible that plaintiff's false arrest claims may be barred by *Heck*.

Because the Amended Complaint asserts claims against an individual whose name is not known to plaintiff, service of process cannot be effectuated on Deputy John Doe until he has been identified by name. If the district court accepts this recommendation, and plaintiff wishes to pursue his claims against defendant Deputy John Doe, he must take reasonable steps to ascertain his identity through discovery. Upon learning the identity of the unnamed defendant, plaintiff must amend the operative complaint to properly name that individual as a party.  If plaintiff fails to ascertain the identity of the Deputy John Doe to permit timely service of process, all claims against that individual will be dismissed.[6]

## VI.   **Opportunity to Amend**

### A. Legal Standards

Generally, before the court dismisses a pro se complaint or any part of the complaint sua sponte, the court should afford the plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *See Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Futility is present when the problem with plaintiff's causes of action is substantive such that better pleading will not cure it. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).

---

[6] Rule 4 of the Federal Rules of Civil Procedure require that a party be served within 90 days of issuance of the summons, absent a court order extending that period. Fed. R. Civ. P. 4(m). The Court's local rules shorten the time for service from 90 days under Rule 4(m) to 60 days. N.D.N.Y. L.R. 4.1(b).

**B. Application**

The court recommends that the claims against the Oneida County Sheriff's Department be dismissed with prejudice. However, in deference to plaintiff's pro se status, the court recommends that plaintiff be provided with an opportunity to amend to clarify what, if any, claims he maintains against the County of Oneida, including facts suggesting that a county policy, custom, or practice caused the alleged constitutional violations.

The court further recommends dismissing the Amended Complaint as against Robert Maciol. To the extent defendant Maciol was personally involved in the alleged violation of plaintiff's constitutional rights, plaintiff should be granted leave to amend his complaint to state facts and circumstances in support of his claim against this individual defendant.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's amended motion to proceed IFP (Dkt. No. 5) be **GRANTED**,[7] and it is

**RECOMMENDED**, that the district court **DISMISS PLAINTIFF'S AMENDED COMPLAINT IN ITS ENTIRETY, WITH PREJUDICE, only** as to defendant Oneida County Sheriff's Department, and it is

---

[7] Although his IFP Application has been granted, plaintiff will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

12

**RECOMMENDED**, that the district court **DISMISS PLAINTIFF'S AMENDED COMPLAINT IN ITS ENTIRETY, WITHOUT PREJUDICE**, as to defendant Robert Maciol, and it is

**RECOMMENDED**, that plaintiff's claims for false arrest/imprisonment proceed as against defendants Connelly and Doe, and it is

**RECOMMENDED**, that if the District Judge adopts this Order and Report-Recommendation, plaintiff be given thirty (30) days from the date of the District Judge's order, within which to submit a proposed second amended complaint to the court for its consideration, and that plaintiff be advised that **any amended pleading must be a COMPLETE PLEADING, WHICH WILL SUPERCEDE THE AMENDED COMPLAINT**, and that plaintiff must include all the remaining facts and causes of action in the second amended complaint. **No facts or claims from the original complaint may be incorporated by reference**, and it is

**RECOMMENDED,** that if the District Court adopts this Order and Report-Recommendation, and plaintiff files a proposed second amended complaint, the proposed pleading be returned to me for review, and it is

**RECOMMENDED**, that if the District Court adopts this Order and Report-Recommendation, and plaintiff does not elect to further amend his Amended Complaint, the case be returned to me for any orders relating to service of the Amended Complaint on the remaining defendants, and it is

13

**ORDERED**, that while plaintiff may file objections to this Order and Report-Recommendation, before plaintiff submits any amended pleading, he should wait for the District Court to rule on the above Orders and Recommendations, and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation on plaintiff by regular mail.[8]

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Hum. Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: June 20, 2024

Mitchell J. Katz
U.S. Magistrate Judge

---

[8] The Clerk shall also provide plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

14

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

Case 6:24-cv-00687-GTS-MJK   Document 7   Filed 06/20/24   Page 15 of 96

2016 WL 6267968
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Eddie HOUSTON, Plaintiff,

v.

COLLERMAN, et. al., Defendants.

9:16-CV-1009 (BKS/ATB)
|
Signed 10/26/2016

**Attorneys and Law Firms**

EDDIE HOUSTON, 08-A-3122, Mid-State Correctional Facility, P.O. Box 2500, Marcy, New York 13403, Plaintiff, pro se.

**AMENDED DECISION AND ORDER** [1]

[1]     On October 20, 2016, the Court issued a Decision and Order upon initial review of plaintiff's complaint. Dkt. No. 4. This Amended Decision and Order is issued to correct clerical errors in the Conclusion of the Order.

BRENDA K. SANNES, United States District Judge

**I. Introduction**

**\*1** The Clerk has sent to the Court for review a civil rights action filed by pro se plaintiff Eddie Houston. Dkt. No. 1 ("Compl."). Plaintiff has not paid the statutory filing fee for this action and seeks leave to proceed in forma pauperis. Dkt. No. 2 ("IFP Application").

**II. IFP Application**

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, No. 09-CV-1922, 2010 W L 5185047, at \*1 (S.D.N.Y. Oct. 26, 2010). Upon review of plaintiff's IFP Application, the Court finds that plaintiff has demonstrated sufficient economic need and filed the inmate authorization form required in the Northern District of New York. Plaintiff's IFP application (Dkt. No. 2) is granted. [2]

[2]     Section 1915(g) prohibits a prisoner from proceeding in forma pauperis where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions or appeals that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(g). Based upon the Court's review of plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service, it does not appear that plaintiff has accumulated three strikes for purposes of 28 U.S.C. § 1915(g).

**III. Initial Screening**

Having found that plaintiff meets the financial criteria for commencing this action in forma pauperis, and because plaintiff seeks relief from an officer or employee of a governmental entity, the Court must consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. §§ 1915(e) and 1915A. Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed in forma pauperis, "the court shall dismiss the case at any time if the court determines that – ... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [3]

[3]     To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

Similarly, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (noting that Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee).

**\*2** Additionally, when reviewing a complaint, the Court may also look to the Federal Rules of Civil Procedure. Rule 8 of

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

Case 6:24-cv-00687-GTS-MJK    Document 7    Filed 06/20/24    Page 16 of 96

the Federal Rules of Civil Procedure provides that a pleading which sets forth a claim for relief shall contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Hudson v. Artuz,* No. 95 CIV. 4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998) (quoting *Powell v. Marine Midland Bank,* No. 95-CV-0063 (TJM), 162 F.R.D. 15, 16 (N.D.N.Y. June 23, 1995) (other citations omitted)).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly,* 550 U.S. at 555). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Thus, a pleading that contains only allegations which "are so vague as to fail to give the defendants adequate notice of the claims against them" is subject to dismissal. *Sheehy v. Brown,* 335 Fed.Appx. 102, 104 (2d Cir. 2009).

## IV. Summary of the Complaint [4]

[4]    Plaintiff annexed exhibits to the complaint. Dkt. No. 1-1. To the extent that the exhibits are relevant to the incidents described in the complaint, the Court will consider the complaint as well as any documents attached as exhibits. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991) (the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortgage Corp.,* 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)) (footnote omitted); *see also Myers v. Wollowitz,* No. 6:95-CV-0272 (TJM/RWS), 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (stating that "§ 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights." (citation omitted)). "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted). The Court will construe the allegations in plaintiff's complaint with the utmost leniency. *See, e.g.,* *Haines v. Kerner,* 404 U.S. 519, 521 (1972) (holding that a pro se litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers.").

**\*3** Plaintiff, an inmate currently being held at Mid-State Correctional Facility ("Mid-State C.F."), asserts claims arising out of his confinement in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). The incidents that form the foundation for this complaint occurred while plaintiff was confined at Elmira Correctional Facility ("Elmira C.F."). *See* Compl., *generally.* On July 13, 2013, plaintiff filed a grievance claiming that defendants Officer Copestick ("Copestick") and Officer Schieber ("Schieber") harassed him, on more than one occasion, about his medication. *See id.* at 6; *see* Dkt. No. 1-1 at 3-5. On August 5, 2013, after an investigation into the allegations, the Superintendent of Elmira C.F. denied plaintiff's grievance. *See* Dkt. No. 1-1 at 5.

On September 30, 2013, plaintiff was on his way to the masjid to participate in Ramadan when he was stopped by Copestick and Schieber and directed to the wall for a pat-frisk. *See* Compl. at 5. While plaintiff's hands were on the wall, Schieber "violently kicked" his legs from underneath him. *See id.* Schieber "stomped" on plaintiff's ankles while Copestick attempted to choke plaintiff. *See id.* During the assault, the officers yelled racial slurs. *See id.* Defendant Sergeant Collerman ("Collerman") watched the officers beat plaintiff. *See* Compl. at 5. As a result of the attack, plaintiff's eyeglasses were broken, his ankle was swollen, and he could not walk. *See id.* at 5, 9.

At approximately 5:00 p.m., plaintiff received medical treatment for complaints of pain in his right big toe and swelling in his right foot. *See* Dkt. No. 1-1 at 19. Plaintiff

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

Case 6:24-cv-00687-GTS-MJK    Document 7    Filed 06/20/24    Page 17 of 96

2016 WL 6267968

received Motrin and was advised to follow with sick call requests, if needed. *See id.* A "use of force/inmate injury" report was compiled. [5] *See id.* At approximately 7:15 p.m., plaintiff, a diabetic, told a medical provider that he had not received his daily "medication." *See id.* The provider ordered various medications to be delivered to plaintiff on a daily basis. *See id.*

[5]     The Use of Force report was not annexed as an exhibit to the complaint.

On October 1, 2013, plaintiff received a misbehavior report charging him with assault on staff and with refusing a direct order and search. [6] *See* Compl. at 5. On the same day, plaintiff was placed in confinement in the Special Housing Unit ("SHU"). *See* Dkt. No. 1-1 at 19. On October 3, 2013, plaintiff attended a Hearing regarding the misbehavior report. [7] *See* Dkt. No. 1-1 at 10. On November 3, 2013, plaintiff received a copy of the hearing disposition dismissing all charges. *See* Dkt. No. 1-1 at 11; Dkt. No. 1 at 5.

[6]     The name of the officer who served the misbehavior report is not clearly legible on the Hearing Disposition annexed as an exhibit. *See* Dkt. No. 1-1 at 10. Plaintiff does not allege that Copestick, Schieber, or Collerman delivered the report. The disposition form indicates that the charges were reported by Schieber. *Id.* The misbehavior report was not annexed as an exhibit to the complaint.

[7]     The officer who presided over the hearing was a Captain at Elmira C.F. However, the name of the hearing officer is not clearly legible. *See* Dkt. No. 1-1 at 10-11.

On November 3, 2013, plaintiff was released from the SHU. *See* Compl. at 5. While plaintiff was in the SHU, he was unable to participate in Ramadan, denied religious meals, denied parole, and excluded from mental health programs. *See id.*

Construed liberally, the complaint contains the following claims: (1) Copestick and Schieber violated plaintiff's Eighth Amendment rights with use of excessive force (Fifth, Fifteenth, Twentieth, and Twenty-Second Causes of Action); (2) Collerman failed to protect plaintiff from the assault in violation of plaintiff's Eighth Amendment rights (Fifteenth Cause of Action); (3) defendants were deliberately indifferent to plaintiff's serious medical needs in violation of the Eighth Amendment (Sixth, Seventh, and Fifteenth Causes of Action); (4) Copestick and Schieber retaliated against plaintiff in violation of plaintiff's First Amendment rights (Twenty-First Cause of Action); (5) plaintiff's First Amendment rights to religious freedom were violated (Fourth Cause of Action); (6) plaintiff's Fourteenth Amendment rights to due process and equal protection were violated (First, Second, Third, Sixth, Sixteenth, and Eighteenth Causes of Action); (7) defendants failed to investigate plaintiff's complaints and follow grievance procedures (Tenth and Thirteenth Causes of Action); (8) perjury claims against officers who filed the misbehavior report (Eleventh and Seventeenth Causes of Action); and (9) supervisory claims against DOCCS (Eighth, Ninth, Twelfth, Fourteenth, Nineteenth, Twenty-Third, Twenty-Fourth, Twenty-Fifth, and Twenty Sixth Causes of Action). *See* Compl., *generally.* Plaintiff seeks compensatory damages, injunctive relief, and criminal charges against defendants (Eleventh and Seventeenth Causes of Action). *See* Compl. at 9-13.

## V. Analysis

### A. Eleventh Amendment
 **\*4**  The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. *Gollomp v. Spitzer,* 568 F.3d 355, 365-66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through 42 U.S.C. § 1983, *see Quern v. Jordan,* 440 U.S. 332, 343-45 (1979), and that New York State has not waived its immunity from suit on the claims asserted in plaintiff's complaint. *See generally Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 38-40 (2d Cir. 1977); *Dawkins v. State of New York,* No. 93-CV-1298 (RSP/GJD), 1996 W L 156764 at *2 (N.D.N.Y. 1996).

Here, insofar as plaintiff seeks an award of money damages pursuant to Section 1983 against DOCCS, those claims are

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

Case 6:24-cv-00687-GTS-MJK   Document 7   Filed 06/20/24   Page 18 of 96

2016 WL 6267968

dismissed as plaintiff seeks relief from a defendant immune from suit under section 1983. *See LeGrand v. Evan*, 702 F.2d 415, 417 (2d Cir. 1983); *see Meehan v. Kenville*, 555 Fed.Appx. 116 (2d Cir. 2014); *see Simmons v. Gowanda Corr. Facility*, No. 13-CV-0647, 2013 WL 3340646, at *1 (W.D.N.Y. July 1, 2013) ("the New York State Department of Corrections and [the named correctional facility] enjoy the same Eleventh Amendment immunity from suit in federal court as enjoyed by the state itself") (quoting *Posr. v. Court Officer Shield No. 207*, 180 F.3d 409, 411 (2d Cir. 1999)).

### B. Eighth Amendment

### 1. Excessive Force Claims

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The Eighth Amendment's prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotations omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)); *see also Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973); *see also Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) ("[t]he Supreme Court has emphasized that the nature of the force applied is the core judicial inquiry in excessive force cases —not whether a certain quantum of injury was sustained."). "Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness." *Wynter v. Ramey*, No. 11-CV-0257 (DNH/DEP), 2013 W L 5465343, at *5 (N.D.N.Y. Sept. 30, 2013) (citations omitted).

Plaintiff has identified the time, location and individuals involved in the alleged assault. Thus, the Court finds that plaintiff's Eighth Amendment excessive force claims against Copestick and Schieber survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Failure To Intervene

*5 The failure of corrections officers to employ reasonable measures to protect an inmate from violence by others may rise to the level of an Eighth Amendment violation. *See Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985). Moreover, allegations that an officer failed to intervene and prevent assaults are sufficient to state an Eighth Amendment failure to protect claim. *See Rogers v. Artus*, No. 13-CV-21, 2013 WL 5175570, at *3 (W.D.N.Y. Sept. 11, 2013). To establish liability under a failure to intervene theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration: 1) possessed actual knowledge of the use by another of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001). In order to succeed on a claim of failure to protect, the inmate "must establish both that a substantial risk to his safety actually existed and that the offending [defendant] knew of and consciously disregarded that risk." *See Walsh v. Goord*, No. 07-CV-0246, 2007 WL 1572146, at *9 (W.D.N.Y. May 23, 2007) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1970)). In addition, a failure-to-protect claim requires a showing that prison officials acted with "deliberate indifference" to the inmate's safety. *Morales v. New York State Dep't of Corr.*, 842 F.2d 27, 30 (2d Cir. 1988).

At this early stage of the proceeding, plaintiff has alleged enough to require a response from Collerman to plaintiff's claim that he failed to protect plaintiff from the assault by Copestick and Schieber. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

### 3. Deliberate Indifference to Serious Medical Needs

To state an Eighth Amendment claim for medical indifference, a plaintiff must allege that the defendant was deliberately indifferent to a serious medical need. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective component of an Eighth Amendment deliberate indifference

**Houston v. Coleman**, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

medical claim "requires that the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)) (internal quotation marks omitted). Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong*, 143 F. 3d 698, 703 (2d Cir. 1998) (quoting *Hathaway*, 99 F.3d at 553). "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To assert a claim for deliberate indifference, an inmate must allege that (1) a prison medical care provider was aware of facts from which the inference to be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702. The inmate must also demonstrate that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. at 835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle*, 429 U.S. at 105-06.

In this instance, even assuming plaintiff's injuries were sufficiently serious, plaintiff must allege facts to demonstrate that defendants acted with a sufficiently culpable state of mind. *See Hathaway*, 99 F.3d at 553. Plaintiff claims that his medical treatment was inadequate because his ankle was not x-rayed until he was transferred to "his next facility," two months after the alleged incident. *See* Compl. at 10. "When the basis of a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (citing *Chance*, 143 F.3d at 702). "Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, this Court has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years." *Demata*

*v. New York State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999) (internal citations omitted).

**\*6** Here, the complaint is void of any facts establishing that any defendant deliberately delayed plaintiff's medical treatment. On the day of the alleged attack, plaintiff received medical attention and prescription medication. *See* Dkt. No. 1-1 at 19. Plaintiff was treated on three other occasions in October 2013 for foot pain before undergoing x-rays on November 14, 2013. Dkt. No. 1-1 at 20-21. During those visits, plaintiff received ice packs, Motrin, and refused Ibuprofen. See id. Plaintiff does not allege that his condition deteriorated during that time. *See Rodriguez v. City of New York*, 802 F.Supp. 477, 482 (S.D.N.Y. 2011) (finding that the plaintiff did not establish that his condition worsened as a result of a delay between his request and receipt of medical attention). Plaintiff does not allege that he sought and was refused medical treatment during this two month time period. *See Kee v. Hasty*, No. 01 Civ. 2123, 2004 W L 807071, at \*29 (S.D.N.Y. April 14, 2004) (holding that the plaintiff's Eighth Amendment claims were overly conclusory because the inmate failed to specify the dates on which he was denied proper treatment, the nature of his needs on those dates, and the nature of the treatment that was purportedly denied by the defendants). The complaint lacks any facts to plausibly suggest that any defendant knew of the severity of plaintiff's injury and the risk posed by any delay in his treatment.

Plaintiff, a diabetic, also claims that he was unable to read or see for over one year because his eye glasses were not replaced until over a year after the assault. *See* Compl. at 10. The complaint does not contain any facts suggesting that plaintiff made any complaints or sick call requests to any defendant related to his eyeglasses. Plaintiff also failed to assert facts suggesting that he made any defendant "aware of the serious harm could occur" if he was not provided with his glasses. *See Myrie v. Calvo/Calvoda*, 591 F.Supp.2d 620, 628 (S.D.N.Y. 2008) (holding that the complaint did not suggest that any defendant was deliberately indifferent to the plaintiff's vision problems).

Plaintiff's Eighth Amendment allegations are also subject to dismissal based upon the failure to plead personal involvement on the part of any defendant. It is well settled in this Circuit that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, "a Section 1983

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas*, No. 04-CV-7263, 2008 W L 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted). The complaint lacks any facts suggesting that Copestick, Schieber, or Collerman were involved in plaintiff's medical treatment or refused to allow plaintiff to receive medical attention. In the absence of factual allegations sufficient to plausibly suggest that any defendant was personally involved, the complaint fails to state a cognizable claim against him. Consequently, plaintiff's Eighth Amendment claims for deliberate indifference to plaintiff's medical needs are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim.

### C. First Amendment

#### 1. Retaliation

Plaintiff alleges that Copestick and Schieber assaulted him in retaliation for plaintiff's grievance against them. *See* Compl. at 6,13. To state a claim of retaliation under the First Amendment, a plaintiff must allege facts plausibly suggesting the following: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff – namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)). The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act." *Dawes*, 239 F.3d at 491, *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)); *Franco v. Kelly*, 854 F.2d 584, 590 (2d Cir. 1988).

*7  It is well-settled that filing a grievance is constitutionally protected conduct. *Johnson v. Eggersdorf*, 8 Fed.Appx. 140, 144 (2d Cir. 2001); *Graham v. R.J. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). A plaintiff can establish a causal connection that suggests retaliatory intent by showing that his protected activity was close in time to the complained-of adverse action. *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2001) (citations omitted). While there is no "bright line" defining the limits of the temporal relationship, courts in the Circuit have held that an adverse action taken within three months after a protected activity can reasonably be perceived as retaliatory. *See Gorman-Bakos v. Cornell Coop. Extn. of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001); *see also Ashok v. Barnhart*, No. 01-CV-1311, 289 F.Supp.2d 305, 314 (E.D.N.Y. Oct. 30, 2003) (the interval between a protected activity and an adverse action that results in a finding of retaliation is generally no more than several months).

At this juncture, the Court finds that plaintiff's retaliation claims against Copestick and Schieber survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

#### 2. Religious Claims

Plaintiff alleges that the defendants violated his religious rights because he was unable to participate in Ramadan and denied his religious meals as a direct result of the false misbehavior report. Dkt. No. 1 at 5-6.

Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause. *See Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). "Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, [however,] are the interests of prison officials charged with complex duties arising from administration of the penal system." *Id.* (citing *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990)). To state a First Amendment Free Exercise claim, a plaintiff must allege that (1) the practice asserted is religious in the person's scheme of beliefs, and that the belief is sincerely held; (2) the challenged practice of the prison officials infringes upon the religious belief; and (3) the challenged practice of the prison officials furthers some legitimate penological objective. *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir.

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

Case 6:24-cv-00687-GTS-MJK    Document 7    Filed 06/20/24    Page 21 of 96

2016 WL 6267968

1988) (citations omitted). A prisoner "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord*, 467 F.3d 263, 274–75 (2d Cir. 2006) (citing *Ford*, 352 F.3d at 591). [8] A religious belief is "sincerely held" when the plaintiff subjectively, sincerely holds a particular belief that is religious in nature. *Ford*, 352 F.3d at 590. A prisoner's sincerely held religious belief is "substantially burdened" where "the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin*, 76 F.3d 468, 476–77 (2d Cir. 1996). Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (quoting *Ford*, 352 F.3d at 595) (punctuation omitted).

[8]    The Second Circuit has yet to decide whether the "substantial burden" test survived the Supreme Court's decision in *Emp't Div. v. Smith*, 494 U.S 872, 887 (1990), in which the Court suggested that application of the test "puts courts in 'the unacceptable business of evaluating the relative merits of differing religious claims.' " *Ford*, 352 F.3d at 592 (quoting *Emp't Div.*, 494 U.S. at 887); *see also Williams v. Does*, 639 Fed.Appx. 55, 56 (2d Cir. May 6, 2016) ("We have not yet decided whether a prisoner asserting a free-exercise claim must, as a threshold requirement, show that the disputed conduct substantially burdened his sincerely held religious beliefs."); *Holland v. Goord*, 758 F.3d 215, 220-21 (2d Cir. 2014) (declining to decide whether a prisoner must show, as a threshold matter, that the defendants' conduct substantially burdened his sincerely held religious beliefs in connection with a First Amendment free exercise claim). In the absence of any controlling precedent to the contrary, I have applied the substantial-burden test in this matter.

**\*8** In this case, plaintiff has not alleged who issued the misbehavior report and it is not attached to the complaint. An inmate "has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schneider*, 105 F.3d 857, 862 (2d Cir. 1997). While a false misbehavior report may give rise to a claim under § 1983 "when done in retaliation for the exercise of a

constitutional right," *Willey v. Kirkpatrick*, 801 F.3d 51, 63 (2d Cir. 2015), here there is no such allegation. While the deprivation of religious meals in SHU may be sufficient to state a claim, *see Williams v. Does*, 639 Fed.Appx. 55, 56 (2d Cir. 2016); *Skates v. Shusda*, No. 9:14-CV-1092 (TJM/ DEP), 2016 WL 3882530, at **4-5 (N.D.N.Y. May 31, 2016), here there is no indication that the defendants had any personal involvement in that conduct. The allegations, without more, fail to plausibly suggest that any defendant burdened plaintiff's right to freely practice his religion. Thus, plaintiff's First Amendment claims against are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### D. Fourteenth Amendment

#### 1. Equal Protection/Discrimination

Plaintiff claims that the September 30, 2013 assault was racially motivated. *See* Compl. at 6, 12. "When verbal harassment and simultaneous physical abuse ... are considered together, [courts] have little doubt concluding that plaintiff's allegations [are] sufficient to state a § 1983 claim for discrimination on the basis of race. *Cole v. Fischer*, 379 Fed.Appx. 40, 43 (2d Cir. 2010). "Under the Fourteenth Amendment's Equal Protection clause, a plaintiff may be able to recover for a physical assault that would not meet the objective threshold for Eighth Amendment excessive force claims, if the defendant's conduct was motivated by racial or religious discrimination." *Bhuiyan v. Wright*, No. 9:06-CV-409 ATB, 2011 WL 1870235, at \*9 (N.D.N.Y. May 13, 2011) (citation omitted).

At this juncture, plaintiff has sufficiently plead a Fourteenth Amendment equal protection claim to warrant a response from Copestick and Schieber. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

#### 2. Due Process

Plaintiff claims that defendants violated his due process rights when they failed to replace plaintiff's eyeglasses. *See* Compl. at 10. Plaintiff also asserts that his Fourteenth Amendment rights were violated because he was improperly confined to the SHU without a hearing as a result of a

Case 6:24-cv-00687-GTS-MJK   Document 7   Filed 06/20/24   Page 22 of 96

Houston v. Collerman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

false misbehavior report. *See id.* at 10. During his SHU confinement, was allegedly unable to participate in Ramadan, denied his religious meals, denied parole, and excluded from mental health programs. *See id.*

### a. Property Claim

The Supreme Court has held that the negligent or intentional deprivation of prisoner's property may not be the basis for constitutional claims if sufficient post deprivation remedies are available to address the claim. *Hudson v. Palmer*, 468 U.S. 517, 531 (1984) (citing *Parratt v. Taylor*, 451 U.S. 527, 541 (1981)); *Davis v. New York*, 311 Fed.Appx. 397, 400 (2d Cir. 2009) (An alleged loss of property, "whether intentional or negligent – will not support a due process claim redressable under § 1983 if 'adequate state post-deprivation remedies are available.' ") (quoting *Hudson*, 468 U.S. 533). "New York in fact affords an adequate post-deprivation remedy in the form of, *inter alia*, a Court of Claims action." *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001). Because plaintiff has access to adequate state law remedies, he has not been deprived of property without due process of law and therefore cannot state a claim for relief pursuant to Section 1983. *See Love v. Coughlin*, 714 F.2d 207, 208-09 (2d Cir. 1983) (per curiam); *see also Aziz Zarif Shabazz v. Pico*, 994 F.Supp. 360, 473-74 (S.D.N.Y. 1998) (dismissing the plaintiff's claim that defendants destroyed his eyeglasses in violation of his due process rights). Thus, plaintiff's due process claims related to his eyeglasses are dismissed pursuant to 28 U.S.C. § 1915(e) (2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### b. SHU Confinement

**\*9** To establish a due process claim, plaintiff must establish: "(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001) (citation and internal quotation marks omitted). In this case plaintiff alleges that the false misbehavior report resulted in a SHU sentence.[9]

[9]    The complaint contains conflicting factual allegations related to the length of plaintiff's SHU confinement. Plaintiff claims that after "one month of being housed in SHU," he was released. *See*

Compl. at 5. In the Third Cause of Action, plaintiff claims that he served "over 60 days in SHU." *See id.* at 9.

A prisoner "has a liberty interest that is implicated by SHU confinement if it 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *J.S. v. T'Kach*, 714 F.3d 99, 106 (2d Cir. 2013) (quoting *Sandin v. Conner*, 515 U.S. 472, 484, (1995)); *see also Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). In making this determination courts are to consider, "among other things, the duration and conditions of confinement." *J.S.*, 714 F.3d at 106; *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009). The conditions of confinement are to be considered "in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." *Davis*, 576 F.3d at 134; *Palmer*, 364 F.3d at 66 n.4.

Although the Second Circuit has "explicitly avoided" creating "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights," the Court has established guidelines. *Palmer*, 364 F.3d at 65. W here the plaintiff is confined for "an intermediate duration –between 101 and 305 days – 'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required.' " *Id.* (quoting *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000)). While confinements for less than 101 days "under normal SHU conditions may not implicate a prisoner's liberty interest," such confinements "could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealy* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer*, 364 F.3d at 65; *see Davis*, 576 F.3d at 133.[10]

[10]    The Second Circuit has noted that "[i]n the absence of a detailed factual record, we have affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short –less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions." *Palmer*, 364 F.3d at 65-66; *see Davis*, 576 F.3d at 133. Absent allegations in the complaint that the conditions of confinement were in some way

Houston v. Coleman, Not Reported in Fed. Supp. (2016)

2016 WL 6267968

Case 6:24-cv-00687-GTS-MJK   Document 7   Filed 06/20/24   Page 23 of 96

atypical, however, many courts in this Circuit have granted motions to dismiss claims by plaintiffs with confinement exceeding thirty days when the plaintiffs failed to allege that the conditions of confinement were in some way atypical. *See, e.g., Acevedo v. Fischer*, No. 12-CV-6866, 2014 WL 5015470 at *15 (S.D.N.Y. Sept. 29, 2014) (citing cases involving confinements of between forty and fifty days which were dismissed for failure to allege a protected liberty interest because there were no allegations of unusual confinement).

**\*10** In this case, the duration of the confinement, 30 to 60 days, "was not long enough to constitute an atypical and significant deprivation by itself," and the Court therefore must "look to the conditions of confinement." *Palmer*, 364 F.3d at 66; *see also Davis*, 576 F.3d at 133. Plaintiff claims that while he was confined in the SHU, he was unable to participate in Ramadan, denied his religious meals, denied parole, and excluded from his mental health program. *See* Compl. at 5, 10; Dkt. No. 1-1 at 1.

It is well established that prisoners do not have a constitutional right to parole. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). "Where a state has created a statutory scheme for parole, the Due Process Clause protects prisoners insofar as they 'have a legitimate expectancy of release that is grounded in the state's statutory scheme.' " *Barna v. Travis*, 239 F.3d 169, 170–72 (2d Cir. 2001) (per curiam) (citing *Greenholtz*, 442 U.S. at 11–13). "New York's parole scheme is not one that creates in any prisoner a legitimate expectancy of release." *Barna*, 239 F.3d at 171. Plaintiff has failed to plead that his inability to participate in mental health programs impacted a protected liberty interest. *See Nieves v. Prack*, No. 6:15-CV-6101, 2016 WL 1165820, at *4 (W.D.N.Y. March 24, 2016) ("[Plaintiff's] claim that his inability ... to participate in various educational, vocational, rehabilitative or self-help programs might have hindered his ability to receive an early parole or release is ... speculative and fails to allege interference with a protected liberty interest.") (citations omitted). Here, the complaint lacks facts establishing when, how many times, and who deprived plaintiff of the right to attend his mental health program. With respect to plaintiff's religious claims, courts have found that the deprivation of communal religious services does not constitute an atypical and significant hardship. *See Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (finding that eighteen days in administrative segregation, including loss of exercise and access to religious services, did not constitute atypical and significant hardship); *Holland v.*

*Goord*, No. 05-CV-6295, 2006 WL 1983382, at *7 (W.D.N.Y. July 13, 2006) (holding the inability to attend Muslim services and celebrate the end of Ramadan while confined in the SHU for seventy-seven days is not an atypical hardship).

Even assuming that plaintiff had pled facts sufficient to show that his confinement imposed an atypical and significant hardship, however, and therefore pled the existence of a valid liberty interest, the complaint fails to state a claim based upon the Fourteenth Amendment and due process. It is well settled that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)). In this case, a hearing regarding the charges was held within two days of plaintiff's receipt of the misbehavior report. Plaintiff does not allege that he was denied any procedural due process during that hearing. Moreover, the complaint lacks facts suggesting that any named defendant issued the misbehavior report or presided over the disciplinary hearings. Based upon the aforementioned, plaintiff's Fourteenth Amendment claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. *See Livingston v. Kelly*, 561 F.Supp.2d 329, 332 (W.D.N.Y. 2008) (dismissing plaintiff's false-report claims because the plaintiff failed to allege that the disciplinary hearings on the reports did not meet constitutional due process standards).

### E. Failure to Respond to Grievances and Failure to Investigate

**\*11** Plaintiff also claims that his constitutional rights were violated because the facility grievance program is "never followed." *See* Compl. at 11. There is no constitutional right of access to the established inmate grievance program. *Davis v. Buffardi*, No. 9:01-CV-0285 (PAM/GJD), 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) ("[p]articipation in an inmate grievance process is not a constitutionally protected right"); *Shell v. Brzezniak*, 365 F.Supp.2d 362, 369-70 (W.D.N.Y. 2005) ("[i]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim"); *Cancel v. Goord*, No. 00. Civ. 2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) ("inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983"); *Mimms v. Carr*, No. 09-CV-5740, 2011 WL 2360059, at *10 (E.D.N.Y. June 9, 2011) ("It is well-established that

**Houston v. Collerman, Not Reported in Fed. Supp. (2016)**

2016 WL 6267968

Case 6:24-cv-00687-GTS-MJK   Document 7   Filed 06/20/24   Page 24 of 96

prison grievance procedures do not create a due-process-protected liberty interest.") (citing cases). Simply stated, there is no underlying constitutional obligation to afford an inmate meaningful access to the internal grievance procedure, or to investigate and properly determine any such grievance.

To the extent that plaintiff attempts to assert a separate constitutional claim based upon the Inspector General's failure to investigate, the law is also clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials. *Bernstein v. New York*, 591 F.Supp.2d 448, 460 (S.D.N.Y. 2008) (collecting cases); *Torres v. Mazzuca*, 246 F.Supp.2d 334, 341-42 (S.D.N.Y. 2003) (Prisoners do not have a due process right to a thorough investigation of grievances.); *DeShaney v. Winnebego Soc. Servs.*, 489 U.S. 189, 196 (1989) (The Due Process Clause confers no right to governmental aid, even where that aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual); *Pine v. Seally*, No. 9:09-CV-1198, 2011 W L 856426, at *9 (N.D.N.Y. Feb. 4, 2011) ("the law is ... clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials") (citing *Bernstein*, 591 F.Supp.2d at 460).

In this regard, plaintiff's claims do not involve a constitutional violation and are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### F. Cause of Action for Criminal Charges/Perjury

"New York does not recognize a common law cause of action for [...] perjury." *Harris v. Summers*, No. 5:14-CV-0013 (LEK/DEP), 2014 W L 1340032, at *5 (N.D.N.Y. Apr. 3, 2014) (citing *Carvel v. Ross*, No. 12-CV-0722, 2011 W L 856283, at *12 (S.D.N.Y. Feb. 16, 2011) (dismissing the plaintiff's perjury claim because "there [is] no private right of action" for perjury)). Moreover, plaintiff's claim is not actionable because it is well-settled that a private citizen does not have a constitutional right to bring a criminal complaint against another individual. *Harper v. New York Child Welfare Comm'rs,* No. 3:12-CV-0646 (NAM/DEP), 2012 WL 3115975, at *4 (N.D.N.Y. May 14, 2012) (citing *Linda R.S. v. Richard D.,* 410 U.S. 614, 619 (1973)). Consequently, plaintiff's request to charge defendants with "perjury" is dismissed for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).

### G. Injunctive Relief Against DOCCS

Plaintiff demands injunctive relief directing DOCCS to require "each officer" to wear body cameras to prevent future assaults and other related injunctive relief. *See* Compl. at 10-12. Plaintiff is presently confined at Mid-State C.F. and therefore, plaintiff's request for injunctive relief involving changes to the operation of security at Elmira C.F., is dismissed as moot. *See Edwards v. Horn,* No. 10 Civ. 6194, 2012 WL 760172, at *23 (S.D.N.Y. March 8, 2012) (dismissing the plaintiff's claim for injunctive relief because the plaintiff had been released from prison).

**\*12** Even assuming plaintiff's request is broader and intended to encompass all DOCCS facilities, the request is nonetheless improper and subject to dismissal. The PLRA provides "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of the particular plaintiff." 18 U.S.C. § 3626(a)(1)(A). "[A] proposed order directing the installation of securities cameras – is beyond the narrow scope permitted by the PLRA." *Barrington v. New York,* 806 F.Supp.2d 730, 750 (S.D.N.Y. 2011) (dismissing the plaintiff's request for injunctive relief seeking an order directing Green Haven to install security cameras as overly broad and unnecessary to correct the alleged past violations of his rights). Accordingly, plaintiff's request for injunctive relief is dismissed.

### VI. Conclusion
**ORDERED** that plaintiff's in forma pauperis application (Dkt. No. 2) is **GRANTED**; [11] and it is further

[11]   Plaintiff should note that, although the Court has granted his application to proceed in forma pauperis, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**ORDERED** that the Clerk provide the Superintendent of the facility, designated by plaintiff as his current location, with a copy of plaintiff's authorization form, and notify the official that this action has been filed and that plaintiff is required to pay the entire statutory filing fee of $350.00 pursuant to 28 U.S.C. § 1915; and it is further

**ORDERED** that the Clerk of the Court provide a copy of plaintiff's inmate authorization form to the Financial Deputy of the Clerk's Office; and it is further

**ORDERED** that the following claims are **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted: (1) plaintiff's § 1983 claims for monetary damages against DOCCS; (2) constitutional claims based upon the failure to adhere to the grievance policy and investigate; and (3) plaintiff's claims related to perjury and filing criminal charges against defendants; and it is further

**ORDERED** that the following claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted: (1) Eighth Amendment claims against defendants for deliberate indifference to plaintiff's serious medical needs; (2) First Amendment freedom of religion claims; (3) Fourteenth Amendment due process claims; and (4) claims for injunctive relief against DOCCS [12]; and it is further

[12]     If plaintiff wishes to pursue any claim dismissed without prejudice, he is advised to that, if accepted for filing, any amended complaint will entirely replace the original complaint and incorporation of prior claims is not permitted.

**ORDERED** that DOCCS is **DISMISSED** as a defendant herein; and it is further

**ORDERED** that the following claims survive the Court's sua sponte review under 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) and require a response: (1) the Eighth Amendment use of excessive force claims against defendants Copestick and Schieber; (2) the Eighth Amendment failure-to-intervene claim against defendant Collerman; (3) the First Amendment retaliation claims against defendants Copestick and Schieber; and (3) the Fourteenth Amendment equal protection claims against Copestick and Schieber; and it is further

**ORDERED**, that the Clerk shall issue summons and forward them, along with copies of the Complaint, to the United States Marshal for service upon the remaining defendants. The Clerk shall forward a copy of the Summons and Complaint to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**\*13 ORDERED**, that a response to the complaint be filed by the remaining defendants, or their counsel, as provided for in the Federal Rules of Civil Procedure;

**ORDERED**, that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; their failure to do so will result in the dismissal of his action**; and it is further

**ORDERED**, in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009), the Clerk of the Court is directed to provide plaintiff with copies of opinions from Westlaw and the Federal Appendix cited in this Decision and Order; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Decision and Order on plaintiff in accordance with the Local Rules.

Dated: October 26, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6267968

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

42 F.Supp.2d 192
United States District Court, N.D. New York.

Eugene BAKER, Plaintiff,

v.

Sheldon WILLETT, sued Individually and as
Deputy Sheriff of the Warren County Sheriff's
Department; Warren County Sheriff's Department;
and The County of Warren, New York, Defendants.

No. 97–CV–1184
|
March 10, 1999.

**Synopsis**

Jail inmate brought action against county, sheriff's department, and deputy sheriff, alleging deputy used excessive force on him in violation of § 1983, Constitution, and state law. On defendants' motion for summary judgment, the District Court, Hurd, United States Magistrate Judge, held that: (1) fact issues existed as to excessive use of force claim against deputy; (2) deputy was not entitled to qualified immunity; (3) state assault and battery claim was time barred; and (4) inmate could not maintain claims against county or sheriff's department.

Motion granted in part, and denied in part.

**Procedural Posture(s):** Motion for Summary Judgment.

West Headnotes (16)

**[1]    Sentencing and Punishment** 🔑 **Use of force**

In determining whether prison officers acted maliciously in using force, in violation of Eighth Amendment, court must consider: (1) need for force; (2) relationship between need and amount of force used; (3) extent of injury suffered; (4) extent of threat to safety of staff and inmates; and (5) any efforts made to temper severity of forceful response. U.S.C.A. Const.Amend. 8.

1 Case that cites this headnote

**[2]    Civil Rights** 🔑 **Criminal law enforcement; prisons**

**Summary Judgment** 🔑 **Prisons and jails**

Material issues of fact as to what transpired during incident between deputy sheriff and jail inmate precluded summary judgment for deputy in inmate's § 1983 suit, alleging excessive use of force. 42 U.S.C.A. § 1983.

**[3]    Civil Rights** 🔑 **Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general**

Doctrine of "qualified immunity" protects government officials from suits against them in their individual capacity for money damages, where their conduct does not violate clearly established statutory or constitutional rights of which reasonable person would have known.

1 Case that cites this headnote

**[4]    Sentencing and Punishment** 🔑 **Use of force**

Eighth Amendment prohibits use of excessive force upon prisoner. U.S.C.A. Const.Amend. 8.

8 Cases that cite this headnote

**[5]    Civil Rights** 🔑 **Prisons, jails, and their officers; parole and probation officers**

Sheriff's deputy was not entitled to qualified immunity in jail inmate's § 1983 suit alleging excessive use of force, since, at time of alleged incident, it was clearly established that unnecessary and wanton infliction of pain constituted cruel and unusual punishment in violation of Eighth Amendment, and Supreme Court had expressed guidelines to assist in determining whether conduct constituted excessive use of force. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

9 Cases that cite this headnote

**[6]    Civil Rights** 🔑 **Liability of Municipalities and Other Governmental Bodies**

Municipalities are included among those persons to whom § 1983 applies. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[7]**  **Municipal Corporations**  🖝  Nature and
status of departments or boards as corporations

Under New York law, police department cannot
sue or be sued, because it does not exist separate
and apart from municipality and does not have
its own legal identity.

115 Cases that cite this headnote

**[8]**  **Civil Rights**  🖝  Governmental Ordinance,
Policy, Practice, or Custom

For county to be held liable under §
1983, plaintiff must demonstrate that county
employee's actions were taken pursuant to
official municipal policy, custom, or practice. 42
U.S.C.A. § 1983.

3 Cases that cite this headnote

**[9]**  **Civil Rights**  🖝  Acts of officers and
employees in general;  vicarious liability and
respondeat superior in general

Municipal liability under § 1983 may not be
founded solely on municipality's employment of
tortfeasor. 42 U.S.C.A. § 1983.

**[10]**  **Civil Rights**  🖝  Criminal law enforcement;
prisons

In § 1983 suit, municipality's deliberate
indifference towards possible use of excessive
force by police officers may be inferred from
lack of supervision, such as lack of meaningful
attempts to investigate repeated complaints of
excessive use of force. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[11]**  **Civil Rights**  🖝  Presumptions, Inferences, and
Burdens of Proof

In § 1983 suit, municipality's persistent
failure to investigate complaints, or discipline
subordinates who violate civil rights, may give

rise to inference of negligent supervision. 42
U.S.C.A. § 1983.

**[12]**  **Civil Rights**  🖝  Criminal law enforcement;
prisons

Municipality's failure to discipline police officer
for single incident of illegality is not sufficient to
raise inference of municipal policy or custom in
violation of § 1983. 42 U.S.C.A. § 1983.

**[13]**  **Civil Rights**  🖝  Lack of Control, Training, or
Supervision;  Knowledge and Inaction

Liability may not be imposed on municipality
under § 1983 on basis of negligent administration
of otherwise adequate training program, or
because conduct actually resulting in injury
could have been avoided by more or better
training. 42 U.S.C.A. § 1983.

**[14]**  **Civil Rights**  🖝  Criminal law enforcement;
prisons

County could not be liable to jail inmate, who
alleged sheriff's deputy used excessive force
on him in violation of § 1983, on ground
that sheriff's department had practice of not
investigating force complaints or disciplining
officers, since fact that three of five meritorious
complaints in past ten years had been directed
toward one officer, who had been terminated
after disciplinary proceedings, showed that
department not only investigated claims asserted,
but also disciplined wrongdoers when necessary.
42 U.S.C.A. § 1983.

7 Cases that cite this headnote

**[15]**  **Civil Rights**  🖝  Criminal law enforcement;
prisons

County could not be liable to jail inmate under
§ 1983, on ground that sheriff's deputy, who
allegedly used excessive on inmate, was never
investigated or disciplined regarding incident,
where division commander brought incident to
attention of undersheriff, who spoke with inmate
and deputy, reviewed incident, and determined

that there was no need for formal investigation or to discipline deputy. 42 U.S.C.A. § 1983.

---

[16]  **Civil Rights** 🔑 Criminal law enforcement; prisons

County could not be liable to jail inmate under § 1983, on basis of negligent training of sheriff's deputy, who allegedly used excessive on inmate, even though sheriff's department regulations mandated annual course of in-service training, which included use of physical force, and deputy testified that he never received any new training subsequent to basic training, since inmate was not alleging that training program itself was deficient, only its administration. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

---

**Attorneys and Law Firms**

*194 Michael S. O'Dell, Glens Falls, New York, for plaintiff.

Fitzgerald, Morris, Baker, & Firth, P.C., Glens Falls, New York (Peter D. Fitzgerald, of counsel), for defendants.

---

### *MEMORANDUM–DECISION AND ORDER*

HURD, United States Magistrate Judge.

### I. *INTRODUCTION*

Plaintiff, Eugene Baker ("Baker" or "plaintiff") commenced this action on August 11, 1997, against the defendants as a result of injuries sustained while he was an inmate at the Warren County Jail in Lake George, New York. Baker asserts causes of action under 42 U.S.C. §§ 1983 and 1988, the First, Fourth, Fifth, and Fourteenth Amendments, and a pendent state law claim. The defendants have moved for summary judgment pursuant to Fed.R.Civ.P. 56. This matter was submitted for decision without oral argument.

### II. *BACKGROUND*

#### A. *Facts*

The following is most favorable to the nonmoving plaintiff. On April 29, 1996, Baker was sitting on a metal table, his feet not touching the ground, watching television from a catwalk adjacent to his cell. When defendant Sheldon Willett ("Willett"), a corrections officer employed by the defendant Warren County Sheriff's Department, stood in front of the television *195 screen, an unidentified inmate called Willett a "fat boy" and demanded that he move out of the way. Willett subsequently stopped in front of Baker, who told Willett, "Keep going fat boy." Willett left to continue his rounds of the jail, returning several minutes later. Baker was conversing with another inmate and did not notice Willett return. When Baker was not looking, Willett pushed him in the back, causing him to fall off of the table and strike his head on the metal bars of his cell approximately four to five feet away from where he had been sitting. Plaintiff sustained a laceration on his forehead which required sutures. Willett completed an incident report that evening. The division commander informed Undersheriff Larry Cleveland ("Undersheriff Cleveland") of the incident. Undersheriff Cleveland reviewed the incident and spoke to both Baker and Willett. No formal investigation was conducted and Willett was not disciplined.

#### B. *Motion*

The causes of action alleged against Willett, in his individual and official capacities, are for excessive use of force and assault and battery; and against the defendants County of Warren ("County") and the Warren County Sheriff's Department are for deliberate indifference as a result of negligent training and supervision of personnel.[1] Defendants' motion asserts that there is no basis for municipal liability, that Willett did not use excessive force, and that he is entitled to qualified immunity. In addition, defendants claim that plaintiff's pendent state claim for assault and battery is barred by the Statute of Limitations because plaintiff did not file a notice of claim within ninety days, and did not file suit within one year and ninety days of the alleged conduct which is the subject of his complaint. Plaintiff opposes the motion.

---

[1]  More specifically, plaintiff's first cause of action alleges excessive use of force inflicted by Willett; the second, fourth, fifth, and sixth causes of action allege municipal liability for Willett's conduct; and the third cause of action alleges assault and battery by Willett, in his official capacity as a corrections officer.

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983).

When the moving party has met the burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. 1348. At that point, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby Inc.,* 477 U.S. at 250, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348. To withstand a summary judgment motion, evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.,* 477 U.S. at 248–249, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348. Thus, **\*196** summary judgment is proper where there is "little or no evidence ... in support of the non-moving party's case." *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–1224 (2d Cir.1994) (citations omitted).

### B. *Excessive Use of Force Claim against Willett*

#### 1. *Standard*

 **[1]**    The Eighth Amendment prohibits "the unnecessary and wanton infliction of pain." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). When prison officials are accused of using excessive force, the standard is "whether [the] force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers,* 475 U.S. 312, 320–21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). Conduct must be " 'inconsistent with contemporary standards of decency' and 'repugnant to the conscience of mankind' " to be actionable under the Eighth Amendment. *Id.* at 327, 106 S.Ct. 1078 (quoting *Estelle,* 429 U.S. at 103, 106, 97 S.Ct. 285). Five factors relevant in determining whether officers acted maliciously are: The need for force, the relationship between the need and the amount of force used, the extent of the injury suffered, the extent of the threat to the safety of staff and inmates, and any efforts made to temper the severity of a forceful response. *See id.* at 321, 106 S.Ct. 1078 (citing *Glick,* 481 F.2d at 1033); *see also Hudson v. McMillian,* 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson,* 503 U.S. at 9, 112 S.Ct. 995. *De minimis* uses of physical force are excluded from Constitutional recognition as long as the force used is "not of a sort repugnant to the conscience of mankind." *Id.* at 9–10, 112 S.Ct. 995.

#### 2. *Review*

The parties present different versions of what happened before and after the incident, as well as different characterizations of Willett's conduct. Willett, who stands over six feet tall and weighs approximately two hundred sixty pounds, claims that he tapped Baker, who is five feet four inches tall and weighs approximately one hundred fifty pounds, on the shoulder and asked him what was happening. Willett asserts that plaintiff became startled, stumbled, and hit his head on the food tray attached to his cell. Willett claims that he later apologized to Baker for startling him. Baker, on the other hand, claims that insults had been levied against Willett a few minutes before Willett "hit [him] in the back," knocking Baker into the bars of his cell. (Baker Dep. at p. 20.) Plaintiff claims that Willett later apologized for hitting him so hard.

As noted above, for the purpose of this motion, the facts must be viewed most favorably to the plaintiff. However, the defendants claim that the distinctions between each party's version of the facts do not matter. They assert that plaintiff's injury was not sufficiently serious to implicate the Eighth Amendment because Baker's initial reaction after striking his head was that he did not think the injury was serious. In addition, the defendants claim that Baker's actual injury was

not causally connected to Willett's conduct, as evidenced by his failure to claim a back injury. Finally, the defendants assert that plaintiff cannot demonstrate malice because of Willett's claim that he merely tapped Baker and the subsequent events were merely "ill-fated circumstances." (Defs.' Mem. of Law in Supp. of Mot. for Summ.J. at 5.)

[2]    The defendants' assertions fail to banish the genuine issues of material fact which remain in this case. Baker's immediate **\*197** response to a head injury could be the result of many factors and is hardly determinative regarding the seriousness of the injury. The fact that he did not claim a back injury is of no moment. The resulting injury to plaintiff's head was the product of a chain of events which commenced when Willett made contact with plaintiff's back. Thus plaintiff's injury is traceable to Willett's conduct. The competing versions of the events occurring before, during, and after the incident require findings to be made regarding the defendant's motivation and intent, the amount of force used, and the nature and extent of the injuries received by the plaintiff. These are issues of fact which cannot be resolved on a motion for summary judgment.

### 3. *Qualified Immunity*

[3]    The doctrine of qualified immunity protects government officials from suits against them in their individual capacity for money damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). A right is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Three factors are utilized to determine whether a right was clearly established: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). Even if a right is clearly established, "the defendants may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established prohibition." *In re State Police Litig.,* 88 F.3d 111, 123 (2d Cir.1996).

[4]    [5]    The Eighth Amendment prohibits the use of excessive force upon a prisoner. At the time of the alleged incident, it was clearly established that the unnecessary and wanton infliction of pain constituted cruel and unusual punishment in violation of the Eighth Amendment. *See Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). Moreover, the Supreme Court expressed guidelines to assist in determining whether conduct constituted an excessive use of force. *See Whitley,* 475 U.S. 312, 321, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Plaintiff has asserted a violation by Willett of a clearly established right to be free from excessive use of force. Willett is not entitled to qualified immunity.

### C. *Supplemental State Claim for Assault and Battery Against Willett*

As a condition precedent to suits against a municipality or its employees, a plaintiff must serve a notice of claim within ninety days after the claim arises. N.Y.Gen.Mun.Law § 50–e(1)(a) (McKinney 1986). In tort actions against a municipality, in addition to serving a notice of claim, a plaintiff must allege in the complaint that at least thirty days have elapsed since the service of the notice of claim and that adjustment or payment has been neglected or refused. § 50–i(1). Finally, the tort action must "be commenced within one year and ninety days after the happening of the event upon which the claim is based...." *Id.*

In the present case, plaintiff's third cause of action alleges assault and battery by Willett in his official capacity, which occurred on April 29, 1996. Plaintiff did not commence suit until August 11, 1997. Plaintiff did not file any notice of claim, nor did he commence this suit within one **\*198** year and ninety days as prescribed by the statute. Therefore, plaintiff's supplemental state claim must be dismissed.

### D. *Claims Against the County and the Sheriff's Department*

#### 1. *Standard*

[6]    [7]    Municipalities are included among those persons to whom § 1983 applies. *Monell v. Department of Social Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Under New York law, a county is a municipal corporation capable of bringing suit and being sued. *See* N.Y.Gen.Mun.Law § 2 (McKinney 1986). A police department is an administrative arm of the municipal

corporation. *Loria v. Town of Irondequoit,* 775 F.Supp. 599, 606 (W.D.N.Y.1990); *Willard v. Town of Hamburg,* No. 96–CV–0187E(H), 1996 WL 607100, at *1 (W.D.N.Y. Sept.30, 1996).* A police department cannot sue or be sued because it does not exist separate and apart from the municipality and does not have its own legal identity. *Loria,* 775 F.Supp. at 606; *East Coast Novelty Co. v. City of New York,* 781 F.Supp. 999, 1010 (S.D.N.Y.1992); *Wilson v. City of New York,* 800 F.Supp. 1098, 1101 (E.D.N.Y.1992).

Defendants correctly claim that plaintiff's claims against the Warren County Sheriff's Department and the County are redundant. Since the sheriff's department is merely an administrative arm of the County, and the County is the real party in interest here, the claims asserted against the Warren County Sheriff's Department are dismissed as redundant. *See Curran v. City of Boston,* 777 F.Supp. 116 (D.Mass.1991). Accordingly, the remainder of this opinion addresses plaintiff's municipal liability claims with respect to the County only.

**[8]  [9]**  In order for the County to be held liable under § 1983, plaintiff must demonstrate that Willett's actions were taken pursuant to an official municipal policy, custom, or practice. *Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018; *Vann v. City of New York,* 72 F.3d 1040 (2d Cir.1995). However, municipal liability may not be founded solely on a municipality's employment of a tortfeasor. *Monell,* 436 U.S. at 691, 98 S.Ct. 2018. Absent an explicitly stated rule or regulation, a plaintiff must show "that the municipality, alerted to the possible use of excessive force by its police officers, exhibited deliberate indifference." *Vann,* 72 F.3d at 1049.

**[10]  [11]  [12]**  Deliberate indifference may be inferred from lack of supervision, such as the lack of meaningful attempts to investigate repeated complaints of excessive use of force. *See id.; see also Fiacco v. City of Rensselaer,* 783 F.2d 319 (2d Cir.1986) (holding that a number of complaints of police brutality together with evidence of the municipality's treatment of the complaints was relevant to the issue of negligent supervision), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987); *Mendoza v. City of Rome,* 872 F.Supp. 1110 (N.D.N.Y.1994). However, the complaints standing alone are not sufficient; it is the combination of repeated complaints and the municipality's response to such complaints which "tip[ ] the scales toward the probative." *Mendoza,* 872 F.Supp. at 1118. Persistent failure to investigate complaints or discipline subordinates who violate civil rights

may give rise to an inference of negligent supervision. *Batista v. Rodriguez,* 702 F.2d 393 (2d Cir.1983); *Powell v. Gardner,* 891 F.2d 1039 (2d Cir.1989). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy...." *Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Anderson v. City of New York,* 657 F.Supp. 1571, 1574–75 (S.D.N.Y.1987). Failure to discipline an officer for a single incident of illegality is not sufficient to raise an inference of a municipal policy or custom. *Turpin v. Mailet,* 619 F.2d 196, 202 (2d Cir.), *cert.* **\*199** *denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980).

**[13]**  There are limited circumstances in which municipalities can be found liable under § 1983 for failure to train employees. *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). "[T]he inadequacy of police training may serve as a basis for § 1983 liability only where the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388, 109 S.Ct. 1197.

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which [it] may be held liable if it actually causes injury.

*Id.* at 390, 109 S.Ct. 1197. Liability may not be imposed upon a municipality merely because a particular officer may have been unsatisfactorily trained, "for the officer's shortcomings may have resulted from factors other than a faulty training program." *Id.* at 390–91, 109 S.Ct. 1197 (citations omitted). Liability may not be imposed on the basis of negligent administration of an otherwise adequate

training program or because the conduct actually resulting in injury could have been avoided by more or better training. *Id.* at 391, 109 S.Ct. 1197. In addition, rather than merely alleging a need for training, a plaintiff must "show how a particular policymaker's specific choice with respect to the training deficiency at issue reflects 'deliberate indifference' to their constitutional rights, and how this indifference directly caused their injuries." *Ferreira v. Westchester County,* 917 F.Supp. 209, 215–16 (S.D.N.Y.1996) (citing *Canton,* 489 U.S. at 391, 109 S.Ct. 1197 (stating that "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable")).

### 2. *Review*

In support of his claims against the county for deliberate indifference and negligent supervision, Baker relies on the County's responses to interrogatories and an affidavit from Undersheriff Cleveland. One particular interrogatory sought information regarding all lawsuits which the County, the Sheriff's Department, or any officer had been involved in the ten years prior to the date of the incident. The defendants answered that

> In excess of thirty (30) to forty (40) such actions have been commenced during the ten year period requested. It is burdensome and would require in excess of eighty (80) hours to research the material you request. After reviewing these interrogatories, should you still feel these documents are relevant and needed, we should talk to the court about an amendment of the scheduling order to accommodate time to provide them.

(Pl.'s Mem. in Opp. to Mot. for Summ.J.Ex. O.) Plaintiff did not pursue this matter further, yet contends that this answer supports the conclusion that the County either fails to maintain adequate records or fails to investigate complaints despite the significant amount of lawsuits asserted each year. However, his conclusion is unpersuasive. Merely requiring additional time to obtain voluminous material does not necessarily imply a failure to investigate claims. To the contrary, it indicates that records do exist concerning investigation of complaints. In addition, since plaintiff did not

follow up on this interrogatory, the nature of these lawsuits has not been established. Without knowing this, the relevance of plaintiff's request is suspect at this point.

**[14]**    Baker asserts that his claim of deliberate indifference and negligent supervision **\*200** is also justified because the one to two use of force complaints per year and the five meritorious complaints in the past ten years made the County aware of "the significant number of complaints and founded reports," and yet it failed to formally investigate Willett's conduct or discipline him. (Pl.'s Mem. of Law in Opp. to Mot. for Summ. J. at 11.) However, three of the five meritorious complaints were directed toward one officer who was terminated after disciplinary proceedings. This shows that the sheriff's department not only investigated claims asserted, but also disciplined wrongdoers when necessary.

**[15]**    The fact that no formal investigation ensued subsequent to the incident in this case, and that Willett was not disciplined, does not provide a basis for municipal liability. Undersheriff Cleveland sets forth the rules and procedures with respect to investigation of complaints of excessive use of force. (*See* Cleveland Aff.) The division commander brought the incident at issue in this case to the attention of Undersheriff Cleveland. Cleveland spoke to Baker and Willett, reviewed the incident, and determined that there was no need for a formal investigation or to discipline Willett. This decision is supported by the fact that Willett had no history of violence or misconduct at the jail and was never a party to any other use of force complaints. Additionally, plaintiff cannot merely rely on the failure to discipline Willett for this single incident to establish a municipal custom or policy for which the County is liable. That is precisely what plaintiff is attempting to do. Therefore, plaintiff has failed to raise a genuine issue of material fact to survive summary judgment with respect to his claim of negligent supervision.

**[16]**    Baker has also failed to raise a genuine issue of material fact with respect to the issue of negligent training. He relies on the fact that department regulations mandated an annual course of in-service training, which includes training in the use of physical force, and that Willett testified at his deposition that he never received any new training subsequent to the basic training he received. In addition, Willett claimed he was never tested on written materials distributed and explained in meetings which were held twice a year. Plaintiff is not alleging that the training program itself is deficient, only its administration. This is insufficient to establish municipal liability. *See Canton,* 489 U.S. at 391, 109 S.Ct. 1197.

Plaintiff has failed to demonstrate any genuine issue of material fact with respect to any municipal custom, policy, or practice on the part of the County. Therefore, plaintiff's claims against the County must also be dismissed.

### IV. *CONCLUSION*

Genuine issues of material fact exist with regard to Baker's excessive use of force claim against Willett. However, the plaintiff has been unable to support the remaining allegations in his complaint.

Accordingly, it is hereby

ORDERED that

1. Plaintiff's second, third, fourth, fifth and sixth causes of action are DISMISSED;

2. The complaint is DISMISSED against defendants Warren County Sheriff's Department and the County of Warren, New York; and

3. Defendant's motion for summary judgment with respect to plaintiff's first cause of action is DENIED.

IT IS SO ORDERED.

**All Citations**

42 F.Supp.2d 192

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by   Hogan v. County of Lewis, N.Y.,   N.D.N.Y.,   March 8, 2013

2010 WL 335581
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
E.D. New York.

Erwin JACKSON, Plaintiff,
v.

COUNTY OF NASSAU, Nassau County
Police Department, and Office of the Nassau
County District Attorney, Defendants.

No. 07-CV-245 (JFB)(AKT).
|
Jan. 22, 2010.

**Attorneys and Law Firms**

Erwin Jackson, pro se.

Ralph J. Reissman and Sara A. Wells of the Nassau County Attorney's Office, Mineola, NY, for defendants.

**MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge.

 **\*1** On January 17, 2007, pursuant to 42 U.S.C. § 1983, *pro se* plaintiff Erwin Jackson ("plaintiff" or "Jackson") brought this action against defendants County of Nassau ("the County"), Nassau County Police Department, and the Office of the Nassau County District Attorney alleging that defendants violated plaintiff's rights under the First, Fourth, and Fourteenth Amendments of the United States Constitution. Specifically, Jackson claims that his constitutional rights were violated during his pretrial proceedings when police officers allegedly withheld exculpatory evidence, made perjurous statements, and falsely verified felony complaints against plaintiff when they had no personalknowledge of the underlying facts. Jackson further contends that the County of Nassau has a policy of committing these constitutional violations. Jackson also alleges that the County of Nassau

has a policy of failing to investigate criminal complaints regarding these types of violations if they are filed by pretrial detainees or criminal defendants. The defendants now move, jointly, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, defendants' motion is granted.

## I. FACTS

The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the defendants' respective Rule 56.1 statements of facts. [1] Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party-here, the plaintiff. *See Capobianco v. City of New York,* 422 F.3d 47, 50 n. 1 (2d Cir.2001). Unless otherwise noted, where a party's 56.1 statement or deposition is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it. [2]

[1]     The Court notes that plaintiff failed to file and serve a response to defendant's Local Rule 56.1 Statement of Facts in violation of Local Civil Rule 56.1. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 504 (S.D.N.Y.2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.,* 262 F.Supp.2d 134, 139 (S.D.N.Y.2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted); *see also Gilani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at \*2 (E.D.N.Y. Apr. 26, 2006) (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). In plaintiff's opposition papers, he specifically identified those paragraphs of defendants' Rule 56.1 statement with which he agreed that there were no material disputed issues of fact. The Court, in its discretion, thus relies on those paragraphs as equivalent to plaintiff's Rule 56 .1 statement of facts for the purposes of this

opinion. In the exercise of its broad discretion and given plaintiff's *pro se* status, the Court will also only deem admitted those facts in defendant's Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy,* 292 F.Supp.2d at 504-05.

2     Because plaintiff is *pro se,* the Court has independently reviewed plaintiff's deposition testimony. Plaintiff's deposition contains no additional evidence other than plaintiff's speculation and conclusory allegations.

### A. The Underlying Prosecution

On November 22, 2005, plaintiff Erwin Jackson was arrested by Nassau County police officers for attempted robbery of the Bank of America located in Baldwin, New York, on November 21, 2005. (Defs.' 56.1 Statement ¶ 4.) Plaintiff was brought to the Bellmore police station, where he was questioned about the November 21, 2005 robbery. (Deposition of Irwin Jackson, Defs.' Ex. E (hereinafter "Pl.'s Dep.") at 32-33.) At the station, Jackson was also questioned about other bank robberies. (*Id.* at 34-35.) Plaintiff was arrested and arraigned on November 23, 2005. He was charged for the November 21 robbery and four additional robberies that had occurred in Nassau County on November 13, 2005, October 1, 2005, September 2, 2005, and July 23, 2005. (*Id.* at 40-41; Defs.' 56.1 Statement ¶ 5.) Plaintiff was indicted by a grand jury on thirteen counts on December 19, 2005. (Pl.'s Dep. at 44-45.) In June 2006, a pretrial suppression hearing was held, at which Police Officer Joseph Hughes testified. (*Id.* at 45-46.) Plaintiff proceeded to trial on the charges and, on February 6, 2007, was found guilty on nine counts of Robbery in the First Degree (New York Penal Law 160.15) and one count of Conspiracy in the Fourth Degree (New York Penal Law 105.10). (*Id.* at 53-54.) On July 30, 2008, Jackson was sentenced to fifteen years for each of the nine counts of Robbery in the First Degree, plus one year and four months for Conspiracy in the Fourth Degree. (Defs.' 56.1 ¶ 8.) Jackson's minimum aggregate sentence was set at twenty-five years, eight months and sixteen days. (*Id.* ¶ 9.)

### B. Officer Hughes

**\*2** By letter dated September 17, 2006, while a pretrial detainee, Jackson filed three criminal complaints against Police Officer Joseph Hughes with the Nassau County District Attorney's Criminal Complaint Unit. (*Id.* ¶ 10.) The complaints were based on Officer Hughes's allegedly inconsistent testimony at a pretrial suppression hearing. Jackson alleges that while testifying before the Grand Jury in December 2005, Officer Hughes stated that he observed five black males fleeing a four-door Buick wearing face masks. During a subsequent pretrial hearing on July 10, 2006, plaintiff cross-examined Officer Hughes. At that hearing, Officer Hughes stated that only some of the males he observed were wearing face masks. The testimony at the July 10 pretrial hearing was as follows:

Q: This individual jumps out of the car. This is the individual that you pursued after?

A: Correct. * * *

Q: Did he have mask on? A: No mask.

Q: No mask. You testified in the grand jury that all five of the occupants of that car that fled had masks on?

A: I was incorrect about that. I stated that before.

Q: That information wasn't true?

A: It was incorrect. * * *

Q: You testified they all had masks on. Now, you're saying, you take the mask off one-

A: I believe in that statement. I was describing all the occupants. I said, they all had masks on. I was incorrect. I should have said, some had masks on.

(*Id.* ¶ 12 (citing Ex. AB at 485-86).)

Jackson also claims Officer Hughes made a "punishable false written statement" and committed the crime of "offering a false instrument for filing" by verifying and signing five felony complaints against plaintiff, although Officer Hughes had no personal knowledge of the information contained in those complaints and relied on information provided by other officers. (*Id.* ¶¶ 13-14.) According to Jackson, during the pretrial hearing and trial of his co-defendant Paul Henry, Officer Hughes testified that it was police procedure for officers to verify and swear to felony complaints even though they lacked knowledge of the underlying facts or crimes alleged therein. (Pl.'s Dep. at 61.) Jackson also alleges that Hughes testified to this at Jackson's own trial on cross-examination. (*Id.* at 61-62.)

On September 21, 2006, Assistant District Attorney ("ADA") Thurer transferred plaintiff's perjury complaint against Officer Hughes to ADA Barbara Kornblau, Chief of the Public Corruption Bureau. (*Id.* ¶ 15.) ADA Kornblau reviewed plaintiff's complaint against Officer Hughes. Because plaintiff's case was still pending and "the issues alleged by plaintiff all pertained to credibility," (Defs.' Ex. K ¶ 6), ADA Kornblau notified Daniel Looney, the ADA prosecuting plaintiff, and plaintiff's attorney, Jeffrey Groder, of plaintiff's claims. The District Attorney's Office later informed Jackson that it also forwarded the case to the Internal Affairs Bureau of the Nassau County Police Department for administrative action at their discretion. (Pl.'s Dep. at 56; Defs.' 56.1 ¶ 16.) After receiving plaintiff's complaint from the District Attorney's Office, the Nassau County Police Department's Internal Affairs Bureau "determined that plaintiff's complaint against Officer Hughes for perjury was unfounded, since plaintiff had been convicted in a jury trial on February 6, 2007." (Defs.' 56.1 ¶ 18.)

### C. Detective Comiskey

**\*3** Jackson also filed criminal complaints against Detective Joseph Comiskey with the Nassau County District Court. (Pl.'s Dep. at 58-59.) According to Jackson, Detective Comiskey committed "official misconduct" and perjury for allegedly failing to provide plaintiff with "exculpatory material" in July 2006 at a pretrial hearing, and for advising the court that he had turned over all of his notes when, according to Jackson, he had not done so. (Defs.' 56.1 ¶ 19.) ADA Steven L. Schwartz, Chief of the Nassau County District Attorney's District Court Bureau, investigated these two complaints against Detective Comiskey, and found the claims in them unfounded. (*Id.* ¶ 20.) Plaintiff was subsequently informed that the District Attorney's Office declined to prosecute these complaints. (*Id.*) These complaints were also reviewed by ADA Kornblau, who determined that Detective Comiskey's actions were not a crime. (*Id.* ¶ 22.) Subsequently, as she had done with the complaint against Officer Hughes, she forwarded the complaints to the Nassau County Police Department Internal Affairs Bureau. (*Id.* ¶ 22.) ADA Kornblau also sent a letter to Jeffrey Groder, plaintiff's trial counsel, informing him of plaintiff's allegations, since they pertained to an incident in which Groder was involved. (*Id.*)

### D. The Instant Complaint

Jackson alleges eleven causes of action against the County of Nassau and two of its administrative arms, the Nassau County District Attorney's Office and the Nassau County Police Department, arguing that these entities had unconstitutional policies, practices, and customs that infringed his constitutional rights. Jackson asserts three claims specifically against the County of Nassau. First, he alleges that the County had a policy of failing to discipline its employees for any alleged perjury or cover-ups with respect to evidence. (Compl. at 5; Pl.'s Dep. at 93.) Jackson's second cause of action claims that the County has a policy, practice, procedure and custom of failing to take steps to terminate the unconstitutional practices of "its legal subordinates," defendants Nassau County Police Department and the Nassau County District Attorney's Office. (Compl. at 5; Pl.'s Dep. at 93-94.) Jackson's third cause of action alleges that the County has failed to properly train and supervise its employees with regard to "the proper constitutional and statutory requirements in the exercise of their authority." (Compl. at 5; Pl.'s Dep. at 94.)

Jackson asserts four claims against the Nassau County Police Department. The fourth cause of action in Jackson's complaint alleges that the Nassau County Police Department has a policy that authorizes subordinates to falsely verify and file criminal felony complaints without "knowledge of or knowledge based upon belief" of the underlying facts. (Compl. at 5; Pl.'s Dep. at 95.) The fifth cause of action alleges that the Nassau County Police Department failed to properly train and supervise its employees in the processing of arrestees. (Compl. at 5-6.) Specifically, Jackson contends that, due to inadequate training, employees of the Nassau County Police Department do not realize "that they are not authorized to swear or fill out a felony complaint that they have absolutely no knowledge of." (Pl.'s Dep. at 96.) The sixth cause of action in Jackson's complaint claims that the Nassau County Police Department has an illegal practice or custom that condones and sanctions its employees who commit perjury, which is demonstrated by the fact that plaintiff, a pretrial criminal defendant, attempted to file criminal charges against the defendants' subordinates, but the defendants took no corrective actions. (*Id.* at 96-97; Compl. at 6.) Jackson's seventh cause of action alleges that the Nassau County Police Department, as a policy maker, has a defective and illegal policy whereby it does not correct or punish wrongdoings,

such as those alleged in causes of action numbers four, five, and six. (Compl. at 6; Pl.'s Dep. at 97-98.)

**\*4** Jackson asserts his four final claims against the Nassau County District Attorney's Office. Jackson's eighth cause of action alleges that the Nassau County District Attorney's Office has a history and practice of ignoring criminal defendants' and arrestees' complaints, ignoring evidence of police misconduct, and shielding police officers and other assistant district attorneys from prosecution. (Compl. at 6.) Jackson's ninth cause of action alleges that the Nassau County District Attorney's Office does not give "any credence to pretrial criminal defendants who seek to file and give any credence to pretrial criminal defendants that seek to commence criminal actions in the court against public officials." (*Id.* at 130.) Specifically, plaintiff contends that the Nassau County District Attorney's Office declines to investigate, arrest, and/or prosecute public officials when illegal conduct is alleged by pretrial or criminal defendants. (Compl. at 6-7.) Jackson's tenth cause of action alleges that the Nassau County District Attorney's Office has failed to punish the illegal practices and wrongdoings of their employees and the Nassau County Police Department. (Compl. at 7.) Jackson's eleventh and final cause of action contends that the Nassau County District Attorney's Office has a policy and procedure whereby the district court clerk does not submit or file any claims or complaints against a public official made by criminal defendants. (Compl. at 7.)

## II. PROCEDURAL HISTORY

Jackson filed the complaint in this action on January 17, 2007. The Court granted plaintiff leave to proceed *in forma pauperis* on January 31, 2007. Defendants filed an answer to the complaint on May 23, 2007. On March 14, 2008, plaintiff filed a motion to amend the complaint. This Court denied that motion on February 13, 2009. On May 15, 2009, defendants submitted their motion for summary judgment and provided *pro se* plaintiff with the notice required by Local Civil Rule 56.2. Defendant submitted supplemental papers to their motion on June 5, 2009. Plaintiff submitted opposition papers on May 28, 2009. [3] Defendants filed their reply to plaintiff's opposition on June 5, 2009. Plaintiff also submitted a motion for sanctions against defendants on June 10, 2009. Defendants submitted their opposition to the motion for sanctions on June 11, 2009. This matter is fully submitted.

[3]     Due to delay, it appears that plaintiff's response was not filed with the Court until June 11, 2009.

## III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir.2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

**\*5** Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.* ' " *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (emphasis in original). As the Supreme Court stated in *Anderson,* "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary

2010 WL 335581

judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " *BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996) (quoting *Research Automation Corp.,* 585 F.2d at 33).

Where the plaintiff is proceeding *pro se,* the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel v. Bd. of Educ. of the City of N.Y.,* 287 F.3d 138, 145-46 (2d Cir.2002) (alterations in original) (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000)). Though a *pro se* litigant's pleadings and other submissions are afforded wide latitude, a *pro se* party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat a motion for summary judgment. *Shah v. Kuwait Airways Corp.,* --- F.Supp.2d ----, No. 08 Civ. 7371(GEL), 2009 WL 2877604, at *2 (S.D.N.Y. Sept. 9, 2009) ("Even a *pro se* party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.' " (quoting *Auguste v. N.Y. Presbyterian Med. Ctr.,* 593 F.Supp.2d 659, 663 (S.D.N.Y.2009))).

### IV. DISCUSSION

### A. Proper Defendants

Plaintiff alleges specific causes of action against the Nassau County Police Department and Nassau County District Attorney's Office as defendants. However, "under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued." *See Davis v. Lynbrook Police Dep't,* 224 F.Supp.2d 463, 477 (E.D.N.Y.2002) (dismissing claim against Lynbrook Police Department); *see also Hall v. City of White Plains,* 185 F.Supp.2d 293, 303 (S.D.N.Y.2002) ("Because plaintiff has named the City of White Plains as a defendant, any claims against the [White Plains Department of Public Safety] are redundant. WPDPS does not have its own legal identity, and therefore the claims against it are dismissed."); *Polite v. Town of Clarkstown,* 60 F.Supp.2d 214, 216 (S.D.N.Y.1999) ("[M]unicipal departments in this State-such as the Clarkstown Police Department-are not amenable to suit, and no claims can lie directly against them."); *Wilson v. City of New York,* 800 F.Supp. 1098, 1101 (E.D.N.Y.1992) ("The court also dismisses the claims against the New York City Police Department, which cannot be sued

independently because it is an agency of the City of New York." (citations omitted)). Plaintiff's allegations against the Police Department are more properly raised in claims against Nassau County, which plaintiff has also brought in his first, second, and third causes of action. Accordingly, the Nassau County Police Department is dismissed as a defendant.

**\*6** For the same reason, plaintiff cannot bring claims against the Nassau County District Attorney's Office. *See Conte v. County of Nassau,* No. 06-CV-4746 (JFB)(ETB), 2008 WL 905879, at *1 n. 2 (E.D .N.Y. Mar. 31, 2008) (dismissing Section 1983 claims against the Nassau County District Attorneys Office because the entity is an " 'administrative arm[ ]' of the same municipal entity-the County ... and thus lack[s] the capacity to be sued"). Plaintiff's allegations against the District Attorneys Office are more properly brought as claims against Nassau County. Plaintiff has brought substantially the same claims against the District Attorney's Office as he has brought against the County of Nassau. Accordingly, the Nassau Count District Attorney's Office is dismissed as a defendant in this case. [4] Because the plaintiff is proceeding *pro se,* the Court, in its discretion, does not dismiss plaintiff's fourth through eleventh causes of action in their entirety, but rather construes those claims, which are largely duplicative of causes of action one through three, as against the County of Nassau.

[4]     The Court further notes that it has previously denied plaintiff's attempt to amend his complaint to state claims against Lawrence Mulvey, the Commissioner of the Nassau County Police Department, and Kathleen Rice, the Nassau County District Attorney. *See Jackson v. County of Nassau,* No. 07-CV-0245 (JFB)(AKT), 2009 WL 393640 (E.D.N.Y. Feb. 13, 2009).

### B. Section 1983 Liability

As stated *supra,* Jackson has brought his claims pursuant to Section 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan,* 443 U.S. 137, 145 n. 3 (1979). [5] For claims under Section 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of

the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citation omitted). Here, the parties do not dispute that defendants were acting under color of state law. The question presented, therefore, is whether defendants' conduct deprived Jackson of the rights he asserts.

[5]     Specifically, Section 1983 provides as follows:
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....
> 42 U.S.C. § 1983.

Although *pro se* plaintiff alleges eleven separate causes of action against the County of Nassau and its administrative arms, the claims alleged by plaintiff in his complaint are as follows: (1) the County of Nassau has a policy or practice of permitting its employees (or employees of its administrative arms) to commit perjury and a policy or practice of failing to discipline its employees who do commit perjury; (2) the County of Nassau has a policy or practice of permitting its police officers to falsely verify criminal complaints; and (3) the County of Nassau has a policy of not investigating, responding to, or prosecuting complaints or cross-criminal complaints of pretrial detainees and criminal defendants that allege crimes and misconduct against police officers and assistant district attorneys. (Plaintiff's Opposition (hereinafter "Opp.") at 14.)

Defendants argue that they are entitled to summary judgment on the grounds that Jackson has failed to provide any evidence that would raise a genuine issue of fact as to municipal liability for any of these claims. As set forth below, the Court agrees. First, plaintiff has failed to provide any evidence that there was an underlying constitutional violation with respect to his arrest and conviction, which would be a necessary element of any municipal liability claim. In fact, under well-settled Supreme Court and Second Circuit precedent, plaintiff's valid conviction precludes him from litigating any of his claims in the instant case because success on such claims (that is, demonstrating his constitutional rights were violated in connection with the investigation and prosecution of his case) would necessarily implicate the unconstitutionality of his conviction. Second, plaintiff has

provided absolutely no evidence of an unconstitutional policy or custom of the County of Nassau and, thus, his municipal liability claims against the County cannot survive summary judgment.

### (1) Plaintiff Cannot Demonstrate Violation of His Constitutional Rights

**\*7** To bring a successful Section 1983 claim, plaintiff must first demonstrate that he was injured as a result of a constitutional violation. In the instant case, plaintiff cannot do so. First, Supreme Court precedent prevents a prisoner, like Jackson, from bringing a Section 1983 claim where success on the claim necessarily would implicate the unconstitutionality of the prisoner's conviction or sentence. Second, even assuming this rule did not apply, plaintiff has presented no evidence of any constitutional violations relating to his conviction.

#### a. *Heck v. Humphrey*

As a threshold matter, although not explicitly raised by defendants, plaintiff's claims fail as a matter of law, by virtue of his conviction. Specifically, the Supreme Court's decision in *Heck v. Humphrey,* 512 U.S. 477 (1994), entitles defendants to a decision in their favor as a matter of law with respect to these claims.

#### i. The *Heck* Rule

In *Heck v. Humphrey,* the Supreme Court "confronted the question of whether, given the overlap between § 1983 and the federal habeas corpus statute, a prisoner seeking civil damages may proceed with a § 1983 claim where success on the claim necessarily would implicate the unconstitutionality of the prisoner's conviction or sentence." *Amaker v. Weiner,* 179 F.3d 48, 51 (2d Cir.1999) (citing *Heck,* 512 U.S. at 480-90). The Supreme Court in that case explained:

> We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a

§ 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

512 U.S. at 486-87 (footnote omitted) (emphasis in original); *see also Wilkinson v. Dotson,* 544 U.S. 74, 81 (2005) ("Heck specifies that a prisoner cannot use § 1983 to obtain damages where success *would* necessarily imply the unlawfulness of a (not previously invalidated) conviction or sentence." (emphasis in original)).

Thus, pursuant to *Heck,* courts routinely dismiss claims brought under Section 1983 when such claims bear on the validity of an underlying conviction or sentence. *See, e.g., Guerrero v. Gates,* 442 F.3d 697, 703-04 (9th Cir.2006) (holding that Heck bars plaintiff's § 1983 claims of wrongful arrest, malicious prosecution, and conspiracy); *Amaker,* 179 F.3d at 51-52 (holding that *Heck* applies to Section 1983 conspiracy); *Perez v. Cuomo,* No. 09 Civ. 1109(SLT), 2009 WL 1046137, at *7 (E.D.N.Y. Apr. 17, 2009) ("A § 1983 claim for the violation of the due process right to a fair trial is, in essence, a claim for damages attributable to an unconstitutional conviction.... Since plaintiff's conviction remains valid, plaintiff's claim for violation of his right to a fair trial is not cognizable under § 1983, and must be dismissed as to all defendants[.]") (internal quotation marks and citations omitted); *Younger v. City of N.Y.,* 480 F.Supp.2d 723, 730 (S.D.N.Y.2007) (holding that plaintiff's claims for false arrest/imprisonment and malicious prosecution were barred by his plea of guilty pursuant to *Heck); cf. Jovanovic*

*v. City of N.Y.,* No. 04 Civ. 8437, 2006 WL 2411541, at * 12 (S.D.N.Y. Aug. 17, 2006) (applying *Heck* to a Section 1983 claim for denial of the right to a fair trial in the context of a statute of limitations issue).

### ii. Application

**\*8** Here, as stated *supra,* Jackson was convicted after a trial in state court of nine counts of Robbery in the First Degree and one count of Conspiracy in the Fourth Degree on July 30, 2008. It is apparent that Jackson is still incarcerated for this conviction and, to date, has been unsuccessful in challenging his conviction or has not even attempted to do so. Under these circumstances, the Supreme Court's holding in *Heck* precludes plaintiff from bringing claims in this Court under Section 1983 for municipal liability, because a plaintiff bringing such claims must demonstrate a constitutional violation in connection with his conviction, and a successful result in this case on any one of plaintiff's claims would bear on the validity of that underlying conviction.

Indeed, *Heck'* s application to the instant matter is straightforward. Plaintiff's complaint claims that he was "subsequently indicted based upon officer Hughes['s] 'inaccurate' testimony." (Compl.¶ 9.) Plaintiff also contends that during his pretrial hearings there was extensive "late disclosure of [exculpatory] material." (*Id.* ¶ 11.) Although it is true that not all claims brought under Section 1983 necessarily implicate the validity of the underlying conviction, in this case, plaintiff's assertions of perjury, withheld evidence, and falsely sworn documents during his trial by police officers do necessarily implicate the validity of his conviction and are thus barred by the *Heck* rule. [6] *See, e.g., McCloud v. Jackson,* 4 F. App'x 7, 10 (2d Cir.2001) ("[Plaintiff] could not assert [municipal liability] claims under § 1983 against the county defendants for holding him in jail because any claim for money damages which, as here, necessarily imputes the invalidity of a conviction, is barred under *Heck v. Humphrey,* 512 U.S. 477, 484, 486-87 (1994), until such time as the conviction is vacated or otherwise invalidated."); *Channer v. Mitchell,* 43 F.3d 786, 787-88 (2d Cir.1994) (per curiam) (affirming *Heck*-based dismissal of claim that police officers committed perjury and coerced witnesses to identify plaintiff wrongfully); *Williams v. Schario,* 93 F.3d 527, 529 (8th Cir.1996) ("[A] judgment in Williams's favor on his damages claim that defendants engaged in malicious prosecution and presented perjured testimony would 'necessarily imply the invalidity of his conviction or sentence' " (quoting *Heck,*

2010 WL 335581

512 U.S. at 487)); *Smithart v. Towery,* 79 F.3d 951, 952-53 (9th Cir.1996) (per curiam) (affirming *Heck*-based dismissal of § 1983 claim of conspiracy to "bring unfounded criminal charges" against plaintiff); *Jasper v. Fourth Court of Appeals,* No. 08 Civ. 7472(LAP), 2009 WL 1383529, at *1 (S.D.N.Y. May 18, 2009) ("The Court liberally construes this complaint as asserting that plaintiff was denied his constitutional right to a fair trial. [However, s]ince plaintiff's conviction remains valid, plaintiff's fair trial claim is not cognizable under § 1983, and it must be dismissed as to all defendants[.]"); *Perez,* 2009 WL 1046137, at *7 ("A § 1983 claim for the violation of the due process right to a fair trial is, in essence, a claim for damages attributable to an unconstitutional conviction.... Since plaintiff's conviction remains valid, plaintiff's claim for violation of his right to a fair trial is not cognizable under § 1983, and must be dismissed as to all defendants[ .]") (internal quotation marks and citations omitted); *Fernandez v. Holzbach,* No. 3:04 Civ. 1664(RNC), 2007 WL 1467182, at *1 (D.Conn. May 15, 2007) (holding that plaintiff's allegations that his convictions were based on perjury and fabricated evidence pursuant to a conspiracy to violate his federal rights "necessarily impl[ied] that he was wrongly convicted" and could not be litigated "until he show[ed] that the convictions have been invalidated"); *Duamutef v. Morris,* 956 F.Supp. 1112, 1115-16 (S.D.N.Y.1997) (dismissing § 1983 claims for, *inter alia,* malicious prosecution, false arrest, and perjury during trial due to a failure to state a claim under *Heck* because of the valid underlying criminal conviction). Thus, in order to bring a cognizable Section 1983 claim in this Court for the harms alleged, plaintiff must first establish the invalidity of his state court conviction.

[6]      With respect to plaintiff's claim that the County of Nassau has a policy of declining to investigate criminal complaints filed by pretrial detainees and criminal defendants, as discussed *infra,* plaintiff has failed to present any evidence that his claim was not investigated, whereas the County has presented substantial evidence demonstrating that plaintiff's claim was, in fact, investigated. Moreover, the prosecution of plaintiff's criminal complaints against Officer Hughes and Detective Comiskey would have implicated the validity of his underlying conviction, in contravention of the *Heck* rule. Accordingly, *Heck* can be construed to preclude all of plaintiff's Section 1983 claims.

**\*9** The fact that plaintiff is seeking to assert municipal liability claims against the County of Nassau, rather than against individual defendants, does not vitiate the application

of the *Heck* rule to plaintiff's claims. To prevail against the County of Nassau in his Section 1983 action under any of these theories, a plaintiff must plead and prove: (1) there was an official municipal policy or custom; and (2) that policy or custom caused him to be subjected to a denial of a constitutional right. *See Monell v. Dep't Soc. Servs.,* 436 U.S. 658, 690-91 (1978). There must be a "direct causal link" between the alleged municipal action and the deprivation of the plaintiff's constitutional rights. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989); *Vippolis v. Vill. of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985); *see also Lynch v. Suffolk County Police Dep't,* No. 07-3684-cv, 2009 WL 3287565, at *2 (2d Cir. Oct. 14, 2009) ("In order to prevail on a claim against a municipality under *Monell,* a plaintiff must allege, among other things, that a 'municipal policy of some nature caused a constitutional tort.' " (citations omitted)). In the instant case, because the Court finds as a matter of law on summary judgment that *Heck v. Humphrey* prevents a finding that a constitutional violation was committed against plaintiff by any of the defendants, *see supra,* no *Monell* claim can lie against the County of Nassau pursuant to § 1983.[7] *See, e.g., Lynch,* 2009 WL 3287565, at *2 ("Insofar as plaintiff alleges that a municipal policy caused prosecutorial misconduct in the trial that led to his felony convictions, plaintiff's claim seeks to 'recover damages for [an] allegedly unconstitutional conviction or imprisonment' and is barred by *Heck,* 51 U.S. at 486." (alteration in original)); *Segal v. City of N.Y.,* 459 F.3d 207, 219 (2d Cir.2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."); *accord Vippolis,* 768 F.2d at 44 ("A plaintiff who seeks to hold a municipality liable in damages under section 1983 must prove that the municipality was, in the language of the statute, the 'person who ... subjected, or cause[d][him] to be subjected,' to the deprivation of his constitutional rights." (citing 42 U.S.C. § 1983)); *see also Ewolski v. City of Brunswick,* 287 F.3d 492, 516 (6th Cir.2002) ("Having concluded that the Appellant has not shown a genuine issue of material fact as to any of the asserted constitutional claims, we therefore conclude that the district court correctly dismissed the Appellant's municipal liability claims.").

[7]      In any event, summary judgment would also be warranted in favor of the County of Nassau because, as discussed *infra,* plaintiff has failed to proffer any evidence of a policy, custom, or

failure to train, that led to any alleged constitutional violation.

In sum, even accepting plaintiff's allegations as true and drawing all reasonable inferences in plaintiff's favor, the Court finds that plaintiff cannot successfully bring a claim because the *Heck* rule, as a matter of law, prevents plaintiff from demonstrating a violation of his constitutional rights, which is a necessary predicate to any municipal liability claim pursuant to Section 1983.

#### b. No Evidence of Violation of Plaintiff's Constitutional Rights

**\*10**  Moreover, even assuming that the validity of plaintiff's underlying conviction is not implicated by his claim that the County of Nassau had a policy of ignoring criminal complaints filed by pretrial detainees and criminal defendants, he has presented no evidence to support his contention that the County did not investigate his claims. Thus, because there is no evidence from which a rational jury could find a violation of his constitutional rights, there is no predicate for his municipal liability claim.

The only forms of evidence offered by plaintiff on this issue are his bald assertions and the fact that the County did not prosecute Officer Hughes or Detective Comiskey for their alleged misconduct in relation to plaintiff's trial. Plaintiff's exhibits consist merely of copies of the letters and complaints that he filed with Nassau County entities. Plaintiff presents no evidence to contradict the evidence put forth by defendants, which demonstrates that plaintiff's complaints were investigated. In two affidavits submitted by ADA Kornblau, former Bureau Chief of the District Attorney's Public Corruption Bureau, she asserts that she personally investigated plaintiff's complaints against the officers. (*See* Defs.' Exs. K, X.) According to ADA Kornblau's affidavit, upon investigating Jackson's complaints, "[it] was clear from the minutes that [Jackson's] criminal attorney raised the issue of the failure to turn over *Rosario* material to the trial court, which is the proper venue for such an allegation." (Defs.' Ex K ¶ 4.) Subsequently, ADA Kornblau determined that the remainder of plaintiff's claims were unfounded, and declined to prosecute the matter. (*See id.* ¶ 4 ("Subsequent to reviewing Jackson's complaint and after determining that the [complaint] did not allege conduct which constituted a crime, I referred the matter to the Internal Affairs Bureau of the Nassau County Police Department ...."); *id.* ¶ 6 ("In view of the fact that the trial of this case

was still pending, and the issues alleged by [Jackson] all pertained to credibility, I notified Daniel Looney, the Assistant District Attorney assigned to Jackson's prosecution, as well as defense counsel, Jeffrey Groder, of Jackson's claims. I also forwarded Jackson's complaint to the Internal Affairs Bureau of the Nassau County Police Department for whatever administrative action they deemed necessary.").) In a separate affidavit, ADA Steven L. Schwartz, Bureau Chief of the District Court Trial Bureau in the Nassau County District Attorney's Office, states that he personally investigated plaintiff's proposed accusatory instruments and found them to be unfounded; accordingly, they were not prosecuted. (Defs.' Ex. Q ¶ 9.) [8]

[8]  The Court further notes that in the absence of any evidence that the Nassau County District Attorney's Office failed to investigate Jackson's complaints, the decision not to prosecute those complaints is protected by prosecutorial immunity. *See, e.g., Fields v. Soloff,* 920 F.2d 1114, 1119 (2d Cir.1990) ("[U]nless a prosecutor proceeds in the clear absence of all jurisdiction, absolute immunity exists for those prosecutorial activities intimately associated with the judicial phase of the criminal process.... This protection extends to the decision to prosecute as well as the decision not to prosecute." (internal quotations and citations omitted)).

Here, as in *Staley v. Grady,* 371 F.Supp.2d 411 (S.D.N.Y.2005), "[s]imply because defendants disagreed with plaintiff as to the merits of the proposed [complaint] and chose not to prosecute the same, does not give rise to an equal protection violation." *Id.* at 417. Here, too, the Nassau County District Attorney's Office received Jackson's criminal complaints, reviewed and investigated them, and declined to prosecute them based upon the conclusion that the complaints were without merit. (*See* Defs.' Exs. K, Q.)

**\*11**  In short, due to plaintiff's inability to set forth any evidence from which a rational jury could find a deprivation of his constitutional rights, plaintiff's *Monell* claims against the County of Nassau cannot survive summary judgment.

#### (2) Plaintiff Has Set Forth No Evidence to Support a *Monell* Claim

Even assuming *arguendo* that plaintiff had put forth evidence to create a genuine issue of fact on whether his constitutional rights were violated, his municipal liability claims still cannot survive summary judgment because there is no evidence of a policy, practice or custom to support a finding by a rational jury of municipal liability under *Monell.*

### i. Applicable Standard

Municipalities cannot be held vicariously liable for the actions of an employee under § 1983. *Monell,* 463 U.S. at 691 ("[A] municipality cannot be held liable solely because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."). Thus, "[a] municipality will not be held liable under Section 1983 unless the plaintiff can demonstrate that the allegedly unconstitutional action of an individual law enforcement official was taken pursuant to a policy or custom 'officially adopted and promulgated by that [municipality's] officers.' " *Abreu v. City of N.Y.,* No. 04-CV-1721 (JBW), 2006 U.S. Dist. LEXIS 6505, at *11 (E.D.N.Y. Feb. 22, 2006) (quoting *Monell,* 436 U.S. at 690) (alteration in original). " '[M]unicipal liability under § 1983 attaches where-and only where-a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers ." *City of Canton,* 489 U.S. at 389 (quoting *Pembaur v. Cincinnati,* 475 U.S. 469, 483-84 (1986)). Thus, an individual's misconduct will not result in *respondeat superior* liability for his supervisors absent specific allegations that he acted pursuant to an official policy or custom. *Ricciuti v. N.Y.C. Transit Auth .,* 941 F.2d 119, 123 (2d Cir.1991). However, "[a] court may draw the inference of the existence of a policy or custom 'when a plaintiff presents evidence that a municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.' " *Caidor v. M & T Bank,* No. 05-CV-297 (FSJ), 2006 U.S. Dist. LEXIS 22980, at *35-36 (N.D.N.Y. Mar. 27, 2006) (quoting *Grifin-Nolan v. Providence Wash. Ins. Co.,* No. 04-CV-1453 (FJS), 2005 U.S. Dist. LEXIS 12902, at *10 (N.D.N.Y. June 20, 2005) (quotation omitted)). But, " 'the mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.' " *Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995) (quoting *Dwares v. City of N.Y.,* 985 F.2d 94, 100 (2d Cir.1993)).

### ii. Application

Even if plaintiff could prove that his constitutional rights were violated, whether at trial or by the subsequent failure to prosecute his criminal complaint for the actions by municipal actors at his trial, this is not sufficient to demonstrate a policy or custom by the County of Nassau. "[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *Ricciuti,* 941 F.2d at 123; *see also Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *McAllister v. N.Y.C. Police Dep't,* 49 F.Supp.2d 688, 706 (S.D.N.Y.1999) (same); *Palmer v. City of Yonkers,* 22 F.Supp.2d 283, 290 (S.D.N.Y.1998) ("[T]he court will not infer the existence of a municipal policy from a single incident."). As discussed *supra,* " 'the mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.' " *Zahra,* 48 F.3d at 685 (quoting *Dwares,* 985 F.2d at 100). [9]

9      Plaintiff contends that the persons who violated his constitutional rights were policymakers. (Opp. at 14 ("All of plaintiff's claims were made against the 'policy makers' and not against employees below the policy making level.").) First, as discussed *supra,* plaintiff's claims regarding alleged perjury, withholding of evidence, or falsely verified complaints relating to his trial are barred by *Heck.* In addition, however, plaintiff presents no evidence in support of this argument. Moreover, for purposes of plaintiff's causes of action regarding the failure to investigate his criminal complaints against those persons, plaintiff would need to allege that the persons who allegedly failed to investigate his accusations were policymakers. Plaintiff does not do so. Instead, he acknowledges that the policy maker is District Attorney Kathleen Rice, and the individuals who submitted the defendants' supporting affidavits-those who investigated plaintiff's allegations-are subordinates to the policy maker. (Opp. at 15.)

2010 WL 335581

For the reasons contained in our earlier opinion, this Court declines to add District Attorney Rice as a defendant in this action. *See Jackson, 2009 WL 393640, at \*3-5.* In light of Jackson's repeated argument that the actions of the Nassau County District Attorney's Office's and Nassau County Police Department's actions were part of a policy, procedure, or custom, the Court interprets his complaint and opposition papers to argue municipal liability based only on a theory of municipal policy, procedure, or custom, and not on a theory of unconstitutional action by a policymaker.

**\*12** Plaintiff's complaint, statements at his deposition, and opposition papers to defendants' motion for summary judgment contain vague allegations regarding the existence of a policy or procedure by the County of Nassau of refusing to investigate criminal complaints of pretrial detainees and criminal defendants. (*E.g.,* Opp. at 5-6 ("Plaintiff also stated that he never received any response or letters of acknowledgment from either office though he wrote numerous letters inquiring about the status of his complaints and criminal charges."); Opp. at 6 ("The complaints were never investigated and plaintiff never received any response."); Opp. at 7 ("During the deposition plaintiff continuously testified to the fact that no one ever investigated nor responded to his complaints and grievances.").) These conclusory allegations as to the existence of a policy or custom are insufficient to withstand summary judgment. *See Bishop v. Toys "R" Us-NY, LLC, No. 04 Civ. 9403(PKC), 2009 WL 440434, at \*4 (S.D.N.Y. Feb. 19, 2009)* ("[P]roceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." (quoting *Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1995)*). Indeed, mere "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Id* . (citing *Matsushita, 475 U.S. 574, 587 (1986)*)); Order, *McCrary v. County of Nassau,* No. 06 CV 4982(SJF)(ARL) (E.D.N.Y. Sept. 22, 2008) ("Magistrate Judge Lindsay properly found that [p]laintiff had proffered no evidence to support his assertion that a custom, policy and/or practice, which precludes the consideration of criminal charges brought by an accused against police officers and assistant district attorneys, existed" when plaintiff merely asserted that a police officer was "aware of alleged police misconduct regarding Plaintiff's apprehension, [the] affidavits in support of County

Defendants' summary judgment motion were not sufficiently detailed, and that there was no record of any investigation having been conducted by [County Defendants] in regards to the [complaints]"). Plaintiff has presented no actual evidence of a policy or custom whereby the County would decline to review the criminal complaints of pretrial detainees or criminal defendants.

The County of Nassau, however, has put forward extensive evidence regarding the policies that it has in place to review criminal complaints filed by all citizens. In two separate affidavits, ADA Kornblau affirms that the County does investigate criminal complaints against police officers and ADAs-including those made by pretrial and criminal defendants: "[M]any of the [District Attorney's Public Corruptions Bureau's] cases are referred from members of the public, including direct complaints of police misconduct that the Bureau receives from defendants and/or their attorneys." (Defs.' Ex. X. ¶ 5.) Similarly, "[t]o facilitate the investigation into complaints by incarcerated individuals including pretrial detainees, the Public Corruption Bureau maintains a hotline in the Nassau County Correctional Center for the purpose of allowing inmates to file complaints directly with the Public Corruption Bureau, without having to have their complaints reviewed first by any other entity, agency, or person." (*Id.*) Moreover, ADA Kornblau's affidavit states that "[e]ach criminal complaint is afforded individual attention and investigation ... [and if] after investigation, it is determined that a complaint is supported by credible evidence, the Nassau County District Attorney's Public Corruption Bureau will recommend prosecution, after which those cases will be prosecuted in criminal court." (*Id.* ¶¶ 6-7.).

**\*13** The County of Nassau has also submitted evidence that the system utilized by the Nassau County District Attorney's Office for examining criminal complaints filed by private citizens does not differentiate between complaints based on the individual who files the complaint. ADA Kornblau explains that:

> Complaints are retrieved from within the computerized complaint system in one of three ways: (1) a complainant's name; (2) a defendant's name; or, (3) a complaint number. Therefore, there is no way to retrieve criminal complaints made specifically by pretrial detainees from within the computer complaint

system since complaints are placed into the system without complainant classification (e.g., civilian, pretrial detainee, police officer, etc.).

(*Id.* ¶ 8; *see also* Defs.' 56.1 ¶ 47; Defs.' Ex. W ¶ 11.) In plaintiff's opposition papers, he stated that he did not dispute these facts. (Opp. at 12.)

The County of Nassau also submitted an affidavit from ADA Warren Thurer, the Bureau Chief of the Nassau County Criminal Complaint Unit. According to ADA Thurer, "[s]pecifically with respect to allegations of an assistant district attorney's or police officer's criminal conduct, such allegations will be individually investigated and if appropriate, will be forwarded to the Public Corruption Bureau of the Nassau County District Attorney's Office." (Defs.' Ex. W ¶ 10; *see also* Defs.' Ex. Q ¶ 10 ("There is no policy, practice, or custom within the Nassau County District Attorney's Office that precludes the consideration, investigation, and/or acceptance of criminal cross-complaints brought by an accused against police officers and/or assistant district attorneys based upon the status of the complainant as a pretrial detainee").) An affidavit provided by ADA Steven L. Schwartz, Bureau Chief of the District Court Trial Bureau in the Nassau County District Attorney's Office, states that:

> All proposed accusatory instruments are given individual attention and investigation. There is no distinction made for the status of the complainant and pretrial detainees are not treated any differently than other individuals proposing accusatory instruments to be filed. Each proposed accusatory instrument is investigated for possible criminalityand, if appropriate, any case may be forwarded and assigned to one of the investigative bureaus within the District Attorney's Office, or prosecuted within the District Attorney's District Court Bureau. If the allegations in a proposed accusatory instrument are determined to be unfounded, I send a letter to the Associate Court Clerk stating that the District Attorney's Office has declined

to prosecute the matter.... Specifically, with respect to allegations of an assistant district attorney's or police officer's criminal conduct, such allegations are individually investigated and if appropriate, are forwarded to the Nassau County District Attorney's Office Public Corruption Bureau.

**\*14** (Defs.' Ex. Q ¶¶ 7-8.) Plaintiff has presented no evidence to contradict the information contained in these affidavits or to suggest otherwise.

Nor has plaintiff presented evidence of a policy or custom of committing perjury, withholding evidence, or falsely verifying criminal complaints. Plaintiff has merely asserted that "he can testify based upon personal knowledge to the undisputed facts and that he has credible witnesses and documental evidence to support said factual claims." (Opp. at 11.) Plaintiff has not alleged with specificity other instances of perjury, withheld evidence, or falsified complaints, nor has he presented any other evidence of police officers' commission of perjury, withholding of evidence, or filing of falsely sworn complaints. The County of Nassau, by contrast, has put forward evidence regarding its arrest processing procedures and arrest records. (*See* Defs.' Ex. Z.) Nowhere in the County's arrest policies is false verification of criminal complaints, withholding of evidence, or perjury authorized. Furthermore, the "collective knowledge doctrine" or "fellow officer rule" permits arresting officers to rely upon other law enforcement officers' knowledge to justify probable cause to arrest. *See Savino v. City of New York,* 331 F.3d 63, 74 (2d Cir.2003) ( [F]or the purpose of determining whether an arresting officer had probable cause to arrest, 'where law enforcement authorities are cooperating in an investigation, ... the knowledge of one is presumed shared by all.' "); *Stokes v. City of New York,* No 05-CV-0007 (JFB) (MDG), 2007 U.S. Dist. LEXIS 32787, at \*17 (E.D.N.Y. May 3, 2007) ("[U]nder the collective knowledge doctrine, defendant Buskey is permitted to rely on knowledge obtained by any other officers during the investigation"); *Phelps v. City of New York,* No. 04 CIV. 8570(DLC), 2006 U.S. Dist. LEXIS 42926, at \*9-10 (S.D.N.Y. June 29, 2006) ("The rationale behind the [collective knowledge] doctrine is that in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on

facts known only to his superiors or associates. Although the doctrine is typically used to establish probable cause for the purpose of admitting evidence at trial, it is equally applicable here. As the Supreme Court has recognized, police officers called upon to aid other officers in making an arrest are entitled to assume that the officers requesting aid have acted properly." (internal quotations and citations omitted)). Accordingly, it is not improper for an officer to verify a criminal complaint based upon facts learned from another officer and plaintiff has put forth no evidence of a policy, practice, or custom of Nassau County police officers falsifying information in criminal complaints or committing perjury.

Moreover, the County of Nassau has put forward an affidavit from a former Nassau County ADA, who investigated and prosecuted a complaint against a Nassau County Police Officer in an unrelated matter that alleged that the officer had committed perjury by falsely testifying before the grand jury. (Defs.' Ex. Y ¶¶ 2-5.) That police officer was prosecuted and convicted of perjury in the third degree. (*Id.* ¶ 8.) In the face of this undisputed evidence of the County prosecuting perjury when it is uncovered, plaintiff has not identified any specific instances of police officers' commission of perjury that were not prosecuted.

**\*15** In sum, the undisputed facts demonstrate the following: (1) plaintiff's conviction prevents him from disputing any alleged constitutional violations relating to his trial; (2) defendants did investigate plaintiff's criminal complaints regarding Officer Hughes's and Detective Comiskey's alleged behavior; (3) defendants do have in place policies and procedures whereby criminal complaints filed by private citizens are investigated-even if those citizens are pretrial detainees or criminal defendants; and (4) the County of Nassau does not have a policy or procedure of permitting its employees to commit perjury, to falsely verify criminal complaints, or to withhold exculpatory evidence at trial. In short, plaintiff has failed to provide any factual support for his conclusory allegations that the defendants have engaged in unconstitutional policies or procedures. Accordingly, defendant's motion for summary judgment is granted.

### C. Motion for Sanctions

The Court has also reviewed plaintiff's motion for sanctions and, for the reasons stated throughout this opinion, finds plaintiff's claims to be without merit. Accordingly, plaintiff's motion for sanctions is also denied. *See S.E. C. v. Shainberg, 316 F. App'x 1, 2 (2d Cir.2008).*

### V. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment in its entirety. Because the Court grants defendants' motion for summary judgment in its entirety, it also denies plaintiff's motion for sanctions against defendant.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States,* 369 U.S. 438, 444-45 (1962).

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 335581

---

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2868231
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Quentin LA GRANDE, Plaintiff,

v.

TOWN OF BETHLEHEM POLICE
DEPARTMENT, et al., Defendants.

No. 1:08–CV–0738 (LEK/DRH).
|
Sept. 1, 2009.

**Attorneys and Law Firms**

Quentin La Grande, Albany, NY, pro se.

Nannette R. Kelleher, Bailey, Kelleher Law Firm, Albany, NY, for Defendants.

***DECISION AND ORDER***

LAWRENCE E. KAHN, District Judge.

**\*1** Plaintiff *pro se* Quentin La Grande ("Plaintiff" or "La Grande") commenced the instant action against Defendants Robert Helligrass [1], Stephen Kraz [2] and the Town of Bethlehem Police Department (collectively, "Defendants") pursuant to 42 U.S.C. § 1983. Complaint (Dkt. No. 1). Presently before this Court is Defendants' Motion to dismiss (Dkt. No. 13) and Plaintiff's Motion for summary judgment (Dkt. No. 12). For the following reasons, Defendants' Motion to dismiss is granted and Plaintiff's Motion for summary judgment is denied.

[1]    Incorrectly named in the Complaint as "R.J. Helliergrass." *See generally* Complaint (Dkt. No. 1).

[2]    Incorrectly named in the Complaint as "William Craz." *See generally* Complaint.

**I. BACKGROUND**

According to Plaintiff, "[o]n April 1, 2008 I was threaten by Patrol Officer William Craz. Patrol Officer called me a 'Nigger,' and also threaten to cause bodily harm to me. On April 2, 2008 I met with Seargent R.J. Helliergrass and was

interogated, and racial harrassed. On or about April 5, 10, 15, May 6, 8, 10, 15, and June 6, 2008, I have been followed by the Bethlehem Police Department." Compl. at 2. Plaintiff's jurisdictional statement asserts that the Complaint is being brought pursuant to 42 U.S.C. § 1983. *Id.* at 1.

In lieu of filing an answer, on March 11, 2009, Defendants filed the Motion to dismiss presently before the Court. Mot. to Dismiss (Dkt. No. 13). Plaintiff also filed a Motion for summary judgment on February 24, 2009, which is now before the Court. Mot. for Sum. Judg. (Dkt. No. 12).

**II. DISCUSSION**

**A. Defendants' Motion to Dismiss**

**a. Standard of Review**

In order to withstand a motion to dismiss, "a [pleading] must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A party must plead with such factual detail so as to sufficiently " 'nudge [ ][its] claims ... across the line from conceivable to plausible.' " *Iqbal,* 129 S.Ct. at 1950–51 (quoting *Twombly,* 550 U.S. at 570). While stating a claim does not require the recitation of detailed factual allegations, it does, however, require facts sufficient to state a claim to relief that is *prima facie* plausible. *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 555). The Court must accept the allegations in the well-pleaded complaint as true, *Albright v. Oliver,* 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), and draw all inferences in favor of the non-moving party. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1973); *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154 (2d Cir.2006); *King v. Am. Airlines, Inc.,* 284 F.3d 352, 356 (2d Cir.2002).

In assessing the legal sufficiency of the Complaint, the Court is mindful that La Grande is a *pro se* litigant and his submissions are subject to "less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). The Court must "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments they suggest.' " *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999); *see Hemphill v. New York,* 380 F.3d

680, 687 (2d Cir.2004) (" "It is well-established that 'when a plaintiff proceeds *pro se* the court is obligated to construe his pleadings liberally, particularly when they allege civil rights violations' ") (quoting *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004)). However, a plaintiff's *pro se* status "does not exempt [him] from compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck,* 710 F.2d 90, 92 (2d Cir.1983).

**b. Analysis**

**\*2** Defendants move to dismiss Plaintiff's Complaint in its entirety pursuant to Rules 12(b)(6) of the Federal Rules of Civil Procedure.[3] Mot. to Dismiss (Dkt. No. 13) at 1. Defendants specifically argue that all causes of action against the Town of Bethlehem Police Department must be dismissed as it is not a legal entity subject to suit under 42 U.S.C. § 1983 and further that Plaintiff's entire Complaint should be dismissed for failing to state a cause of action. *Id.* at 4.

[3]    Defendants argue, alternatively, that Plaintiff's Complaint should be dismissed pursuant to 28 U.S.C. § 1915(e) and for failing to adhere to Rule 8(a) of the Federal Rules of Civil Procedure. The Court need not address these arguments as it is dismissing Plaintiff's Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).

**i. Town of Bethlehem Police Department**

The Town of Bethlehem moves to dismiss Plaintiff's Complaint on the ground that it is not susceptible to suit under 42 U.S.C. § 1983. While a municipality may be susceptible to suit under 42 U.S.C. § 1983, a municipal police department is not. *See Walker v. Waterbury Police Dep't.,* 08–cv–959 (JG)(AKT), 2009 U.S. Dist. LEXIS 7933, at \*5, 2009 WL 261527 (E.D.N.Y. Feb. 4, 2009). "Under New York law, departments which are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and cannot sue or be sued." *Id.* (citing *Hall v. City of White Plains,* 185 F.Supp.2d 293, 303 (S.D.N.Y.2002)). Accordingly, claims asserted under 42 U.S.C. § 1983 will be dismissed against a municipality's police department. *See Walker,* 2009 U.S. Dist. LEXIS 7933, at \*5, 2009 WL 261527 (internal citation omitted); *see also Baker v. Willett,* 42 F.Supp.2d 192, 198 (N.D.N.Y.1999).

Here, Plaintiff has sued the Town of Bethlehem Police Department along with two individual officers of the

department. *See generally* Compl. Plaintiff's Complaint asserts that it is brought pursuant to 42 U.S.C. § 1983 and does not provide any other basis for the claims. *Id.* at 1. Since the Bethlehem Police Department cannot be sued pursuant to 42 U.S.C. § 1983, Plaintiff's Complaint is dismissed as against the Town of Bethlehem Police Department.

Even assuming *arguendo* that Plaintiff's claims against the Town of Bethlehem Police Department can be construed as a claim against the Town of Bethlehem, Plaintiff's Complaint would still be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

In order to state a cause of action for municipal liability under 42 U.S.C. § 1983, "a plaintiff must allege that the municipality has adopted a custom or policy which is the moving force behind the [alleged constitutional violation]." *Zappala v. Albicelli,* 980 F.Supp. 635, 649 (N.D.N.Y.1997). A municipality cannot be held liable on the basis of *respondeat superior* and "a single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy." *Campanaro v. City of Rome,* 999 F.Supp. 277, 281 (N.D.N.Y.1998); *see also Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993).

Plaintiff's Complaint is devoid of any allegations that the Town of Bethlehem had a policy or custom of violating constitutional rights, nor does plaintiff allege or even allude that the Town was deliberately indifferent to his constitutional rights. The complete failure to plead such warrants dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, as the Complaint fails to state a cause of action for which relief can be granted under 42 U.S.C. § 1983. *See Campanaro,* 999 F.Supp. at 281; *Dwares,* 985 F.2d at 100.

**ii. Defendants Kraz and Helligrass**

**\*3** La Grande's Complaint alleges that between April and June 2008, he was "racially harassed," "threatened" and "interrogated" by Defendants Kraz and Helligrass, two officers of the Bethlehem Police Department. Compl. at 2. Specifically, La Grande alleges that on multiple occasions the officers addressed him with a racial epithet and followed him through town. *Id.* It is well settled in this Circuit that "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Murray v. Pataki,* No. 9:03–cv–1263, 2007 U.S. Dist. LEXIS 26959, at \*22, 2007 WL 956941 (N.D.N.Y. Mar. 29, 2007) (Kahn, J.) (quoting *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003)) (collecting cases).

"[V]erbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Murray,* 2007 U.S. Dist. LEXIS, at * 22 (quoting *Moncrieffe v. Witbeck,* 2000 U.S. Dist. LEXIS, at *3, 2000 WL 949457 (N.D.N.Y. June 29, 2000)); *see also Zeno v. Cropper,* 650 F.Supp. 138, 141 (S.D.N.Y.1986) ("vile and abusive language ... no matter how abhorrent or reprehensible cannot form the basis for a § 1983 claim) (internal citation and quotation omitted). Further, "threats do not amount to violations of constitutional rights." *Murray,* 2007 U.S. Dist. LEXIS, at *23 (quoting *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995)).

In this case, Plaintiff's claim for verbal harassment in the form of racial slurs and threats is not actionable under § 1983 and, therefore, fails to state a claim entitled to relief. Compl. at 2.

### B. Plaintiff's Motion for Summary Judgment

Even assuming *arguendo* that this Court did not grant Defendants' Motion to dismiss, Plaintiff's Motion for summary judgment would still be denied. Under the Local Rules, *"all* motions ... require a memorandum of law, supporting affidavit, and proof of service on all the parties." N.D.N.Y. L.R. 7.1(a) (emphasis added). "All memoranda of law shall contain a table of contents and, wherever possible, parallel citations." *Id.* at 7 .1(a)(1). Further "[a]ny motion for summary judgment shall contain a Statement of Material Facts ... *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion." Id.* at 7 .1(a)(3) (emphasis in original).

Here, not only did the Plaintiff fail to submit a memoranda of law in support of his Motion for summary judgment and an affidavit but he also failed to submit a Statement of Material Facts. In fact, in his Motion for summary judgment filed on February 24, 2009, Plaintiff explicitly stated, "I will provide this Court with a 'Law Memorandum' in support of my motion; such will contain applicable law, and case law. I will submit this to the Court on or before March 6, 2009." Mot. for Sum. Judg. at 1. To date, this Court has not received said memorandum of law. While this Court recognizes Plaintiff's *pro se* status, he has failed to comply with *all* of the Local Rules. *See Traguth v. Zuck,* 710 F.2d 90, 92 (2d Cir.1983) (a plaintiff's *pro se* status "does not exempt [him] from compliance with relevant rules of procedural and substantive law"). Accordingly, Plaintiff's Motion for summary judgment

is denied for failing to comply with the relevant rules of procedure. *See, e.g.,* N.D.N.Y. L.R. 7.1(a), 7.1(a)(3).

### C. Amended Complaint

**\*4** Plaintiff also moves to amend his Complaint. Response (Dkt. No. 27). While *pro se* litigants are generally afforded wide latitude and an opportunity to amend, a District Court need not permit an amendment to a Complaint where it would be futile. *See Forman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (holding that although leave to amend should be freely given where justice so requires, a district court need not grant leave if amendment would be futile); *Acito v. Imcera Group, Inc.,* 47 F.3d 47, 55 (2d Cir.1995).

Here, Plaintiff's Complaint does not state any viable causes of action under 42 U.S.C. § 1983. Further, Plaintiffs Complaint does not state which, if any, of his constitutional rights were violated by Defendants nor does it plead any facts to establish municipal liability. Plaintiff's Complaint also does not plead any facts supporting his allegations that he was "racially harassed," "threatened" or "interrogated." Since, as the Court discussed above, none of the complained of actions provides the basis for a cognizable cause of action, leave to cure these defects would be futile. These deficiencies may have been excusable, albeit not cureable, had this Court not previously informed Plaintiff of the requirements for pleading a cause of action under 42 U.S.C. § 1983 against a municipality. *See La Grande v. Albany Police Dep't,* 1:07–CV–757 (Dkt. No. 4). [4] Given that leave to amend would be futile, this Court denies Plaintiff's request.

[4]    Notably, Plaintiff has also filed numerous Complaints in the Northern District, many of which include assertions of civil rights violations and racial discrimination or harassment, wherein Plaintiff has been granted leave to amend his complaints. Plaintiff has filed eleven suits in the Northern District since 2000, including the instant matter. In fact, on May 12, 2008, Chief United States District Judge Norman A. Mordue entered an order enjoining Plaintiff from filing any further actions or pleadings in this district without the prior permission of the Chief Judge. Dkt. No. 6. This Order was entered based on a record of vexatious and frivolous pleadings previously filed by La Grande.

### III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED,** that Defendants' Motion to dismiss (Dkt. No. 13) is **GRANTED in its entirety;** and it is further

**ORDERED,** that Plaintiff's request to amend his Complaint (Dkt. No. 27) is **DENIED;** and it is further

**ORDERED,** that Plaintiff's Motion for summary judgment (Dkt. No. 12) is **DENIED in its entirety;** and it is further

**ORDERED,** that the Clerk serve a copy of this Decision and Order on all parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2868231

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4052286
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Sylvia JENKINS, Plaintiff,

v.

Mr. LIADKA, Syracuse Police Officer; Mr. Sands,
Syracuse Police Officer; John Doe, Syracuse Police
Officer; and Syracuse Police Dep't, Defendants.

No. 5:10–CV–1223 (GTS/DEP).
|
Sept. 13, 2012.

**Attorneys and Law Firms**

Sylvia Jenkins, Syracuse, NY, pro se.

Hon. Mary Anne Dougherty, Corporation Counsel for
City of Syracuse, Catherine Ena Carnrike, Esq., Assistant
Corporation Counsel, of Counsel, Syracuse, NY, for
Defendants.

***MEMORANDUM–DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Sylvia Jenkins ("Plaintiff") against Mr. Liadka,
Mr. Sands, John Doe, and Syracuse Police Department
("Defendants"), is Defendants' motion to dismiss Plaintiff's
Complaint for insufficient service of process pursuant to
Fed.R.Civ.P. 12(b)(5) and/or for failure to state a claim
pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 13.) For the
reasons set forth below, Defendants' motion is granted in part
and denied in part.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Complaint**
Generally, construed with the utmost of special liberality,
Plaintiff's Complaint asserts three claims against Defendants
arising from an investigatory stop in September 2010, in
Syracuse, New York: (1) a claim that three Syracuse Police
Officers unreasonably searched her in violation of the Fourth
Amendment; (2) a claim that they unlawfully seized, and
failed to return, her personal property in violation of the

Fourth, Fifth, and/or Fourteenth Amendments; and (3) a claim
that they subjected her to excessive force in violation of
the Fourth Amendment. (*See generally* Dkt. No. 1 [Plf.'s
Compl].)

Generally, in support of these claims, Plaintiff alleges as
follows: (1) on the evening of September 9, 2010, she was
stopped on Butternut Street in the City of Syracuse by
two officers, who questioned her regarding a call they had
received; (2) when she told the two police officers that she
did not know what they were talking about and "attempted
to go on about [her] business," the officers became "uptight,
rude, [and] abnormal in their conversations [and] behavior,"
and threatened her; (3) the officers then proceeded to conduct
a search of "all [of Plaintiff and her] personal property,"
and, in the process of doing so, twisted her arm and forced
her onto the front of their police vehicle; (4) a third police
officer arrived, and she was assaulted by all three officers
(hereinafter "Defendants"), who hit her on the back and threw
her onto the police vehicle; (5) following the deprivation on
September 9, 2010, Defendants denied her a post-deprivation
remedy through a combination of threats, intimidation and/
or nonresponsiveness; and (6) Defendants took these actions
against her intentionally because they did not personally like
her, given her previous interactions with the Syracuse Police
Department. (*Id.*)

Plaintiff further alleges that, as a result of this incident,
she suffered various injuries and losses, including (1) a
"tremendous setback in already trying to recover in an [sic]
grave overall manner of my life [and] lifestyle involving
officials internally [and] externally," (2) head and back pain,
and mental suffering, (3) loss of personal property, and, (4)
loss of employment. (*Id.*) As relief, Plaintiff requests an award
of twelve thousand dollars ($12,000) in damages. (*Id.* at ¶ 6.)

Familiarity with the remaining factual allegations supporting
Plaintiff's three claims is assumed in this Decision and Order,
which is intended primarily for review by the parties. (*See
generally* Dkt. No. 1.)

**B. Defendants' Motion**
**\*2** On May 6, 2011, Defendants filed a motion to dismiss.
(Dkt. No. 13, Attach 2.) Generally, in support of their motion,
Defendants assert the following two arguments: (1) because
the Complaint was not served within the time allowed by
Fed.R.Civ.P. 4 or Local Rule 4.1 of the Local Rules of Practice
for this Court, the Court lacks jurisdiction over Defendants in
accordance with Fed.R.Civ.P. 4; and (2) the Complaint fails

to state a claim upon which relief can be granted, because
(a) the Complaint fails to identify what constitutional rights
Plaintiff is attempting to vindicate, (b) even if the Complaint
has sufficiently identified a constitutional violation, the
Complaint fails to allege facts plausibly suggesting the
personal involvement of the individual Defendants in any
such constitutional violation, (c) the City of Syracuse Police
Department does not have the legal capacity to be sued, (d)
even if Plaintiff's Complaint can be liberally construed as
attempting to assert a claim against the City of Syracuse,
the Complaint fails to allege facts plausibly suggesting that
the individual Defendants' actions the result of a city policy
or custom sufficient to confer municipal liability upon the
City, (e) the Fifth Amendment does not govern a plaintiff's
deprivation-of-property claim against state actors, (f) the
Complaint fails to allege facts plausibly suggesting that force
was used or that if force was used it was excessive for
purposes of a Fourth Amendment claim, and (g) based on
Plaintiff's factual allegations, Defendants Liadka and Sands
are protected from liability as a matter of law by the doctrine
of qualified immunity. (*See generally* Dkt. No. 13, Attach. 2.)

On June 2, 2011, Plaintiff filed a response to Defendants'
motion. Generally, Plaintiff's response, which is handwritten
and three pages in length, states that she "definitely oppose[s]
[Defendants'] request" for the dismissal of her Complaint.
(*See generally* Dkt. No. 17.) However, Plaintiff's response
does not address the legal arguments asserted by Defendants
for the dismissal of Plaintiff's Complaint. (*Compare* Dkt.
No. 17 *with* Dkt. No. 13, Attach. 2.) Although Plaintiff's
response was submitted two days after the expiration of
the responsedeadline, the Court has accepted it, out of an
extension of special solicitude to her as a *pro se* civil rights
litigant.

In addition, Plaintiff has filed three letters to the Court on the
following dates: July 6, 2011, August 22, 2011, and January
13, 2012. (Dkt. No. 18–20.) Generally, these letters contain
assertions that Plaintiff believes that the police are treating
her, treating her negatively, and responding unsatisfactorily to
her telephone calls. (*Id.*) To the extent that these three letters
are intended to constitute papers in opposition to Defendants'
motion, the Court will not consider them, because (1) they
are not responsive to the motion, and/or (2) they were not
submitted in a timely manner. Moreover, to the extent that
these three letters are intended to constitute a request for
relief, the Court will not consider them, because do not
state the relief sought, state with particularity the grounds
for seeking the order, and attach a memorandum of law and

affidavit, as required by Fed.R.Civ.P. 7(b) and Local Rule 7.1
of the Local Rules of Practice for this Court.

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions to Dismiss for Insufficient Service of Process

**\*3** Rule 4(m) of the Federal Rules of Civil Procedure
provides, in pertinent part, as follows:

> If a defendant is not served within
> 120 days after the complaint is filed,
> the court-on motion or its own after
> notice to the plaintiff-must dismiss
> the action without prejudice against
> that defendant or order that service be
> made within a specified time. But if
> the plaintiff shows good cause for the
> failure, the court must extend the time
> for service for an appropriate period.

Fed.R.Civ.P. 4(m).

The Local Rules of Practice for this Court shorten the service
requirements under Fed.R.Civ.P. 4. Specifically, Local Rule
4.1(b) requires "service of process upon all defendants within
sixty (60) days of the filing of the complaint. This expedited
service is necessary to ensure adequate time for pretrial
discovery and motion practice. In no event shall service of
process be completed after the time specified in Fed.R.Civ.P.
4." N.D.N.Y. L.R. 4.1(b).

### B. Legal Standard Governing Motions to Dismiss for Failure to State Claim

It has long been understood that a defendant may base
a motion to dismiss for failure to state a claim upon
which relief can be granted on either or both of two
grounds: (1) a challenge to the "sufficiency of the pleading"
under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal
cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549
F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J.,
adopting Report–Recommendation on *de novo* review).

Because such motions are often based on the first ground,
a few words on that ground are appropriate. Rule 8(a)(2) of
the Federal Rules of Civil Procedure requires that a pleading

contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n. 17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

**\*4** Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turning on the *conceivability* of an actionable claim,

the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id .* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* [1]

[1]    It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Twombly*-that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not show[n]-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 [internal quotation marks and

citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an adorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [2] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [3] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28.

[2]     See *Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N . Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[3]     See *Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

**\*5** Finally, a few words are appropriate regarding what documents are considered on a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6). The court may consider the following documents without triggering the summary judgment standard: "(1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference into the complaint (and provided by the parties),

(3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case." *Planck v. Schenectady Cnty.,* 12–CV–0336, 2012 WL 1977972, at \*5 (N.D.N.Y. June 1, 2012) (Suddaby, J.). Moreover, "a pro se plaintiff's papers in response to a defendant's motion to dismiss for failure to state a claim may be considered as effectively amending the allegations of [her] complaint-to the extent those papers are consistent with the allegations in the complaint." *Planck,* 2012 WL 1977972, at \*5.

### C. Legal Standard Governing Unopposed Motions

In this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b) (3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini,* 07–CV–0279, 2009 WL 3672105, at \*1, n. 1 (N.D.N.Y.Oct.30, 2009) (Suddaby, J.) (collecting cases); *Este–Green v. Astrue,* 09–CV–0722, 2009 WL 2473509, at \*2 & n. 3 (N.D.N.Y. Aug.7, 2009) (Suddaby, J.) (collecting cases).

### D. Legal Standards Governing Plaintiff's Claims

Because the Court has, in its Decision and Order of March 7, 2011, addressed the relevant points of law contained in the legal standards governing Plaintiff's claims in this action, the Court will not again recite, in their entirety, those legal standards in this Decision and Order, 9 which is intended primarily for review by the parties. (*See generally* Dkt. No. 5 [Decision and Order].)

### E. Legal Standards Governing Defendants' Defenses

#### 1. Defense of Lack of Separate Identity

"Under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality, and therefore, cannot sue or be sued." *Davis v. Lynbrook Police Dept.,* 224 F.Supp.2d 463, 477 (E.D.N.Y.2002). "Pursuant to Fed.R.Civ.P. 17, New York governs the capacity of

a police department to sue or be sued. In New York, police department like the defendant, which are merely administrative arms of a municipal corporation, do not have a legal identity separate and apart from the town." *Loria v. Irondequoit* 775 F.Supp. 599, 606 (W.D.N.Y.1990). While a municipality can sue or be sued, the police department, which does not exist separate from that municipality, can not. *Baker v. Willett,* 42 F.Supp.2d 192, 198 (N.D.N.Y.1999).

**2. Defense of Limited Municipal Liability**

**\*6** It is well established that "[a] municipality may not be held liable in a Section 1983 action for the conduct of a lower-echelon employee solely on the basis of *respondeat superior.*"[4] "Rather, to establish municipal liability under § 1983 for unconstitutional acts by a municipality's employees, a plaintiff must show that the violation of [his or] her constitutional rights resulted from a municipal custom or policy ."[5] "Thus, to hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to ... prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."[6]

[4]     *Powell v. Bucci,* 04–CV–1192, 2005 WL 3244193, at \*5 (N.D.N.Y. Nov.30, 2005) (McAvoy, J.); *see also Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."); *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983) ("[A] [municipality] may not be held for the actions of its employees or agents under a theory of *respondeat superior." ).*

[5]     *Powell,* 2005 WL 3244193, at \*5; *Monell,* 436 U.S. at 690–691 ("[L]ocal governments ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."); *Batista,* 702 F.2d at 397 ("[M]unicipalities may be sued directly under § 1983 for constitutional deprivations inflicted upon private individuals pursuant to a governmental custom, policy, ordinance, regulation, or decision."); *Smith v. City of New York,* 290 F.Supp.2d 317, 321 (S.D.N.Y.2003) ("In order to establish the liability of [municipal] defendants in an action under §

1983 for unconstitutional acts by [its] employees, a plaintiff must show that the violation of [his or] her constitutional rights resulted from a municipal custom or policy.").

[6]     *Batista,* 702 F.2d at 397, *accord, Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995), *McKeon v. Daley,* 101 F.Supp.2d 79, 92 (N.D.N.Y.2000) (Hurd, J.), *Merriman v. Town of Colonie, NY,* 934 F.Supp. 501, 508 (N.D.N.Y.1996) (Homer, M.J.); *Douglas v. Cnty. of Tompkins,* 90–CV–0841, 1995 WL 105993, at \*12 (N.D.N.Y. March 2, 1995) (McCurn, J.), *Keyes v. Cnty. of Albany,* 594 F.Supp. 1147, 1156 (N.D.N.Y.1984) (Miner, J.).

With regard to the first element (the existence of a policy or custom), a "[p]laintiff may establish the 'policy, custom or practice' requirement by demonstrating: (1) a formal policy officially endorsed by the municipality ...; (2) actions taken by government officials responsible for establishing municipal policies related to the particular deprivation in question ...; (3) a practice so consistent and widespread that it constitutes a 'custom or usage' sufficient to impute constructive knowledge to the practice of policymaking officials ...; or (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to 'deliberate indifference' to the rights of those who come in contact with the municipal employees...."[7] With regard to the second element (causation), a plaintiff must show "a direct causal link" or "an affirmative link" between the municipal policy or custom and the alleged constitutional deprivation (i.e., that the policy or custom was the "moving force" behind the deprivation).[8]

[7]     *Dorsett–Felicelli, Inc.,* 371 F.Supp.2d 183, 194 (N.D.N.Y.2005) (Kahn, J.) (citing three Supreme Court cases for these four ways), *accord, Dunbar v. Cnty. of Saratoga,* 358 F.Supp.2d 115, 133–134 (N.D.N.Y.2005) (Munson, J.); *see also Clayton v. City of Kingston,* 44 F.Supp.2d 177, 183 (N.D.N.Y.1999) (McAvoy, J.) (transposing order of second and third ways, and citing five more Supreme Court cases).

[8]     *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ("[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional

Jenkins v. Liadka, Not Reported in F.Supp.2d (2012)

2012 WL 4052286

deprivation."); *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, n. 8, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) ("The fact that municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell'* s requirement that the particular policy be the 'moving force' behind a constitutional violation. There must at least be an affirmative link between [for example] the training inadequacies alleged, and the particular constitutional violation at issue."); *Monell,* 436 U.S. at 694 ("[I]t is when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983. Since this case unquestionably involves official policy as the moving force of the constitutional violation [at issue] ... we must reverse the judgment below."); *Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985) ("A plaintiff who seeks to hold a municipality liable in damages under section 1983 must prove that ... an official policy or custom [was] the cause of the deprivation of constitutional rights.... [T]he plaintiff must establish a causal connection-an affirmative link-between the policy and the deprivation of his constitutional rights.") [internal quotation marks and citation omitted]; *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiff's injury, *Monell* prohibits a finding of liability against the City."); *Powell,* 2005 WL 3244193, at *5 ("Ultimately, the plaintiff must demonstrate a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation.") [internal quotation marks and citation omitted].

### 3. Defense of Qualified Immunity

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d

Cir.2004) [citations omitted], *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007) [citations omitted].

In determining the second issue (i.e., whether it would be clear to a reasonable official that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**\*7** *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) [citations omitted], *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).[9] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007) [citations omitted].[10] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).[11] As the Supreme Court has explained,

[9] *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

[10] *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)

("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") [citation omitted]; *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

11      *See also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]; *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341.[12]

12      *See also Hunter v. Bryant,* 502 U.S. 224, 299, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks and citation omitted].

## III. ANALYSIS

### A. Whether Plaintiff's Complaint Should Be Dismissed for Failure to Serve Process in Timely Manner

After carefully considering the matter, the Court must answer this question in the negative. By Defendants' own calculations, Plaintiff's Complaint was served on April 18, 2011–a mere 42 days after the Court granted Plaintiff's motion to proceed *in forma pauperis,* approved the filing of her Complaint, and directed the Clerk of the Court to issue summonses and forward them with the Complaint to the United States Marshal's Service, for service on Defendants. (Dkt. No. 5 [Decision and Order filed March 7, 2011].) Indeed, Defendants acknowledge that Plaintiff completed the Civil Summonses and USM285 form, and returned them to the Clerk's Office (so that the Clerk's Office could forward them to the U.S. Marshal's Service for service of Plaintiff's Complaint) less than eight days after receiving them from the Clerk's Office. (Dkt. No. 13, Attach. 1, at ¶¶ 6–7; Dkt. No. 13, Attach. 2, at 9 [attaching page "8" of Defs.' Memo. of Law]; *see also* Dkt. Nos. 6, 8.) After that point in time, service was largely if not entirely outside of Plaintiff's control.

Under the circumstances, the Court finds that good cause exists to extend the deadline for service by 42 days. The Court notes that a contrary conclusion (e.g., a conclusion that Plaintiff had to serve her Complaint by December 13, 2010 pursuant to Local Rule 4.1, or even February 11, 2011 pursuant to Fed.R.Civ.P. 4) would render meaningless the Court's directive to the Clerk of the Court, on March 5, 2011, to take sufficient action to enable the United States Marshal's Service to effect service for Plaintiff.

### B. Whether Plaintiff's Complaint Should Be Dismissed for Failure to State a Claim Upon Which Relief Can Be Granted

### 1. Whether Plaintiff's Complaint Should Be Dismissed for Failing to Sufficiently Identify What Constitutional Rights She Is Attempting to Vindicate

**\*8** After carefully considering the matter, the Court must answer this question also in the negative. In construing the pleadings of a *pro se* civil rights litigant in this Circuit, a district court's imagination should be limited only by the plaintiff's factual allegations, not by the legal claims set out in his or her pleadings. *See Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, Phillips has raised. In so doing, the court's imagination should be limited only by Phillips' factual allegations, not by the legal claims set out in his pleadings.").

Here, based on Plaintiff's (albeit scant and confused) factual allegations, the Court can imagine that she is attempting to assert the following three claims: (1) a claim of an unreasonable search under the Fourth Amendment; (2) a claim of an unlawful seizure of, and failure to return, her personal property under the Fourth, Fifth and/or Fourteenth

Amendments; and (3) a claim of excessive force under the Fourth Amendment.

### 2. Whether Plaintiff's Claims Against the Individual Defendants Should Be Dismissed for Failing to Allege Facts Plausibly Suggesting Their Personal Involvement in the Constitutional Violations Alleged

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 13 [attaching page "12" of Defs.' Memo. of Law].) The Court would add only the following three brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. *See, supra,* Part III.C. of this Decision and Order. [13] Second, in any event, the Court would reach the same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, and finally, even when construed with the utmost of special liberality, the Complaint does not identify the precise location of the incident, which officers were responsible for violating her rights, how she suffered the head injury she alleges, what property was taken from her, and how Defendants frustrated her efforts to recover that property. *See Vogeler v. Colbath,* 04–CV–6071, 2005 U.S. Dist. LEXIS 44658, at *29, 2005 WL 2482549 (S.D.N.Y. Oct. 6, 2005) ("Plaintiffs must also allege ... the personal involvement of the Defendant in the actions underlying their claim."). [14]

[13]    Under the circumstances, the Court finds that Plaintiff had sufficient notice of the consequences of failing to respond to the arguments asserted in Defendants' motion. For example, on October 14, 2010, Plaintiff was given a courtesy copy of the District's *Pro Se* Handbook and a courtesy copy of the Local Rules of Practice for the Northern District of New York. (Dkt. No. 4.) In addition, on May 6, 2011, Defendants advised Plaintiff of her need to respond to their arguments. (Dkt. No. 15.) Also, Plaintiff had extensive experience as a *pro se* civil rights litigant in this District, before responding to the motion in question. *See, infra,* Part III.D. of this Decision and Order.

[14]    Indeed, the Court notes that one of the officers that Plaintiff lists in her Complaint has not been

identified. In a prior decision by the Court, Plaintiff was ordered to take reasonable steps to ascertain the identity of the unnamed officer, immediately notify the Court, amend her complaint to include the identity of the third Defendant, and also to have that officer served. (Dkt. No. 5, at 14.) Because Plaintiff has not done so, her alleged physical injuries remain attributable to an unidentified person.

For all of these alternative reasons, Plaintiff's claims against the individual Defendants are dismissed.

### 3. Whether the Syracuse Police Department Should Be Dismissed as a Defendant

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach 2, at 13.) The Court would add only the following three brief points.

**\*9** First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would reach the same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, and finally, "as Plaintiff has been told several times, under New York State law, departments, like the Onondaga County Sheriff's Department, that are merely administrative arms of a municipality, do not have a legal identity separate from the municipality and may not sue or be sued." *Jenkins v. Onondaga Cnty. Sheriff's Dep't,* 12–CV–0855, Report–Recommendation, at 5 (N.D.N.Y. filed June 28, 2012) (Baxter, J.) (citing *Hayes v. Cnty. of Sullivan,* 07–CV–0667, 2012 WL 1129373, at *24 [S.D.N.Y. March 30, 2012]). Because the Syracuse Police Department is merely an administrative arm of the City of Syracuse, it is not a proper defendant in this case. The real party in interest is the City of Syracuse itself.

For all of these alternative reasons, the Syracuse Police Department dismissed as a Defendant.

### 4. Whether, Even if the City of Syracuse Were Substituted for the Police Department, Plaintiff's Claims Against the City Should Be Dismissed for Failing to Allege Facts Plausibly Suggesting Municipal Liability

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 14–15 [attaching pages "13" and "14" of Defs.' Memo. of Law].) The Court would add only the following three brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would reach same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, even when it is construed with the utmost of special liberality, Plaintiff's Complaint has not alleged facts plausibly suggesting a widespread policy or custom promulgated by the municipal policy maker necessary to hold the City liable for her injuries. As indicated above in Part II.E.2. of this Decision and Order, Plaintiff must allege facts plausibly suggesting that the municipality "has adopted a 'custom' or 'policy' which is the 'moving force' behind [the violation]." *Zappala v. Albicelli,* 980 F.Supp. 635, 639 (N.D.N.Y.1997) (Scullin, J.) (citing, *inter alia, Monell v. Dept. of Soc. Servs. of City of New York,* 436 U.S. 658, 689 [1978] ). However, Plaintiff has not alleged *any* official policy or custom adopted by the City of Syracuse or its Police Department,[15] let alone one responsible for the alleged injuries she received. Because *Monell* prohibits the finding of liability against a City when there is no causal connection between a municipal policy and a resulting injury, Syracuse City Police Department cannot be responsible for Plaintiff's alleged injuries. *Monell,* 436 U.S. at 692. As a result, the City of Syracuse cannot be maintained as a Defendant in this action, and Plaintiff's Section 1983 claims against it are dismissed.

[15]     In addition to not alleging facts plausibly suggesting the existence of a department-wide policy or custom, Plaintiff has not alleged facts plausibly suggesting that Officers Liadka, Sands, and the unnamed officer created or promulgated that policy, or even that they were final policymakers. "A municipal official that exercises discretion, whether it be in a constitutional or unconstitutional manner, in an area of which that official is not the final policymaker, cannot, by itself, establish municipal liability." *Clayton v. City of Kingston,* 44 F.Supp.2d 177, 184 (N.D.N.Y.1999) (McAvoy, C.J.).

**\*10** For all of these reasons, Plaintiff's claims against the City of Syracuse Police Department and/or the City of Syracuse are dismissed on this alternative ground.

### 5. Whether, in the Alternative, Plaintiff's Deprivation–of–Property Claim Should Be Dismissed to the Extent It Is Grounded on the Fifth Amendment

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 16–17 [attaching pages "15" and "16" of Defs.' Memo. of Law].) The Court would add only the following four brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would reach the same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, a takings claim is not ripe where a state remedy is potentially available. *Vandor Inc. v. Militello,* 301 F.3d 37, 39 (2d. Cir.2002). As the Supreme Court has explained,

> An unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available. For intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy.

*Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Police are not required to provide the owner with notice for state-law remedies, which are "established by published, generally available state statutes and case law." *City of W. Covina v. Perkins,* 525 U.S. 234, 240–241, 119 S.Ct. 678, 142 L.Ed.2d 636 (1999). "Once the property owner is informed that his property has been seized,

he can turn to these public sources to learn about the remedial procedures that are available to him. The City need not take other steps to inform him of his options." *City of W. Covina, 525 U.S. at 241.* Here, Plaintiff has not alleged facts plausibly suggesting that she attempted to recover her property in the proper manner (or even what property was taken). Fourth, and, finally, Plaintiff does not allege facts suggesting that her property was taken for public use in an unconstitutional manner that would require her to be paid just compensation. Instead, Plaintiff alleges that, after she attempted to escape from their investigation and was restrained by officers, she was searched and had property taken from her.

For all of these alternative reasons, Plaintiff's deprivation-of-property claim is dismissed to the extent that it is grounded on the Fifth Amendment.

### 6. Whether, in the Alternative, Plaintiff's Excessive Force Claim Should Be Dismissed for Failing to Allege Facts Plausibly Suggesting Either that Force Was Used or that Any Such Force Was Excessive

**\*11** After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 17–18 [attaching pages "16" and "17" of Defs.' Memo. of Law].) The Court would add only the following three brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would reach same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, as stated in the Court's Decision and Order of March 7, 2011, in evaluating a Fourth Amendment excessive-force claim, "courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." (Dkt. No. 5, at 13.)[16] Here, Plaintiff alleges the following facts, which could be construed as plausibly suggesting that, at the time the incident occurred, she had given Defendants probable cause to use the force at issue against her: (1) Defendants were dispatched to that location regarding a problem; (2) Defendants specifically chose to question Plaintiff about the incident; (3) Plaintiff was attempting to get away from Defendant when they were attempting to question her; (4) she acted in such a way as to cause Defendants to become "worked up"; (5) it became

necessary for a third unnamed officer to step in and assist Defendants Sands and Liadka in controlling Plaintiff. (Dkt. No. 1, at ¶ 4 & Attachment.) Simply stated, it is plausible, based on Plaintiff's factual allegations, that the amount of force used by the officers to pull her hands behind her back and detain her was necessary to keep her from getting away and "going about [her] business." (*Id.* at ¶ 4.) It is important to note that Plaintiff does not allege facts plausibly suggesting any physical injury other than vague "head & back pains." (*Id.* at ¶ 5.)[17]

[16] More specifically, the standard governing constitutional excessive-force claims against government officials in "the course of making an arrest, investigatory stop, or other seizure" of a person is the Fourth Amendment's objective reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 388, 391, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Pursuant to this standard, three elements must be objectively examined to determine whether excessive force was used for Fourth Amendment violations: "(1) the need for the application of force; (2) the relationship between that need and the amount of force that was used; and (3) the extent of the injury inflicted." *Graham,* 490 U.S. at 390, 397. It is essential to look at surrounding circumstances in each case, and analyze "whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. The "extent of intrusion on the suspect's rights" must be balanced against the "importance of governmental interests." *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

[17] More specifically, Plaintiff's Complaint does not allege facts plausibly suggesting that her injuries were significant, how long the pain lasted, or that medical treatment was necessary (or even sought) following the incident. *See Smith v. City of New York,* 04–CV–3286, 2010 U.S. Dist. LEXIS 88774, at \*27, 2010 WL 3397683 (S.D.N.Y. Aug. 27, 2010) ("Courts in this Circuit have consistently held that an injury is de minimis when it is temporary and/or minor in severity.") (collecting cases).

For all of these reasons, Plaintiff's excessive force claim is dismissed on this alternative ground.

**7. Whether, in the Alternative, Plaintiff's Claims Against the Individual Defendants Should Be Dismissed Because, Based on the Factual Allegations of the Complaint, Defendants Are Protected from Liability as a Matter of Law by the Doctrine of Qualified Immunity**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 19–20 [attaching pages "18" and "19" of Defs.' Memo. of Law].) The Court would add only the following three brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would the reach same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, as indicated above in Part I.E.3. of this Decision and Order, "[u]nder federal law, a police officer is entitled to qualified immunity where (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Jenkins v. City of New York,* 478 F.3d 76, 87 (2d Cir.2007) (internal quotations and other citations omitted). Here, based on Plaintiff's own factual allegations, it is plausible that police officers of reasonable competence could disagree as to whether Defendants' actions were unlawful (e.g., given their need to question her, and her attempt to flee the scene).

**\*12** For all of these reasons, Plaintiff's claims against the individual Defendants are dismissed on this alternative ground.

**C. Whether the Court Should Give Plaintiff an Opportunity to File an Amended Complaint Before Dismissing This Action**

Generally, when a district court dismisses a *pro se* action, the plaintiff will be allowed to amend his action. *See Gomez v. USAA Fed. Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999). However, an opportunity to amend is not required where the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile. As the Second Circuit has explained, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (citations omitted), *accord, Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) ("[T]he court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile.") (citation omitted); *see also Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (denial not abuse of discretion where amendment would be futile); *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with Cuoco's causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.") (citation omitted); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (citation omitted); *Health–Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir.1990) ("[W]here ... there is no merit in the proposed amendments, leave to amend should be denied").

This rule applies even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103; *Brown,* 1997 WL 599355, at *1. As explained above in Part II.B. of this Decision and Order, while the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12; rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.

Here, the Court has some difficulty finding that the referenced defect in Plaintiff's Complaint is merely formal. Nor is the Court confident that granting Plaintiff an opportunity to amend her Complaint will be productive. The Court notes that the errors made by Plaintiff in this action were previously made by her, and not corrected, on many occasions. Plaintiff has been ordered numerous times to file amended complaints at risk of dismissal of her case.[18] Of the seven times an amended complaint was required, Plaintiff submitted an amended complaint only three times.[19] Two of these were one page documents which did not state a claim upon which relief could be granted and were rejected by the Court, and the other did not correct the deficiencies of the original complaint.[20] Plaintiff did not comply with the Court's order

to amend her complaint at all on four occasions.[21] In one case, Plaintiff was given an additional thirty day period to file her complaint after she failed to do so within the first 30 day period granted to her. *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006). Similarly, in a separate case, Plaintiff did not follow up on her original claim because she failed to appear for three hearings the Court rescheduled despite warnings of her need to comply with the Court Orders. *Jenkins v. Onondaga Sheriffs' Dep't,* 05–CV–1457 (N.D.N.Y. filed Nov. 21, 2005). All seven of these cases resulted in dismissal, most for failure to prosecute, failure to comply with Court Orders, or failure to state a claim. Five of Plaintiff's cases were not given leave to amend because granting such leniency would have been futile.[22]

[18]  *Jenkins v. Comm'r of Soc. Sec. Admin.,* 06–CV–0059 (N.D.N.Y. filed Jan 17, 2006); *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. Dep't Corr. Servs.,* 06–CV–0621 (N.D.N.Y. filed May 19, 2006); *Jenkins v. Onondaga Sheriff's Dep't.,* 06–CV–1092 (N.D.N.Y. filed Sept. 12, 2006); *Jenkins v. Sheriff's Dep't.,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007); *Jenkins v. Murphy,* 08–CV–0921 (N.D.N.Y. filed Aug. 8, 2008); *Jenkins v. Onondaga Cnty. Sheriff's Dep't.,* 12–CV–0855 (N.D.N.Y. filed May 23, 2012).

[19]  *Jenkins v. Dep't Corr. Servs.,* 06–CV–0621 (N.D.N.Y. filed May 19, 2006); *Jenkins v. Comm'r of Soc. Sec. Admin.,* 06–CV–0059 (N.D.N.Y. filed Jan 17, 2006); *Jenkins v. Sheriff's Dep't.,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007).

[20]  *Id.*

[21]  *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. Onondaga Sheriff's Dep't.,* 06–CV–1092 (N.D.N.Y. filed Sept. 12, 2006); *Jenkins v. Murphy,* 08–CV–0921 (N.D.N.Y. filed Aug. 8, 2008); *Jenkins v. Onondaga Cnty. Sheriff's Dep't.,* 12–CV–0855 (N.D.N.Y. filed May 23, 2012)

[22]  *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. Mohawk Corr. Facility,* 06–CV–1167 (N.D.N.Y. filed Sept. 29, 2006); *Jenkins v. Sheriff's*

*Dep't,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007); *Jenkins v. USA,* 09–CV0603 (N.D.N.Y. filed May 11, 2009); *Jenkins v. Rice,* 11–CV–1037 (N.D.N.Y. filed Aug. 31, 2011).

**\*13** However, the Court is mindful of the special solicitude that should be afforded to *pro se* civil rights litigants. For these reasons, before the Court dismisses Plaintiff's action, the Court will afford her an opportunity to file an Amended Complaint correcting the above-described pleading defects within thirty (30) days from the date of the filing of this Decision and Order.

If Plaintiff submits an Amended Complaint, she is encouraged to describe the acts of misconduct alleged therein and identify each individual who participated in the misconduct. Moreover, Plaintiff is advised that her Amended Complaint must be a complete pleading that will replace and supersede her original Complaint in its entirety. Finally, Plaintiff is cautioned that, if she fails to file, in a timely fashion, an Amended Complaint that successfully states a claim upon which relief can be granted, her action will be dismissed with prejudice without further Order of the Court.

### D. Whether This Case Should Be Forwarded to the Chief Judge with a Recommendation that an Anti–Filing Injunction Order Be Issued Against Plaintiff

A review of Plaintiff's litigation history on Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service reveals that, before filing the current action on October 13, 2010, she filed thirteen *pro se* civil actions in this District alone-twelve of which have been dismissed and the thirteen of which is being considered for dismissal.[23] A review of Plaintiff's litigation history has caused the undersigned to believe that (1) Plaintiff lacks a good-faith expectation in prevailing in her lawsuits, (2) she is vexatious and indeed incorrigible when proceeding pro se, (3) she has caused needless expense to other parties and placed an unnecessary burden on the Court and its personnel, and (4) no lesser sanctions (e.g., such as dismissal or chastisement) would be adequate to protect the Court and other parties.

[23]  *Jenkins v. Onondaga Sheriffs' Dep't,* 05–CV–1457 (N.D.N.Y. filed Nov. 21, 2005); *Jenkins v. Dep't Corr. Servs.,* 06–CV–0621 (N.D.N.Y. filed May 19, 2006); *Jenkins Comm'r of Soc. Sec. Admin.,* 06–CV–0059 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. City*

*of Syracuse,* 06–CV–1005 (N.D.N.Y. filed Aug. 21, 2006); *Jenkins v. Onondaga Sheriff's Dep't,* 06–CV1092 (N.D.N.Y. filed Sept. 12, 2006); *Jenkins v. Mohawk Corr. Facility,* 06–CV–1167 (N.D.N.Y. filed Sept. 29, 2006); *Jenkins v. City of Syracuse,* 07–CV–0930 (N.D.N.Y. filed Sept. 7, 2007); *Jenkins v. Sheriff's Dep't,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007); *Jenkins v. Murphy,* 08–CV–0921 (N.D.N.Y. filed Aug. 8, 2008); *Jenkins v. USA,* 09–CV–0603 (N.D.N.Y. filed May 11, 2009); *Jenkins v. Rice,* 11–CV–1037 (N.D.N.Y. filed Aug. 31, 2011); *Jenkins v. Onondaga Cnty. Sheriff's Dept.,* 12–CV–0855 (N.D.N.Y filed May 23, 2012).

For example, eight of Plaintiff's actions have resulted in a dismissal for failure to state a claim or frivolousness, another has resulted in the pending recommendation of a dismissal on that ground, three others have resulted in a dismissal for lack of subject-matter jurisdiction, and another has resulted in a dismissal for failure to prosecute. [24]

[24]    *Jenkins v. Onondaga Sheriffs' Dep't,* 05–CV–1457, Decision and Order (N.D.N.Y. filed Apr. 25, 2006) (Scullin, J.); *Jenkins Comm'r of Soc. Sec. Admin.,* 06–CV–0059, Decision and Order (N.D.N.Y. filed March 29, 2007) (Hurd, J.); *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060, Memorandum–Decision and Order (N.D.N.Y. filed April 14, 2006) (Scullin, J.); *Jenkins v. Dep't Corr. Servs.,* 06–CV–0621, Decision and Order (N.D.N.Y. filed July 5, 2006) (Kahn, J.); *Jenkins v. City of Syracuse,* 06–CV–1005, Order (N.D.N.Y. filed Oct. 5, 2006) (Mordue, C.J.); *Jenkins v. Onondaga Sheriff's Dep't,* 06–CV–1092, Decision and Order, (N.D.N.Y. filed Oct. 6, 2006) (McAvoy, J.); *Jenkins v. Mohawk Corr. Facility,* 06–CV–1167, Decision and Order (N.D.N.Y. filed Oct. 12, 2006) (Mordue, C.J.); *Jenkins v. City of Syracuse,* 07–CV–0930, Decision and Order (N.D.N.Y. filed Oct. 7, 2006) (Mordue, C.J.); *Jenkins v. Sheriff's Dep't,* 07–CV–0939, Decision and Order (N.D.N.Y. filed Nov. 21, 2007) (Hurd, J.); *Jenkins v. Murphy,* 08–CV–0921, Order (N.D.N.Y. filed Oct. 14, 2008) (McCurn, J.); *Jenkins v. USA,* 09–CV–0603, Decision and Order (N.D.N.Y. filed May 28, 2009) (McAvoy, J.); *Jenkins v. Rice,* 11–CV–1037, Decision and Order (N.D.N.Y. filed Oct. 11, 2011) (Kahn, J.); *Jenkins*

*v. Onondaga Cnty. Sheriff's Dept.,* 12–CV–0855, Report–Recommendation (N.D.N.Y filed June 28, 2012) (Baxter, M.J.).

Moreover, Plaintiff has sued the Onondaga County Sheriff's Department four times. [25] As a result, she has been repeatedly instructed on the legal standard for suing a municipality. For example, on October 6, 2006, she was specifically informed of the need to establish a custom or policy which is the moving force behind a resulting injury. *Jenkins v. Onondaga Cnty. Sheriff's Dep't.,* 06–CV–1092, Decision and Order, at 4 (N.D.N.Y. filed Oct. 6, 2006) (McAvoy, J.). However, despite receiving that specific information, she has *repeatedly* continued to file improper claims against the Onondaga County Sheriff's Department. [26]

[25]    *Jenkins v. Onondaga Sheriffs' Dep't,* 05–CV–1457 (N.D.N.Y. filed Nov. 21, 2005); *Jenkins v. Onondaga Sheriff's Dep't,* 06–CV–1092 (N.D.N.Y. filed Sept. 12, 2006); *Jenkins v. Sheriff's Dep't,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007); *Jenkins v. Onondaga Cnty. Sheriff's Dept.,* 12–CV–0855 (N.D.N.Y filed May 23, 2012).

[26]    *Jenkins v. Sheriff's Dep't,* 07–CV–0939, Decision and Order at 3 (N.D.N.Y. filed Oct. 2, 2007) (Hurd, J.); *Jenkins v. Sheriff's Dep't,* 07–CV–0939, Decision and Order at 2 (N.D.N.Y. filed Nov. 21, 2007) (Hurd, J.); *Jenkins v. Onondaga Cnty. Sheriff's Dept.,* 12–CV0855, Decision and Order, at 4–5 (N.D.N.Y filed May 24, 2012) (Baxter, M.J.); *Jenkins v. Onondaga Cnty. Sheriff's Dept.,* 12–CV–0855, Report–Recommendation, at 5–6 (N.D.N.Y filed June 28, 2012) (Baxter, M.J.); *see also, supra,* Part III.B.4. of this Decision and Order.

Finally, Plaintiff has repeatedly had to be ordered to comply with the Local Rules, and reminded that all factual allegations should be contained in the complaint itself, that paragraphs ought to be numbered, and that the individuals she alleges violated her rights must be identified. *See, e.g., Jenkins v. Dep't Corr. Servs.,* 06–CV–0621, Decision and Order (N.D.N.Y. filed July 5, 2006) (Kahn, J.); *Jenkins v. Onondaga Sheriff's Dep't,* 06–CV–1092, Order (N.D.N.Y. filed Oct. 6, 2006) (McAvoy, J.).

**\*14** Under such circumstances, a federal district court may impose reasonable filing restrictions on a *pro se* litigant in that particular court, pursuant to 28 U.S.C. § 1651(a) and its inherent authority to control and manage its own docket

2012 WL 4052286

so as to prevent abuse in its proceedings. For example, a federal district court may, after providing an appropriate opportunity to be heard, prohibit a vexatious litigant from filing, in that particular court, any action *pro se* (that is, without counsel), without prior leave of that court. *See Hong Mai Sa v. Doe,* 406 F.3d 155, 158 (2d Cir.2005) ("If a litigant has a history of filing vexatious, harassing or duplicative lawsuits, courts may impose sanctions, including restrictions on future access to the judicial system.") [internal quotations and citations omitted]; *In re Sassower,* 20 F.3d 42, 44 (2d Cir.1994) (where a *pro se* plaintiff has demonstrated a "clear pattern of abusing the litigation process by filing vexatious and frivolous complaints," a "leave to file" requirement may be instituted by the court as an appropriate sanction); *Moates v. Barkley,* 147 F.3d 207, 208 (2d Cir.1998) ( "[T]he district court may not impose a filing injunction on a litigant *sua sponte* without providing the litigant with notice and an opportunity to be heard."); *Azubuko v. Unknown Boston Police Officers,* 08–CV–0330, 2008 WL 1767067, at * 1 (N.D.N.Y. Apr.16, 2008) (McCurn, J.).

For all of these reasons, this case is forwarded to Chief United States District Judge Gary L. Sharpe with a recommendation that an Anti–Filing Injunction Order be issued against Plaintiff.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 13) is ***GRANTED* in part** and ***DENIED* in part;** and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is conditionally ***DISMISSED;*** and it is further

**ORDERED** that Plaintiff is permitted to file an Amended Complaint within **THIRTY (30) DAYS** of the filing date of this Order; and it is further

**ORDERED** that, *if Plaintiff fails to timely file an Amended Complaint, the Clerk shall enter judgment dismissing this action without further Order of this Court;* and it is further

**ORDERED** that, upon filing of the Amended Complaint, this file in this matter be returned to the Court for further review; and it is further

**ORDERED** that the Clerk of the Court is directed to forward this case to Chief United States District Judge Gary L. Sharpe with the recommendation of the undersigned that an AntiFiling Injunction Order be issued against Plaintiff.

*The Court hereby certifies, for purposes of 28 U.S.C. § 1915(a) (3), that any appeal taken from the Court's final judgment in this action would not be taken in good faith.*

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4052286

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.   14

Case 6:24-cv-00687-GTS-MJK   Document 7   Filed 06/20/24   Page 65 of 96

Vance v. Department of Corrections and Community Supervision, Not Reported in Fed....

2020 WL 7481585

2020 WL 7481585
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Wayne Phillip VANCE, Plaintiff,

v.

The State of New York DEPARTMENT
OF CORRECTIONS AND COMMUNITY
SUPERVISION, et al., Defendants.

9:18-CV-748 (BKS/ATB)
|
Signed 11/30/2020

**Attorneys and Law Firms**

WAYNE PHILLIP VANCE, Plaintiff, pro se.

ERIK PINSONNAULT, Asst. Attorney General for
Defendants.

**REPORT-RECOMMENDATION and ORDER**

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** This matter has been referred to me for Report and
Recommendation by the Honorable Brenda K. Sannes,
United States District Judge. On June 21, 2018, plaintiff
commenced this civil rights action pursuant to 42 U.S.C.
§ 1983 against, *inter alia*, the New York State Department
of Corrections and Community Supervision ("DOCCS") and
individuals employed by DOCCS (Complaint ("Compl."),
Dkt. No. 1). By Decision and Order dated November 19,
2018, the Honorable Mae A. D'Agostino [1] dismissed several
defendants and causes of action pursuant to 28 U.S.C. §§
1915, 1915A. (Dkt. No. 25). On April 8, 2019, Judge
D'Agostino dismissed additional defendants and causes of
actions pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994).
(Dkt. No. 52). Liberally construed, the surviving claims in
plaintiff's complaint include (1) Eighth Amendment excessive
force claims against defendants Rief, Barcomb, Engstrom,
Waldron, Rowe, Baxter, Russell, Cox, and Rufa; (2) Eighth
Amendment deliberate medical indifference claim against
defendant Waterson; and (3) Fourteenth Amendment due
process claims against defendants Bullis and Venettozzi
arising out of the June 2016 disciplinary action. (Dkt. Nos. 25
at 32-33; 52 at 3-4).

[1]   By order of recusal, this matter was reassigned to
Judge Sannes for all further proceedings on August
26, 2019. (Dkt. No. 79).

Presently before this court is defendants' motion to dismiss
plaintiff's (1) deliberate medical indifference claim against
defendant Waterson, and (2) due process claim against
defendant Venettozzi. (Dkt. No. 127-1). Plaintiff has not filed
a response to defendants' motion. For the reasons set forth
below, I recommend that defendants' motion be denied.

**I. Facts and Contentions**
In her prior order, Judge D'Agostino summarized the facts as
stated in plaintiff's lengthy complaint. (Dkt. No. 25 at 4-10).
Subsequently, plaintiff submitted various documents cited as
exhibits in the original complaint, which have since been
docketed accordingly. (*See* Dkt. Nos. 1, 64). The court will
briefly review the facts as necessary to discuss the causes of
actions relevant to the pending motion.

**A. Assault at Clinton Correctional Facility**
Plaintiff alleges that he was assaulted on May 11, 2016 by
several correctional officers as a means of intimidation and
to interfere with plaintiff's pending legal actions. (Compl. at
¶¶ 10(e), 14). After the assault, plaintiff was restrained and
escorted to the medical unit at Clinton for examination. (*Id.*
at ¶ 12). Plaintiff suffered multiple injuries from the assault,
including finger and fibula fractures. (*Id.* at ¶ 14(a)-(x)). After,
plaintiff was escorted to the special housing unit ("SHU")
and issued a disciplinary ticket for assaulting a correctional
officer. (*Id.* at ¶¶ 12-13, 18).

**B. Subsequent Disciplinary Hearing**
Non-moving defendant Hearing Officer ("H.O.") Bullis
conducted a disciplinary hearing on June 29, 2016, with
respect to the ticket issued to plaintiff following the alleged
assault at Clinton. (*Id.* ¶ 18). At the conclusion of the hearing,
H.O. Bullis found plaintiff guilty of assault on staff, violent
conduct, creating a disturbance, and refusing a direct order.
(*Id.* at ¶ 18, Exhs. 4, 8).

**\*2** Plaintiff appealed H.O. Bullis's disciplinary hearing
determination. On September 6, 2016, defendant Donald
A. Venettozzi, the Director of the Special Housing/Inmate
Disciplinary Program ("Director Venettozzi"), issued a one-
page "Review of Superintendent's Hearing," affirming H.O.
Bullis's determination. (Dkt. No. 1-14 at 26). The decision

Case 6:24-cv-00687-GTS-MJK    Document 7    Filed 06/20/24    Page 66 of 96

Vance v. Department of Corrections and Community Supervision, Not Reported in Fed....

2020 WL 7481585

states: "On behalf of the Commissioner and in response to your recent letter of appeal, please be advised that your superintendent's hearing of June 29, 2016, has been reviewed and affirmed on September 6, 2016." (*Id.*). The following statement appears at the bottom of the decision: "Appeal decision rendered pursuant to Section 254.8 of Chapter V and electronically produced upon the authority of the Director of Special Housing/Inmate Discipline Program." (*Id.*).

Nevertheless, on November 22, 2016, the June 2016 hearing determination was administratively reversed, and a rehearing was ordered. [2] (Compl. at ¶ 23; Dkt. No. 1-14 at 28). The rehearing was held on December 21, 2016 by non-moving defendant H.O. Liberty at Upstate Correctional Facility ("Upstate"), where plaintiff had since been transferred. (Compl. at ¶ 26). After the rehearing, plaintiff was once again found guilty of assault on staff, violent conduct, creating a disturbance, and refusing a direct order. (*Id.*). Director Venettozzi affirmed the rehearing determination on February 8, 2017. (Compl. at ¶ 30, Dkt. No. 1-14 at 31).

[2]    This decision appears to have been rendered upon DOCCS' receipt of a letter of reconsideration prepared by Prisoners' Legal Services of New York on behalf of the plaintiff. (*See* Dkt. No. 1-14 at 33-34).

### C. Assault at Upstate Correctional Facility
Plaintiff further alleges that he was assaulted by two correctional officers inside his cell while confined at Upstate on August 26, 2016. (Compl. at ¶ 33). After the assault, plaintiff was placed in mechanical restraints and "escorted in a wheelchair to a holding tank to be asked a few questions by [defendant] Nurse G. Waterson." (*Id.*). Plaintiff alleges to have suffered an "abnormal left lower rib" and a "refractured" left fibula as a result of the assault. (*Id.* at ¶ 33(a)).

## II. Motion to Dismiss
To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what

the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.*, 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 71 (2d Cir. 1995). The court must heed its particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir. 2005); *Tapia-Ortiz v. Doe*, 171 F.3d 150, 152 (2d Cir. 1999) (*per curiam*).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment). Finally, the court may consider matters of which judicial notice may be taken, such as public filings and administrative decisions. *See Kavowras v. New York Times, Co.*, 328 F.3d 50, 57 (2d Cir. 2003) (citing *inter alia County Vanlines, Inc. v. Experian Info. Solutions, Inc.*, 205 F.R.D. 148, 154 (S.D.N.Y. 2002) (taking judicial notice of NLRB decisions)). *See also Combier-Kapel v. Biegelson*, 242 F. App'x 714, 715 (2d Cir. 2007) (taking judicial notice of the Impartial Hearing Officer's decision as well as certain other documents in the administrative record of an IDEA case); *In re Howard's Exp., Inc.*, 151 F. App'x 46, 48 (2d Cir. 2005) (taking judicial notice of Bankruptcy Court docket); *Caro v. Fidelity Brokerage Services, LLC*, No. 3:12-CV-1066, 2013 WL 3299708, at *6 (D. Conn. July 26, 2013) (taking judicial notice of record in prior litigation between the same parties).

## III. Personal Involvement

### A. Legal Standards
 **\*3**  The "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983[,]" and supervisory officials may not be held liable merely because they held a position of authority. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citations omitted); *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). A defendant may be considered "personally involved" if

Case 6:24-cv-00687-GTS-MJK  Document 7  Filed 06/20/24  Page 67 of 96

Vance v. Department of Corrections and Community Supervision, Not Reported in Fed....

2020 WL 7481585

(1) the defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)).[3]

[3]    Many courts in this Circuit have discussed whether all of the personal involvement factors, set forth in *Colon*, are still viable after *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). See, e.g., *Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 439 (E.D.N.Y. 2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon*. *Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.' " *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 815 (S.D.N.Y. 2011)). *See also Young v. Choinski*, 15 F. Supp. 3d 172, No. 3:10–CV–606, 2014 WL 962237, at *10–12 (D. Conn. Mar. 13, 2014) ("Although *Iqbal* does arguably cast doubt on the viability of certain categories of supervisory liability, where the Second Circuit has not revisited the criteria for supervisory liability, this Court will continue to recognize and apply the *Colon* factors.").

**B. Application**

**1. Nurse Waterson**

Defendants seek dismissal of the medical deliberate indifference claim against Nurse Waterson for lack of personal involvement and failure to state a claim. (Defendants' Brief ("Def.'s Br.") at 6-8). Specifically, defendants cite to the complaint in identifying plaintiff's allegation that "Nurse Waterson refused to conduct a medical examination *at Clinton* after the May 11, 2016 use of force." (*Id.* at 7, citing Compl. ¶ 59). Defendants proceed to make much of the fact that Nurse Waterson had no personal involvement in plaintiff's medical care at Clinton, therefore could not have been deliberately indifferent to plaintiff's medical needs on that date, and liability may not attach. However, the defendants have improperly construed the complaint, and their argument appears to be based on a single typographical error. Accordingly, this court recommends denying defendants' motion to dismiss the complaint as against Nurse Waterson.

**\*4** The crux of defendants' argument relies on an allegation in paragraph 59 of plaintiff's complaint, which, properly quoted, states: "Nurse G. Waterson had refused to conduct an examination, diagnose, treat, and document all injuries of the use of force incident at **Upstate Correctional Facility** on May 11, 2016." (emphasis added). As defendants point out, the alleged Upstate assault actually occurred on August 26, 2016 – the May 11, 2016 date refers to the alleged Clinton assault. Nevertheless, and despite plaintiff's typographical error, it is clear to this court that the cause of action against Nurse Waterson contemplates his[4] involvement in the events immediately following the August 26, 2016 incident at Upstate. Defendants do not deny that Nurse Waterson was involved, to some extent, in plaintiff's medical care at Upstate on August 26, 2016. Plaintiff describes his interaction with Nurse Waterson on that date in a previous section of the complaint, which recounts the alleged Upstate assault in further detail. (Compl. at ¶ 33). Nurse Waterson is not otherwise identified in any portion of plaintiff's complaint describing the alleged assault at Clinton. Moreover, in making their argument, the defendants have failed to acknowledge that, despite inserting the wrong date, plaintiff's allegation at paragraph 59 cites to the proper correctional facility in describing the underlying facts surrounding Nurse Waterson's misconduct.

Case 6:24-cv-00687-GTS-MJK   Document 7   Filed 06/20/24   Page 68 of 96

Vance v. Department of Corrections and Community Supervision, Not Reported in Fed....

2020 WL 7481585

4     The court adopts defendants' representation that Nurse Waterson is male.

Otherwise stated, this court will not recommend dismissing a pro se plaintiff's claim based on a single typographical error, considering that the complaint otherwise sufficiently apprises defendants of the nature of the cause of action asserted against Nurse Waterson. *See Board of Trustees v. Oao,* 811 F. Supp. 2d 853, 858 n. 2 (S.D.N.Y. 2011) (declining to dismiss the complaint on the basis of "an obvious typographical error," where plaintiff cited to the wrong date but the pleading and subsequent filings otherwise clearly define the period in question).

To the extent that the prior order of this court refers to the surviving claim against Nurse Waterson as relative to the May 11, 2016 alleged assault at Clinton (*See* Dkt. No. 25 at 8, 21), these assertions also appear to be based on plaintiff's typographical error. Should the district court adopt the findings contained herein, I further recommend that the surviving claim against Nurse Waterson be clarified as arising from allegations of deliberate medical indifference challenging his conduct immediately following an assault at Upstate on August 26, 2016.

### 2. Director Venettozzi

Defendants further contend that the complaint should be dismissed against Director Venettozzi for lack of his personal involvement in the alleged events giving rise to plaintiff's due process claim. (Def.'s Br. at 8-12). Plaintiff's only surviving claim against Director Venettozzi is that he affirmed H.O. Bullis's June 29, 2016 disciplinary determination. The courts within this Circuit are split as to whether an affirmance of a disciplinary determination can suffice to establish personal involvement. Some courts have determined that it can. *See Samuels v. Fischer,* 168 F. Supp. 3d 625, 643-44 (S.D.N.Y. 2016) (holding that an affirmance of an unconstitutional disciplinary proceeding can be sufficient to find personal involvement); *Albritton v. Morris,* 2016 WL 1267799, at *15-16 (S.D.N.Y. Mar. 30, 2016) ("[I]t is difficult to imagine how a prison official could be deemed uninvolved where that official considered the inmate's objections and had the power to undo or preserve punishment."). Other courts, including several in the Northern District of New York, subscribe to the "affirmance-plus standard," which holds that "the mere rubber stamping of a disciplinary determination is insufficient to plausibly allege personal involvement." *Scott v. Frederick,*

No. 9:13-CV-605 (TJM), 2015 WL 127864, at *17 (S.D.N.Y. Jan. 8, 2015); *see also Jean-Laurent v. Lane,* No. 9:11-CV-186 (NAM/TWD), 2016 WL 4775742, at *28 (N.D.N.Y. Aug. 18, 2016), *report and recommendation adopted,* 2016 WL 4768828 (N.D.N.Y. Sept. 13, 2016) (subscribing to the "affirmance-plus standard" in finding that defendant, in affirming a hearing officer's disciplinary determination, did not violate plaintiff's due process rights).

This very issue was recently addressed by another court in this district, apparently against the same defendant. *See Pagan v. Venettozzi,* No. 9:18-CV-1094 (TJM/DJS), 2019 WL 7584295 (N.D.N.Y. Dec. 6, 2019), *report and recommendation adopted,* 2020 WL 224700 (N.D.N.Y. Jan. 15, 2020). In *Pagan,* the court denied the defendants' motion to dismiss a due process claim against Venettozzi based on his purported lack of personal involvement in affirming a hearing officer's disciplinary determination. *Id.* at *5. The court emphasized that its decision was based on the fact that "details regarding defendant Venettozzi's affirmance were not included in the pleadings, and the character of the actions taken by defendant Venettozzi were unclear." *Id.* Thus, the court opined that even if it were to agree that some proactive action was needed to show that defendant Venettozzi did not simply rubber stamp the determination, the lack of discovery, or opportunity therefore, precluded the court from dismissing the claim as a matter of law at such an early juncture. *Id.*

**\*5** This case is distinguishable from *Pagan* to some extent, insomuch as plaintiff has submitted documents attached as exhibits to his complaint, including Director Venettozzi's decision on appeal. (Dkt. No. 1-14 at 26). The decision consists of Director Venettozzi's one-sentence affirmance of H.O. Bullis's hearing. (*Id.*). The decision purports to be "electronically produced upon the authority" of Director Venettozzi. (*Id.*). Director Venettozzi's signature also appears to be electronically produced. (*Id.*).

Notwithstanding the nuances between *Pagan* and the pending matter, this court finds it of further consequence that other courts in this district have dismissed similar claims at the summary judgment phase of litigation, upon completion of discovery. *See Jean-Laurent v. Lane,* 2016 WL 4775742, at *28; *Ward v. Lee,* No. 9:16-CV-1224 (FJS/CFH), 2018 WL 4610682, at *11 (N.D.N.Y. July 3, 2018), *report and recommendation adopted,* 2018 WL 3574872 (N.D.N.Y. June 25, 2018).[5] Moreover, while recognizing this district's general adherence to the "affirmance-plus standard," the court is also reminded of its duty to afford a plaintiff the benefit of

Case 6:24-cv-00687-GTS-MJK   Document 7   Filed 06/20/24   Page 69 of 96

Vance v. Department of Corrections and Community Supervision, Not Reported in Fed....

2020 WL 7481585

every reasonable inference to be drawn from the complaint, as well as the special solicitude that the court must give to a plaintiff with pro se status.

5    *But see* Scott v. Frederick, 2015 WL 127864 at *17 (granting defendant's motion to dismiss where "plaintiff fail[ed] to allege a single fact from which it could plausibly be inferred that [defendant] did anything other than rubber-stamp his disciplinary determination."); *see also* Canales v. Sheahan, No. 12-CV-693, 2017 WL 1164462, at *5 (W.D.N.Y. Mar. 28, 2017), *report and recommendation adopted sub nom.*, 2018 WL 774335 (W.D.N.Y. Feb. 7, 2018) ("Notwithstanding the split of authority, Plaintiff alleges no other facts other than Venettozzi's affirmance of the Superintendent Hearing to establish his personal involvement, and the appeal determination attached to the proposed third amended complaint ... suggests no more than a "rubber-stamping" of the determination as contemplated by courts in this Circuit.")

For these reasons, the court recommends that defendants' motion to dismiss plaintiff's claim against Director Venettozzi for lack of personal involvement be denied as premature. It is unclear what, if any, action was taken by Venettozzi in his "review" of H.O. Bullis's disciplinary hearing determination, and plaintiff has not yet been afforded the opportunity to develop these facts. If they deem it appropriate, defendants will have the opportunity to raise this argument in a future motion for summary judgment, at the completion of discovery.

**WHEREFORE**, based on the above, it is **RECOMMENDED**, that defendants' motion to dismiss based upon Fed. R. Civ. P. 12(b)(6) (Dkt. No. 127) be **DENIED;** and it is further

**ORDERED** that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 7481585

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:24-cv-00687-GTS-MJK   Document 7   Filed 06/20/24   Page 70 of 96

Vance v. Venettozzi, Not Reported in Fed. Supp. (2020)

2020 WL 7480955

2020 WL 7480955
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Wayne Phillip VANCE, Plaintiff,

v.

Donald VENETTOZZI, et al., Defendants.

9:18-cv-0748 (BKS/ATB)
|
Signed 12/18/2020

**Attorneys and Law Firms**

Plaintiff, pro se: Wayne Phillip Vance, 12-B-3682, Elmira
Correctional Facility, P.O. Box 500, Elmira, NY 14902.

For Defendants: Letitia James, Attorney General of the State
of New York, Erik Boule Pinsonnault, Assistant Attorney
General, The Capitol, Albany, NY 12224.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, United States District Judge:

**\*1** Plaintiff Wayne Phillip Vance, a New York State inmate,
commenced this action asserting claims under 42 U.S.C.
§ 1983 arising out of his incarceration. (Dkt. No. 1). On
August 24, 2020, Defendants filed a partial motion to dismiss
under Fed. R. Civ. P. 12(b)(6) on behalf of Defendants G.
Waterson and D. Venettozzi. (Dkt. No. 127). Plaintiff did not
file a response; on October 15, 2020, he notified the Court
that he did not intend to respond to the motion. (Dkt. No.
132). This matter was assigned to United States Magistrate
Judge Andrew T. Baxter who, on November 30, 2020, issued
a Report-Recommendation recommending that Defendants'
motion to dismiss be denied. (Dkt. No. 137). [1] Magistrate
Judge Baxter advised the parties that under 28 U.S.C. §
636(b)(1), they had fourteen days within which to file written
objections to the report, and that the failure to object to the
report within fourteen days would preclude appellate review.
(*Id.* at 12).

[1]

In light of what appears to be a typographical
error in the complaint, Magistrate Judge Baxter
recommended that the surviving claim against
Nurse Waterson be clarified as arising from
allegations of deliberate medical indifference
challenging Nurse Waterson's conduct immediately
following an alleged assault at Upstate Correctional
Facility on August 26, 2016. (Dkt. No. 137, at 9).

No objections have been filed. As no objections to the
Report-Recommendation have been filed, and the time
for filing objections has expired, the Court reviews the
Report-Recommendation for clear error. *See Petersen v.
Astrue*, 2 F. Supp. 3d 223, 229 (N.D.N.Y. 2012) (citing
Fed. R. Civ. P. 72(b), Advisory Committee Notes to 1983
amendment). Having reviewed the Report-Recommendation
for clear error and found none, the Court adopts the Report-
Recommendation in its entirety.

For these reasons, it is

**ORDERED** that the Report-Recommendation (Dkt. No. 137)
is **ADOPTED** in its entirety; and it is further

**ORDERED** that the surviving claim against Nurse Waterson
is clarified as arising from allegations of deliberate medical
indifference challenging his conduct immediately following
an alleged assault at Upstate Correctional Facility on August
26, 2016; and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. No.
127) is **DENIED**; and it is further

**ORDERED** that the Clerk serve a copy of this Order upon
the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 7480955

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by    Schoolcraft v. City of New York,    S.D.N.Y.,    May 5, 2015

696 F.Supp.2d 403
United States District Court, S.D. New York.

Timothy KRAFT, Plaintiff,
v.
The CITY OF NEW YORK et al., Defendants.

No. 07 Civ. 02978(DC)
|
March 18, 2010.
|
Opinion Denying Reconsideration April 21, 2010.

**Synopsis**
**Background:** Patient sued city, police officers, physicians, social workers, and other governmental officials and private defendants for damages arising out of his purportedly wrongful transport and admission to psychiatric hospital. Defendants moved for summary judgment dismissing all claims.

**Holdings:** The District Court, Chin, J., held that:

[1] doctor defendants' determinations and actions in retaining patient for further observation and later admitting patient pursuant to New York's Mental Hygiene Law, even if incorrect, did not constitute substantial departure from accepted judgment, practice, or standards, and therefore did not violate due process;

[2] doctor defendants had probable cause and reasonable grounds for believing that plaintiff was subject to seizure; and

[3] police defendants were entitled to qualified immunity for their actions.

Motion granted.

**Procedural Posture(s):** Motion for Summary Judgment.

**West Headnotes (26)**

**[1]**    **Constitutional Law** 🔑 Commitment and proceedings therefor

**Mental Health** 🔑 Persons subject to control or treatment

Due process does not permit the involuntary hospitalization of a person who is not a danger either to herself or to others; however, due process does not require a guarantee that a physician's assessment of the likelihood of serious harm be correct. U.S.C.A. Const.Amend. 14.

3 Cases that cite this headnote

**[2]**    **Constitutional Law** 🔑 Commitment and proceedings therefor

**Health** 🔑 Mental Health

Doctors' determinations and actions in retaining patient for further observation and later admitting patient pursuant to New York's Mental Hygiene Law, even if incorrect, did not constitute substantial departure from accepted judgment, practice, or standards, and therefore did not violate due process; doctors' medical judgments were based on their own observations as well as information from collateral sources, some of which alleged violence and threatening behavior on part of patient, and, to extent that one physician determined from her own examination of patient that he exhibited no symptoms indicative of dangerous mental illness requiring psychiatric hospitalization, such finding was insufficient to meet substantial departure standard. U.S.C.A. Const.Amend. 14; N.Y.McKinney's Mental Hygiene Law §§ 9.39, 9.40.

5 Cases that cite this headnote

**[3]**    **Search, Seizure, and Arrest** 🔑 What Constitutes a Seizure or Detention of a Person

An involuntary confinement to a hospital constitutes a "seizure" within the meaning of the Fourth Amendment. U.S.C.A. Const.Amend. 4.

4 Cases that cite this headnote

**[4]**   **Mental Health**   Persons subject to control or treatment

Fourth Amendment requires that an involuntary hospitalization may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard. U.S.C.A. Const.Amend. 4.

6 Cases that cite this headnote

**[5]**   **False Imprisonment**   Probable cause

Doctor defendants had probable cause and reasonable grounds for believing that patient was subject to seizure under New York's Mental Hygiene Law, and therefore their determinations and actions in retaining patient for further observation and later admitting patient did not violate Fourth Amendment or subject patient to false arrest; doctors' medical judgments, that patient might have a mental illness that would likely result in serious harm to himself or others if left untreated, were based on their own observations as well as information from collateral sources, some of which alleged violence and threatening behavior on the part of patient. U.S.C.A. Const.Amend. 4; N.Y.McKinney's Mental Hygiene Law §§ 9.39, 9.40.

4 Cases that cite this headnote

**[6]**   **Process**   Nature and elements in general

A defendant can be held liable under New York law for malicious abuse of process when he (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.

29 Cases that cite this headnote

**[7]**   **Process**   Improper, ulterior, collateral, or unlawful purpose

To meet collateral objective element of a claim under New York law for malicious abuse of process, a plaintiff must prove not that defendant acted with an improper motive, but rather an improper purpose.

28 Cases that cite this headnote
More cases on this issue

**[8]**   **Process**   Particular cases

Doctor defendants were not liable under New York law for malicious abuse of process for retaining patient for further observation and later admitting patient pursuant to New York's Mental Hygiene Law, since patient failed to establish that doctors admitted him for improper purpose of keeping hospital's psychiatric beds filled, thereby increasing their job security. N.Y.McKinney's Mental Hygiene Law §§ 9.39, 9.40.

**[9]**   **Constitutional Law**   Commitment and proceedings therefor

**Mental Health**   Admission or Commitment Procedure

Where each of the relevant provisions of involuntary commitment provisions of New York's Mental Hygiene Law have been followed, there is no procedural due process violation. U.S.C.A. Const.Amend. 14; N.Y.McKinney's Mental Hygiene Law § 9.39.

3 Cases that cite this headnote

**[10]**   **Civil Rights**   Arrest and detention

**False Imprisonment**   Nature and Elements of False Imprisonment

To state a claim for false arrest under § 1983 or New York law, a plaintiff must show that (1) the defendant intentionally confined the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise justified. 42 U.S.C.A. § 1983.

22 Cases that cite this headnote

**[11]    Civil Rights** 🔑 **Arrest and detention**

**False Imprisonment** 🔑 **Probable cause**

Probable cause to arrest is a complete defense to an action for false arrest under § 1983 or New York law, even where a person is ultimately acquitted, because it constitutes justification. 42 U.S.C.A. § 1983.

17 Cases that cite this headnote

**[12]    Civil Rights** 🔑 **Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general**

Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists. 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[13]    Civil Rights** 🔑 **Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general**

For qualified immunity purposes, an officer's actions are objectively reasonable if a reasonably competent officer would have acted the same way under similar circumstances. 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

**[14]    Civil Rights** 🔑 **Sheriffs, police, and other peace officers**

Even if the seizure violated plaintiff's Fourth Amendment rights, police defendants, who were informed that plaintiff had caused or threatened serious physical harm and had been verbally abusive, were entitled to qualified immunity for their actions in seizing the plaintiff and transporting him to a mental hospital for psychiatric evaluation, and therefore, were not liable under § 1983 for false arrest; reasonable officers in the defendants' position would have believed that they had probable cause to seize plaintiff, and they acted in accordance with emergency medical services (EMS) supervisor's ultimate decision to transport plaintiff to mental hospital, a decision that they believed was not within their purview. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[15]    Civil Rights** 🔑 **Liability of Municipalities and Other Governmental Bodies**

There can be no municipal liability under § 1983 where no constitutional violations are found to have occurred. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[16]    False Imprisonment** 🔑 **Persons procuring or instigating arrest**

For a private defendant to be liable for false arrest or imprisonment in New York, defendant must have affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal to the point where the officer is not acting of his own volition.

3 Cases that cite this headnote

**[17]    False Imprisonment** 🔑 **Persons procuring or instigating arrest**

**Malicious Prosecution** 🔑 **Instigation of or participation in prosecution**

A civilian complainant, by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed, will not be held liable for false arrest or malicious prosecution under New York law.

7 Cases that cite this headnote

**[18]    False Imprisonment** 🔑 **Persons procuring or instigating arrest**

**Malicious Prosecution** 🔑 **Instigation of or participation in prosecution**

Since actions of private defendants, who provided information that led to plaintiff's seizure, did not affirmatively induce plaintiff's seizure to the point where police officers, emergency medical services (EMS) workers and their supervisor, or the doctors at mental hospital were not acting of their own volition in the hospitalization of plaintiff, private defendants were not liable under New York law for false arrest or malicious prosecution.

**[19]**    **Process**    Particular cases

Even if private defendants had an improper motive in seeking plaintiff's confinement at mental hospital, they were not liable under New York law for malicious abuse of process since the objective or purpose of their actions, removal of plaintiff from the premises for psychiatric evaluation and commitment, was not outside the legitimate ends of the legal process, namely plaintiff's arrest and involuntary hospitalization.

30 Cases that cite this headnote

**[20]**    **Damages**    Elements in general

To prevail on a claim for intentional infliction of emotional distress under New York law, plaintiff must prove: (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal relationship between the conduct and the resulting injury; and (4) severe emotional distress.

3 Cases that cite this headnote

**[21]**    **Damages**    Government; criminal justice
**Damages**    Health care

Were actions extreme and outrageous?**No**
Police and doctors defendants' actions in seizing, transporting, and involuntarily committing plaintiff to psychiatric hospital based on probable cause, and in accordance with New York's Mental Hygiene Law were not extreme and outrageous so as to give rise to intentional infliction of emotional distress claim under New York law.

2 Cases that cite this headnote
More cases on this issue

**[22]**    **Damages**    Negligent Infliction of Emotional Distress
**Damages**    Injury or Threat to Another; Bystanders

In New York, a plaintiff may establish negligent infliction of emotional distress claim through either the "bystander theory" or the "direct duty" theory.

**[23]**    **False Imprisonment**    Persons procuring or instigating arrest

Private defendant cannot be liable for false arrest or imprisonment, under New York law, for his active role in arrest unless his role rises to point where arresting authorities are not exercising their own judgment, but rather, are acting on advice and encouragement or importuning of defendant.

15 Cases that cite this headnote

**[24]**    **False Imprisonment**    Persons procuring or instigating arrest

When police independently act to arrest suspect on information provided by a party, that party is not liable for false arrest or imprisonment, under New York law, even if information provided is later found to be erroneous.

1 Case that cites this headnote

**[25]**    **Federal Civil Procedure**    Further evidence or argument

Motion to reconsider should not be granted where moving party seeks solely to relitigate issue already decided.

1 Case that cites this headnote

**[26]**    **Federal Civil Procedure**    Error by court

To be entitled to reconsideration, movant must demonstrate that court overlooked controlling

decisions or factual matters that were put before it on underlying motion, which, had they been considered might reasonably have altered result reached by court.

**Attorneys and Law Firms**

**\*407** Rose M. Weber, Esq., New York, NY, for Plaintiff.

Michael A. Cardozo, Esq., Corporation Counsel of the City of New York, by Elizabeth A. Wells, Esq., Assistant Corporation Counsel, New York, NY, for City of New York Defendants.

Hoey, King, Toker & Epstein, by Glen H. Parker, Esq., Danielle M. Dandrige, Esq., New York, NY, Attorneys for Common Ground Community Defendants.

Lester, Schwab, Katz & Dwyer LLP, by Thomas A. Catalano, Esq., New York, NY, Attorneys for Center for the Urban Community Services Defendants.

*OPINION*

CHIN, District Judge.

On May 18, 2006, plaintiff Timothy Kraft was transported by members of the New York City Police Department (the "NYPD") and the New York City Fire Department (the "FDNY") to Bellevue Hospital following two different incidents with a tenant and staff at his apartment building. Doctors at Bellevue Hospital kept plaintiff overnight for observation and later admitted him over his objection to the psychiatric ward, where he remained until his discharge on May 23, 2006.

In this case, Kraft sues the City of New York (the "City"); Police Officers Brett Bara and Jose Bueno (the "police defendants"); the New York City Health and Hospitals Corporation ("HHC"); Dr. Eli Greenberg, Dr. Fadi Haddad, and Dr. Alyson Maloy (the "doctor defendants"); Amy Cohen; an unnamed emergency medical services ("EMS") supervisor; Common Ground Community H.D.F.C., Inc. ("CGC"), Oretha Franklin, Michael Giordano, Rosanne Haggerty, and Nancy Porcaro (collectively the "CGC defendants"); and the Center for Urban Community Services ("CUCS"), Stacy Neri, and Dawn Bradford (collectively the "CUCS defendants") for damages arising out of his

purportedly wrongful transport and admission to Bellevue Hospital. He asserts claims under 42 U.S.C. § 1983 and state law.

Defendants move for summary judgment dismissing all claims pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, defendants' motions are granted, and the complaint is dismissed.

*BACKGROUND*

**A. *The Facts***

On a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party. The following facts are drawn from the exhibits, declarations, and deposition transcripts submitted by the parties. Conflicts in the evidence have been resolved in plaintiff's favor.

Plaintiff resided at the Prince George, a CGC-operated residential building in Manhattan. (Pl. Dep. 5:1–5; Haggerty Dep. 23:10–18). CGC is a non-profit entity that **\*408** owns and manages several residential properties for use in assisting the homeless. (Dandrige Decl. Ex. B at 1). CUCS is a non-profit social services organization that assists chronically homeless individuals, and it provides such assistance to residents at the Prince George. (*Id.*).

On May 18, 2006, plaintiff was involved in an incident with another tenant, Thomas Hansen, a wheelchair-bound individual who plaintiff saw get out of his wheelchair on many prior occasions. (Pl. Dep. 10–11). Plaintiff was walking out of the Prince George when Hansen (in his wheelchair) approached him and made insulting and threatening remarks. (*Id.* at 10:23–25, 14:1–12). Plaintiff "told him to go to hell" and continued walking up the block. (*Id.* at 15:7–8). Hansen pulled up along side plaintiff, stood up from his wheelchair, and hit plaintiff in the face. (*Id.* at 15:14–18). After plaintiff attempted to punch Hansen several times, he turned around and walked away. (*Id.* at 17:19–23). Oretha Franklin, a member of the security staff at the Prince George, witnessed plaintiff attempting to punch Hansen (*id.* at 94:7–95:7; Franklin Dep. 9–10, 31:13–32:19) and notified her supervisor, Michael Giordano, CGC's assistant director of building operations including security (Giordano Dep. 7:11–15, 8:23–9:3, 76; Weber Decl. Ex. M at NYC 0005).

Later that day, between 4:15 p.m. and 4:30 p.m., plaintiff exited the building, and Hansen, who was outside, started to

threaten him again. (Pl. Dep. 89:9–14). Plaintiff approached Hansen, but Giordano stepped between the two men, telling plaintiff he could not hit Hansen. (*Id.* at 89:13–16, 104:1–3). Plaintiff tried to explain that Hansen had punched him in the face earlier. (*Id.* at 104:3–4). At that point, Giordano pushed plaintiff. (*Id.*).[1] Plaintiff again tried to explain the earlier incident, and Giordano said he did not care and pushed plaintiff again. (*Id.* at 104:4–5). Giordano proceeded to push plaintiff a third time, at which point, plaintiff pushed him back. (*Id.* at 90:1–7). Plaintiff then kicked Hansen's wheelchair and told him to get out of the chair, calling him a "phoney bastard." (*Id.* at 102:21–22). He then walked back into the building. (*Id.* at 102:23–25).

[1]     Giordano denies pushing plaintiff (*see* Giordano Dep. 94:10–14), but for the purposes of this motion I assume plaintiff's version is true.

At that point, Dawn Bradford, a CUCS employee who had witnessed the incident, directed Franklin to call 911. (Bradford–Watt Dep. 4, 86–87). Giordano, Bradford, and Franklin informed Stacey Neri, a CUCS social worker, about the incidents involving plaintiff. (Neri Decl. ¶¶ 5, 10–13). After conferring with Bradford, Neri concluded that plaintiff should be evaluated at Bellevue's Comprehensive Psychiatric Emergency Program ("CPEP") and called 911 again to follow-up. (*Id.* at ¶¶ 15–16).

Police Officers Brett Bara and Jose Bueno of the NYPD arrived at the Prince George and gathered information from Neri, Giordano, Hansen, and plaintiff. (Pl. Dep. 137–40; Bara Dep. 29–30). Plaintiff overheard Neri tell the officers that plaintiff had beat up a man in a wheelchair unprovoked. (Pl. Dep. 125:14–22). Neri further informed them that plaintiff "had become verbally abusive to her" and "was not in the right state of mind at that point." (Bueno Dep. 27:25–28:7). The officers took formal complaints from both Hansen and plaintiff. (Wells Decl. Ex. M at NYC 0266–73). When the officers asked plaintiff to describe what happened, plaintiff raised his voice and spoke loudly, prompting the officers to tell him to calm down. (Pl. Dep. 140:10–12, 141:10–11, 142:9–10). Officer Bueno explained to plaintiff that EMS had been called and **\*409** that he would have to wait for EMS to arrive and evaluate him. (Bueno Dep. 30:9–19). Plaintiff maintains that the officers told him to "go to the corner and stay there and don't move." (Pl. Dep. 127:19–20). Plaintiff did so. (*Id.* at 147:11–18; 148:23–49:4).

EMS arrived at approximately 5:14 p.m. (Dandrige Decl. Ex. O at NYC 0060). Two EMS workers spoke with the officers, Neri, and plaintiff. (Pl. Dep. 155–57). Neri showed plaintiff's file to the EMS workers. (*Id.* at 156:21–23). After some discussion, the EMS workers radioed for their supervisor to come to the Prince George. (*Id.* at 164:24–65:22). The supervisor arrived approximately ten to fifteen minutes later and spoke with the EMS workers, Neri, and the officers. (*Id.* at 165:23–25, 166:19–67:5). He then pointed east and said "let them over there decide." (*Id.* at 167:7–14). Plaintiff then walked to the ambulance on his own. (*Id.* at 168:10–69:4; Bara Dep. 44:20–22). The ambulance transported plaintiff to Bellevue Hospital where EMS escorted plaintiff inside to the admission desk. (Pl. Dep. 170:6–10, 175:1–11). Officers Bara and Bueno followed the ambulance to Bellevue, but did not enter the hospital. (*Id.* at 170:9–10, 176:8–9).

Dr. Greenberg was the attending psychiatrist in the psychiatric emergency room at Bellevue Hospital on the evening of May 18, 2006, and spoke with the EMS workers who transported plaintiff. (Greenberg Decl. ¶¶ 5–6). An unidentified medical student first interviewed plaintiff. (Maloy Dep. 59:22–60:3). The medical student spoke with Neri who informed her that plaintiff had punched a man in a wheelchair unprovoked and that plaintiff had been paranoid and irritable and was following staff members around the building. (Maloy Decl. ¶ 8; Wells Decl. Ex. N at NYC 0051). The medical student also spoke with plaintiff's neighbor, Cleo Capers, who stated that plaintiff had been more agitated over the past two years and had expressed having trouble with the staff in the building. (Wells Decl. Ex. N at NYC 0051). The neighbor, however, had never witnessed plaintiff start any trouble. (*Id.*).

Dr. Maloy then interviewed plaintiff together with the medical student. (Maloy Decl. ¶ 7). The interview lasted between fifteen and forty-five minutes. (Maloy Dep. 55:2–6). According to Dr. Maloy, plaintiff became very angry while describing what had happened that day. (Maloy Decl. ¶ 10). Dr. Maloy requested more references from plaintiff, explaining that because he only interacted with his neighbor occasionally, she felt more references were needed. (Pl. Dep. 186:25–88:4). Plaintiff refused to provide her with anymore references. (*Id.* at 187:16–20).

After interviewing plaintiff, Dr. Maloy determined the global assessment of plaintiff's functioning to be at a "thirty-five" out of "one-hundred."[2] (Maloy Decl. ¶ 11). She also found his affect to be "grandiose." (Maloy Dep. 55:16–18). She determined that plaintiff demonstrated poor judgment in

the incidents involving Hansen and Giordano and that this judgment combined with his grandiosity could be a sign of hypomania or mania, a potentially dangerous condition if untreated. (Maloy Decl. ¶ 12). She concluded that plaintiff's symptoms interfered with his ability to engage in the community in a safe way. (*Id.* at ¶ 11). Dr. Maloy then presented plaintiff's case to Dr. Greenberg. (*Id.* at ¶ 11). At the time, Dr. Maloy was "leaning towards" **\*410** recommending that plaintiff be kept for further observation. (*Id.* at ¶ 12).

2    A "one" is considered unable to function, and a "one-hundred" is considered completely functional. (Maloy Decl. ¶ 11).

Dr. Greenberg then interviewed plaintiff. (Greenberg Decl. ¶ 7). Based on his direct observations of plaintiff, Dr. Maloy's presentation, his own review of plaintiff's medical chart, the information from collateral sources, and his conversation with the EMS workers, Dr. Greenberg concluded that plaintiff exhibited poor judgment and potentially aggressive and violent verbal and physical behavior. (*Id.* at ¶¶ 8–9). Dr. Greenberg determined that plaintiff should be held for further observation under New York Mental Hygiene Law ("M.H.L.") § 9.40. (*Id.* at ¶ 10).

Dr. Maloy certified on the M.H.L. § 9.40 form that she examined plaintiff and determined that he might have a mental illness requiring immediate observation, care, and treatment in the CPEP at Bellevue Hospital. (Maloy Decl. ¶ 14; Wells Decl. Ex. N at NYC 0104). She further certified that, if untreated, plaintiff's illness would likely result in serious harm to himself or others. (Maloy Decl. ¶ 14; Wells Decl. Ex. N at NYC 0104). Dr. Maloy met with plaintiff a second time and informed him that he was being held for further observation for up to seventy-two hours. (Maloy Decl. ¶ 15). She provided plaintiff with a copy of a Notice of Status and Rights of CPEP Emergency Admission. (*Id.*). According to Dr. Maloy, at this point, plaintiff became very angry, stood up from his chair, came within inches of her face, and invaded her personal space. (*Id.* at ¶ 16). Plaintiff was not violent nor did he attempt to hit Dr. Maloy. (Maloy Dep. 47:8–11; Wells Decl. Ex. N at NYC 0055). Plaintiff denies standing up from his chair, raising his voice, or coming close to Dr. Maloy. (Kraft Decl. ¶¶ 4–5).

Plaintiff spent the night of May 18th sleeping intermittently in the waiting room. (Pl. Dep. 188:5–13). He awoke around 7:00 or 8:00 a.m. the next morning (*id.* at 188:22–23) and later met with Amy Cohen, a psychology intern. (*Id.* at 192:20–22; Wells Decl. Ex. N at NYC 0065–66). Cohen interviewed

plaintiff, who recounted the prior incidents at the Prince George. (Wells Decl. Ex. N at NYC 0066). Cohen also spoke with Neri who informed her that plaintiff had demonstrated a recent change in mental status, becoming increasingly agitated the previous day. (*Id.*). Neri also told Cohen about the two incidents at the Prince George. (*Id.*). After interviewing plaintiff, Cohen presented plaintiff's case to Dr. Fadi Haddad, the attending psychiatrist in the psychiatric emergency room of the CPEP on May 19, 2006. (Haddad Decl. ¶¶ 7–8). Dr. Haddad then spoke to a collateral source, Dr. Jack Jurich, plaintiff's outpatient therapist. (*Id.* at ¶ 10). Dr. Jurich informed him that plaintiff had a history of impulse control and a paranoid personality disorder. (*Id.*). Dr. Haddad reviewed plaintiff's medical chart, including Dr. Maloy's report of plaintiff's confrontation with her. (*Id.* at ¶ 11). He concluded that plaintiff's reported behavior with Dr. Maloy showed poor impulse control, and that plaintiff displayed paranoid behavior. (*Id.*).

Dr. Haddad and Cohen then met with plaintiff approximately two to three hours after Cohen's initial interview. (Pl. Dep. 199–200). The meeting lasted fifteen to twenty minutes. (*Id.* at 200:7–8). Dr. Haddad informed plaintiff that he wanted to keep him in the hospital for a longer period of time. (*Id.* at 200–01). He then certified that he had examined plaintiff and had reasonable cause to believe that plaintiff had a mental illness requiring immediate observation, care, and treatment in a mental hospital under M.H.L. § 9.39. (Haddad Decl. ¶ 12; Wells Decl. Ex. N at NYC 0101). He further certified that if plaintiff remained untreated, the condition would likely result in serious harm to himself **\*411** or others. (Haddad Decl. ¶ 12; Wells Decl. Ex. N at NYC 0101). Plaintiff received notification of his M.H.L. § 9.39 status. (Haddad Decl. ¶ 15).

Plaintiff spent the night of May 19th again sleeping intermittently in the waiting room. [3] (Pl. Dep. 207:5–14). He awoke the next morning, was given breakfast, and was later admitted to the psychiatric ward. (*Id.* at 207–08). That morning, Dr. Richard Nadrich confirmed Dr. Haddad's determination under M.H.L. § 9.39. (Haddad Decl. ¶ 13; Wells Decl. Ex. N at NYC 0068, 0102). Plaintiff, however, recalls seeing no doctors on May 20th. (Pl. Dep. 215:16–18).

3    It is unclear from the exhibits provided whether "waiting room" is synonymous with "intake room." (*See* Pl. Dep. 208:13–15).

Plaintiff met with Dr. Terrance Leingang on Monday, May 22, 2006. (*Id.* at 225:8–18). Dr. Leingang interviewed plaintiff

with an intern and a social worker present. (*Id.* at 225:12–24). The interview lasted approximately forty to forty-five minutes. (*Id.* at 229:1–3). Dr. Leingang diagnosed plaintiff with psychothymic disorder, a mild form of manic depressive disorder, and personality disorder with obsessional, paranoid, and narcissistic trends. (Leingang Dep. 47:19–23; Wells Decl. Ex. N at NYC 0248). He concluded that plaintiff was not bipolar, but "clearly had problems." (Leingang Dep. 58:22–59:3). Dr. Leingang determined that plaintiff's primary condition was his obsessional disorder, which could be treated outside of the hospital, though he concluded that doctors could have made the decision to medicate plaintiff over plaintiff's objection. (*Id.* at 59:5–13). Dr. Leingang decided that plaintiff should continue therapy with Dr. Jurich after his discharge and subsequently referred him back to Dr. Jurich. (Wells Decl. Ex. N at NYC 0249). Plaintiff was discharged from Bellevue Hospital on Tuesday, May 23, 2006. (*Id.* at NYC 0245).

### B. *Prior Proceedings*

Plaintiff filed the complaint in this action on April 13, 2007. The complaint asserts four claims against all defendants under 42 U.S.C. § 1983 for substantive due process violations, procedural due process violations, false arrest, and malicious abuse of process. It also asserts a municipal liability claim against the City and the HHC pursuant to *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The complaint also alleges eight additional state law claims against all defendants for false arrest, false imprisonment, malicious abuse of process, intentional infliction of emotional distress, negligent infliction of emotional distress, prima facie tort, negligent hiring and retention, and negligent training and supervision. Various cross claims were then filed among defendants, none of which are the subject of the motions before the Court. On August 29, 2008, on consent of the parties, the Court entered an order dismissing plaintiff's claims against Amy Cohen without prejudice. On May 7, 2009, on stipulation of the parties, the Court entered an order dismissing with prejudice the following claims: (1) plaintiff's federal claims against all CGC and CUCS defendants; (2) plaintiff's procedural due process claims against the individual City police defendants; and (3) plaintiff's state and federal malicious abuse of process claims against the individual City police defendants

The parties completed discovery. These motions followed.

## *412   DISCUSSION

### A. *Applicable Law*

#### 1. *Summary Judgment Standard*

The standards governing motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment should be denied "if the evidence is such that a reasonable jury could return a verdict" in favor of the non-moving party. *See NetJets Aviation, Inc. v. LHC Commc'ns, LLC,* 537 F.3d 168, 178–79 (2d Cir.2008). In deciding a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. *In re "Agent Orange" Prod. Liab. Litig.,* 517 F.3d 76, 87 (2d Cir.2008). The non-moving party cannot, however, "escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *W. World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (internal citations and quotation marks omitted).

#### 2. *Section 1983*

Section 1983 imposes civil liability on any party who, "under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983; *see also Williams v. N.Y. City Hous. Auth. & Local 237, I.B.T.,* No. 05 Civ. 2750(DC), 2007 WL 4215876, at *4, 2007 U.S. Dist. LEXIS 91134, at **12–13 (S.D.N.Y. Nov. 30, 2007), *aff'd,* 335 Fed.Appx. 108 (2d Cir.2009). To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show that (1) defendants acted under "color of state law" (2) to deprive him of a right, privilege, or immunity guaranteed by the Constitution or laws of the United States. *Pitchell v. Callan,* 13 F.3d 545, 547–48 (2d Cir.1994); *see also Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999).

### B. *Federal Claims Against the Doctor Defendants*

### 1. *Substantive Due Process*

Plaintiff alleges that the City doctor defendants violated his right to substantive due process under the Fourteenth Amendment by involuntarily committing him to Bellevue Hospital. He contends that the doctor defendants' diagnoses and determinations under M.H.L. §§ 9.40 and 9.39 were incorrect and that they were based upon either false factual allegations about plaintiff or facts unsupportive of such determinations and diagnoses.

### a. *Applicable Law*

[1]   The Second Circuit has recognized that "[a]n involuntary civil commitment is a 'massive curtailment of liberty.' " *Rodriguez v. City of New York,* 72 F.3d 1051, 1061 (2d Cir.1995) (quoting *Vitek v. Jones,* 445 U.S. 480, 491, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980)). Therefore, "[a]s a substantive matter, due process does not permit the involuntary hospitalization of a person who is not a danger either to herself or to others." *Id.* (citing *O'Connor v. Donaldson,* 422 U.S. 563, 575, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975)). Due process does not, however, "require a guarantee that a physician's assessment of the likelihood of serious harm be correct." *Id.* at 1062. The Second Circuit has instructed **\*413** that "a doctor will not be liable under § 1983 for the treatment decisions she makes unless such decisions are 'such a substantial departure from accepted judgment, practice, or standards as to demonstrate that [she] actually did not base the decision on such a judgment.' " *Kulak v. City of New York,* 88 F.3d 63, 75 (2d Cir.1996) (alteration in original) (quoting *Youngberg v. Romeo,* 457 U.S. 307, 323, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)).

A doctor's decision to commit someone involuntarily under the M.H.L. "does not ordinarily involve matters 'within the layman's realm of knowledge.' " *Olivier v. Robert L. Yeager Mental Health Ctr.,* 398 F.3d 183, 190 (2d Cir.2005) (quoting *Sitts v. United States,* 811 F.2d 736, 740 (2d Cir.1987)). The decision is " 'based on medical 'impressions' drawn from subjective analysis and filtered through the experience of the diagnostician.' " *Id.* (quoting *Addington v. Texas,* 441 U.S. 418, 430, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)). Whether it violates a person's right to substantive due process " 'turns on the *meaning* of the facts which [typically] must be interpreted by expert psychiatrists and psychologists.' " *Id.* at 191 (emphasis and alteration in original) (quoting *Addington,* 441 U.S. at 429, 99 S.Ct. 1804).

"The plaintiff bears the burden of producing competent evidence, typically in the form of expert testimony, regarding applicable medical standards and the defendants' alleged failure to meet those standards." *Fisk v. Letterman,* 501 F.Supp.2d 505, 522 (S.D.N.Y.2007) (citing *Olivier,* 398 F.3d at 190–91; *Drozdik v. City of New York,* No. 01 Civ. 3300(RCC)(GWG), 2003 WL 366639 (S.D.N.Y. Feb. 20, 2003)). In the absence of such evidence, summary judgment is appropriate. *See Kulak,* 88 F.3d at 75 (affirming summary judgment where plaintiff's expert disagreed with defendants' diagnosis of plaintiff, but failed to assert "that it was substantially below accepted professional judgment"; *Fisk,* 501 F.Supp.2d at 524; *Algarin v. N.Y. City Dep't of Corr.,* 460 F.Supp.2d 469, 477 (S.D.N.Y.2006), *aff'd* 267 Fed.Appx. 24 (2d Cir.2008); *see also Olivier,* 398 F.3d at 191.

### b. *Application*

[2]   Construing the evidence in the light most favorable to plaintiff, I conclude that a reasonable jury could not find that the doctor defendants' determinations and actions, even if incorrect, constituted a substantial departure from accepted judgment, practice, or standards.

In support of his claim, plaintiff offers the expert testimony and report of Dr. Mirjana Blokar, a board-certified, licensed psychiatrist. (Wells Decl. Ex. K at 1; Blokar Dep.). Dr. Blokar, however, fails to conclude anywhere in her report or deposition that the doctor defendants' diagnoses, actions, and subsequent determinations under M.H.L. §§ 9.40 and 9.39 fell substantially below accepted medical standards. Excerpts from her deposition testimony provided by the City and plaintiff largely consist of questions and disagreements about the doctor defendants' perceptions, diagnoses, and subsequent actions. (*See* Blokar Dep. 46:18–47:10, 60:9–15, 60:19–25, 61:8–12, 94:15–16). Such statements are not sufficient to raise material issues regarding the treatment decisions made by the doctor defendants. *See Kulak,* 88 F.3d at 75 (finding that expert's disagreement with diagnosis made by defendant doctors failed to raise material issue regarding their treatment decisions and did not constitute determination by expert that defendant doctors' diagnosis fell substantially below accepted professional judgment). Although Dr. Blokar, in one instance, deems a doctor's note in the medical records "unprofessional" (Blokar Dep. 60:13–15), she does not identify any standards from which it departs. Further, critiquing the note's form is not equivalent **\*414** to critiquing the physician's determination, which is the relevant inquiry before this Court. In fact, the only reference Dr. Blokar makes in either her report or her deposition

to any sort of medical standard is when she explains in her deposition that to be involuntarily hospitalized, one has to be deemed imminently dangerous to himself or others. (*Id.* 98:2–17). She fails, however, to assert that the doctor defendants' determination that plaintiff was imminently dangerous substantially departed from accepted judgment, practice, or standards.

To the extent that Dr. Blokar determined from her own examination of plaintiff that he exhibited no symptoms indicative of a dangerous mental illness requiring psychiatric hospitalization (Wells Decl. Ex. K at 2–3), such a finding is insufficient to meet the substantial departure standard under *Kulak.* Dr. Blokar met with plaintiff on one occasion in March of 2009, nearly three years after plaintiff's involuntary confinement at Bellevue Hospital in May of 2006. (*Id.* at 1). The fact that plaintiff appeared healthy in 2009 with no sign of any dangerous mental condition has little bearing on what the doctor defendants may have perceived three years earlier. Notably, Dr. Blokar even qualifies one of her findings in this regard. (*Id.* at 3 ("Mr. Kraft does not suffer a dangerous mental illness and he does not require treatment with psychotropic medications *at this time.*") (emphasis added)).

Dr. Blokar's report and testimony also ignore the fact that five different doctors and two medical and psychology interns examined plaintiff over the course of his five-day confinement at Bellevue Hospital. (Greenberg Decl. ¶¶ 7–10; Haddad Decl. ¶¶ 8–9, 11–14; Leingang Dep. 58–59; Maloy Decl. ¶¶ 8–14). Six of those seven individuals were involved in the initial decision to retain and later admit plaintiff. (Greenberg Decl. ¶¶ 7–10; Haddad Decl. ¶¶ 8–9, 11–14; Maloy Decl. ¶¶ 8–14). The four doctors involved all concluded that plaintiff may have had a mental illness that would likely result in serious harm to himself or others if left untreated. (Greenberg Decl. ¶¶ 7–10; Haddad Decl. ¶¶ 8–9, 11–14; Maloy Decl. ¶¶ 9–14; Wells Decl. Ex. N at NYC 0068, 0102). These determinations were based on their own observations of plaintiff, their review of his medical records, and information elicited from him directly and other collateral sources. (Greenberg Decl. ¶¶ 6–9; Haddad Decl. ¶¶ 8–12; Maloy Decl. ¶¶ 7–10, 13; Wells Decl. Ex. N at NYC 0051, NYC 0055–57, NYC 0065–67).

Plaintiff's contention that the doctor defendants relied on disputed facts and false allegations—primarily, the information provided by Stacey Neri that plaintiff attacked a wheelchair-bound individual unprovoked and the claim by Dr. Maloy that plaintiff displayed threatening behavior upon

learning that he was going to be held for further observation—is rejected. (Pl. Mem. 17–18, 20). First, each doctor defendant stated that no one factor was determinative in making his or her decision to retain or admit plaintiff, but rather, each relied on the total universe of information and observations collected—including their own interactions with plaintiff. (Greenberg Decl. ¶ 11; Haddad Decl. ¶ 14; Maloy Decl. ¶ 13). Second, even assuming that such allegations were false, there is no evidence that the doctor defendants should have known that to be the case or should have discredited the claim by Dr. Maloy, their own colleague, that plaintiff had invaded her personal space and made her fearful when she told him that he was going to be held for further observation. [4]  **415** Plaintiff's own expert even seems to suggest that because of plaintiff's alleged altercation with a wheelchair-bound individual, the doctor defendants were justified in keeping plaintiff for further observation. (Blokar Dep. 96:8–15) ("[I]f you just got that history that they just attacked somebody, you of course want to retain them and find out if they are dangerous."); *see also* (*id.* at 97:24–98:1); (Wells Decl. Ex. K at 3).

[4]  Although there is some conflict between plaintiff's and Dr. Maloy's account of how plaintiff reacted, there is nothing to suggest that Dr. Maloy was lying. The medical records document the encounter and even candidly state that plaintiff "was not violent." (Wells Decl. Ex. N at NYC 0055).

Because plaintiff fails to offer any evidence that the doctor defendants' diagnoses, actions, and subsequent determinations under M.H.L. §§ 9.40 and 9.39 fell substantially below accepted medical standards, no reasonable jury could conclude that they violated plaintiff's substantive due process rights under the Fourteenth Amendment. [5] The City's motion for summary judgment is therefore granted as to the substantive due process claim against the doctor defendants.

[5]  Further, not only does Dr. Blokar fail to assert that the doctor defendants' determinations under M.H.L. §§ 9.40 and 9.39 fell substantially below accepted medical standards, she in fact implies in her report that the initial M.H.L. § 9.40 determination to hold plaintiff for up to seventy-two hours was justified. (Wells Decl. Ex. K at 3) ("staff at Bellevue did not have any justification

for keeping Mr. Kraft involuntarily hospitalized *beyond the requisite 72 hours* ") (emphasis added).

### 2. *False Arrest*

Plaintiff claims that the doctor defendants violated his Fourth Amendment rights by subjecting him to false and improper arrest while at Bellevue Hospital because plaintiff did not meet the criteria for involuntary hospitalization.

#### a. *Applicable Law*

**[3]**   **[4]**   An involuntary confinement to a hospital constitutes a seizure within the meaning of the Fourth Amendment. *Glass v. Mayas,* 984 F.2d 55, 58 (2d Cir.1993); *Drozdik,* 2003 WL 366639, at *5. Such an "infringement" is "tantamount to the infringement of being arrested." *Glass,* 984 F.2d at 58 (internal citation omitted). "The Fourth Amendment requires that an involuntary hospitalization 'may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard.' " *Id.* (quoting *Villanova v. Abrams,* 972 F.2d 792, 795 (7th Cir.1992)).

Pursuant to M.H.L. § 9.40, a comprehensive psychiatric emergency program can retain a person for a period of seventy-two hours when the individual is "alleged to have a mental illness for which immediate observation, care and treatment in such program is appropriate and which is likely to result in serious harm to the person or others." N.Y. Mental Hygiene Law ("M.H.L.") § 9.40(a) (McKinney 2009). Under M.H.L. § 9.39, a hospital can admit a person on that same basis and retain him for a period of fifteen days. *Id.* § 9.39(a). The M.H.L. requires that this finding be made before the individual is committed for an extended period of time. *Drozdik,* 2003 WL 366639, at *5 (citing M.H.L. § 9.39(a)).

#### b. *Application*

**[5]**   Here, the doctor defendants had probable cause and reasonable grounds for believing that plaintiff was subject to seizure under the M.H.L. It is undisputed that the doctor defendants determined that plaintiff might have a mental illness that would likely result in serious harm to **\*416** himself or others if left untreated. Based on this determination, they initially decided to hold him for further observation under M.H.L. § 9.40 and later admit him to the psychiatric ward under M.H.L. § 9.39. As discussed in Section B(1)(b), *supra,* their medical judgments were based on their own observations as well as information

from collateral sources, some of which alleged violence and threatening behavior on the part of plaintiff. *See Drozdik,* 2003 WL 366639, at *5. Moreover, the fact that plaintiff's expert, Dr. Blokar, disagrees with those medical judgments is not enough to defeat summary judgment because she failed to conclude that the doctor defendants' determinations fell substantially below accepted medical standards. *See Kulak,* 88 F.3d at 75 ("[A] doctor will not be liable under § 1983 for the treatment decisions she makes unless such decisions are 'such a substantial departure from accepted judgment, practice, or standards as to demonstrate that [she] actually did not base the decision on such a judgment.' " (alteration in original) (quoting *Youngberg,* 457 U.S. at 323, 102 S.Ct. 2452)). Therefore, the City's motion for summary judgment is granted as to the false arrest claim against the doctor defendants.

### 3. *Malicious Abuse of Process*

Plaintiff accuses the doctor defendants of malicious abuse of process under § 1983.

#### a. *Applicable Law*

**[6]**   **[7]**   A defendant can be held liable for malicious abuse of process when he

> (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse [or] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.

*Savino v. City of New York,* 331 F.3d 63, 76 (2d Cir.2003) (internal citation and quotation marks omitted). The crux of a malicious abuse of process claim is the collateral objective element. To meet this element, a plaintiff must prove not that defendant acted with an improper motive, but rather an improper purpose. *Id.* at 77 (noting that to state a claim for abuse of criminal process, a plaintiff "must claim that [authorities] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution"). For example, tampering with evidence is not considered abuse of process because the goal or purpose—convicting the defendant—is

a legitimate use of process. *See Chamberlain v. Lishansky,* 970 F.Supp. 118, 122 (N.D.N.Y.1997). Fabricating assault charges to save one's job could be abuse of process, however, because "safeguarding one's own employment lies outside the legitimate goal of criminal process." *Hernandez v. Wells,* 01 Civ. 4376(MBM), 2003 WL 22771982, at *9, 2003 U.S. Dist. LEXIS 21146, at *27 (S.D.N.Y. Nov. 18, 2003).

### b. *Application*

**[8]**    Plaintiff argues that he was confined at Bellevue Hospital "for the financial purpose of keeping psychiatric beds filled and [HHC] hospitals running in the black" and that the doctor defendants admitted him for Bellevue Hospital's "financial gain, thereby increasing their job security." (Pl. Mem. 26). Plaintiff states that he intends to introduce evidence at trial documenting this widespread practice by the HHC. (*Id.*). No evidence, however, has been offered as of yet and plaintiff's mere reliance on his conclusory allegations regarding the HHC's practices fails to "set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). The City's motion for summary judgment is therefore granted as to the malicious **\*417** abuse of process claim against the doctor defendants.

### 4. *Procedural Due Process*

Plaintiff alleges that the City doctor defendants violated his right to due process before being deprived of a liberty interest because they failed to comply with the requirements of M.H.L. § 9.39.

### a. *Applicable Law*

**[9]**    The Second Circuit has recognized that involuntary commitment to a mental hospital cannot be executed by the State without due process of law. *Project Release v. Prevost,* 722 F.2d 960, 971 (2d Cir.1983) (citing *O'Connor,* 422 U.S. at 580, 95 S.Ct. 2486 (Burger, C.J., concurring)). It has further held that New York's overall statutory scheme outlining the process for involuntary commitment under the M.H.L. meets the requirements of procedural due process. *Id.* at 971. Where each of the relevant provisions of the M.H.L. have been followed, there is no procedural due process violation. *See Fisk,* 501 F.Supp.2d at 525–26.

### b. *Application*

Here, the doctor defendants complied with each of the relevant provisions of the statute. Indeed, plaintiff does not allege that any of the named doctor defendants violated the M.H.L. Rather, plaintiff claims that a Dr. Nadrich, who is not a party to this action, falsified his medical records and the second M.H.L. § 9.39 certification in violation of the statute. (*See* Compl. 51; Pl. Mem. 25). Plaintiff asserts that this violated his due process, and that the HHC should be held vicariously liable for this violation. (*See* Compl. ¶ 51; Pl. Mem. 25).

Plaintiff's contention regarding Dr. Nadrich, however, does not change the undisputed fact that each of the named doctor defendants in this action complied with the relevant provisions of the M.H.L. Further, plaintiff's argument that the HHC can be held vicariously liable for Dr. Nadrich's procedural due process violations fails because a municipal defendant cannot be held vicariously liable under § 1983 on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.") (emphasis in original). The City's motion for summary judgment is therefore granted as to the procedural due process claim against the doctor defendants and the HHC.

### 5. *Qualified Immunity as to Federal Claims Against the Doctor Defendants*

The doctor defendants also argue that they are entitled to qualified immunity. Because I am granting summary judgment as to their liability under § 1983 and dismissing the remaining state law claims against them, I do not reach the qualified immunity argument.

### C. *Federal Claims Against the Police Defendants*

### 1. *False Arrest*

Plaintiff claims that the City police defendants violated his Fourth Amendment rights by subjecting him to false and improper arrest because they did not have probable cause to believe he had a mental illness and was a danger to himself or others. The police defendants contend that because they did not formally arrest plaintiff or do anything to restrain or affect his movement and because plaintiff voluntarily agreed to wait in the lobby of the Prince George for EMS to arrive, no arrest of plaintiff occurred. (City Mem. **\*418** 15). They further assert that even if plaintiff could demonstrate arrest, the seizure would have been constitutionally permissible because they had probable cause to believe plaintiff was a danger to himself or others. (*Id.* at 15–16). Moreover, even if probable

cause did not exist, the police defendants argue that they are entitled to qualified immunity. (*Id.* at 16–17).

The Court need not to determine whether as a matter of law the police defendants arrested plaintiff or had probable cause to arrest plaintiff. Even if the seizure did violate plaintiff's Fourth Amendment rights, the Court concludes that the police defendants are entitled to qualified immunity for their actions, and therefore, the City's motion for summary judgment is granted as to the false arrest claim against the police defendants. *See, e.g., Anthony,* 339 F.3d at 137 (declining to determine as a matter of law whether defendants had probable cause to arrest plaintiff, but affirming summary judgment because defendants were entitled to qualified immunity for their actions).

### a. *Applicable Law*

**[10]** The elements necessary to state a claim for false arrest under § 1983 are the same as those necessary to state a claim for false arrest under New York law. *See Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). To state a claim for false arrest under New York law, a plaintiff must show that (1) the defendant intentionally confined the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise justified. *See Posr v. Doherty,* 944 F.2d 91, 97 (2d Cir.1991).

**[11]** Probable cause to arrest is a complete defense to an action for false arrest, even where a person is ultimately acquitted, because it constitutes justification. *See Weyant,* 101 F.3d at 852 (citing *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994)); *see also Montalvo v. Jennings,* No. 93 Civ. 8351(KMW), 1996 WL 148483, at *2 (S.D.N.Y. Apr. 1, 1996). "A warrantless seizure for the purpose of involuntary hospitalization 'may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized' is dangerous to herself or to others." *Anthony,* 339 F.3d at 137 (quoting *Glass,* 984 F.2d at 58) (internal citation omitted).

The doctrine of qualified immunity shields police officers from personal liability for "official conduct that 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 127 (2d Cir.1997) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). An officer is therefore entitled to qualified immunity for false arrest if (1) it was objectively

reasonable for the officer to believe that there was probable cause to make the arrest; or (2) if reasonably competent police officers could disagree as to whether there was probable cause to arrest. *See id.* at 128. In qualified immunity cases, the focus is not on the "correctness of the defendants' conduct, but rather the 'objective reasonableness' of their chosen course of action given the circumstances confronting them at the scene." *Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir.1995).

**[12]** Further, "[p]lausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists." *Anthony,* 339 F.3d at 138 (internal citations and quotation marks omitted).

**\*419** **[13]** "[A] defendant is entitled to summary judgment on qualified immunity grounds when 'no reasonable jury ... could conclude that it was objectively unreasonable for the defendant[ ]' to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lennon,* 66 F.3d at 420 (first and third alterations in original) (quoting *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987)). An officer's actions are objectively reasonable if a reasonably competent officer would have acted the same way under similar circumstances. *See id.* at 420–21.

### b. *Application*

**[14]** Here, the actions of the police defendants were objectively reasonable. There is no dispute as to what they knew or observed, or what occurred while they were at the Prince George, notwithstanding whether plaintiff voluntarily agreed to wait for EMS.

Although plaintiff offers the unsupported allegation in his memorandum that "no one advised the police officers that plaintiff had caused or threatened serious physical harm" (Pl. Mem. 12), his own deposition testimony stated that he overheard Stacey Neri tell the police defendants that he "beat up a man in a wheelchair unprovoked." (Pl. Dep. 125:21–22). Neri confirmed this, explaining that she had "informed the police officers that there had been an incident in which Mr. Kraft had punched a tenant and had shoved our Security Director." (Neri Decl. 17). The police defendants also learned from Neri that plaintiff "had become verbally abusive to her" and "was not in the right state of mind at that point." (Bueno Dep. 27:25–28:7; Neri Decl. 17). Further, the police defendants took formal complaints from both Hansen and plaintiff. (Wells Decl. Ex. M at NYC 0266–73). Hansen

accused plaintiff of being "verbally abusive," spitting on him, and attempting to punch him. (*Id.* at NYC 0266; Bara Dep. 29:10–16). According to Officer Bara, Hansen appeared more calm than plaintiff who "began to scream and yell at the top of his lungs." (Bara Dep. 29:18–21). Though plaintiff denies this, he acknowledges that he was talking loudly (Pl. Dep. 142:9–11) and was "totally upset and livid" at the time. (*Id.* at 142:24–43:4).

Further, the police defendants were aware that the radio call to which they had originally responded had been changed to a call concerning an emotionally disturbed person ("EDP") and that EMS was en route to evaluate plaintiff. (Bueno Dep. 27:9–10, 28:23–25, 30:11–19). Officer Bueno explained in his deposition what typically happens once police get an EDP call:

> Once we get a call of an EDP, automatically EMS is going to show up. EMS can make a decision right there and then, if they feel you don't need to go to the hospital, you go on your own way. And if you need to go to the hospital, they'll take you to the hospital. I'm not a doctor obviously.

(Bueno Dep. 30:9–19). Officer Bueno added that police officers do not make the ultimate decision whether someone is an EDP but that they do sometimes decide whether to get EMS involved if they think someone might be an EDP. (Bueno Dep. 48:15–24). Here, neither officer remembers calling EMS, but Officer Bueno testified that he believed "the social worker" (presumably Neri) did. (Bueno Dep. 27:8–17). Officer Bara also testified that he felt plaintiff appeared enough disturbed that a call for EMS was warranted. (Bara Dep. 42:6–9). When the EMS workers and their supervisor arrived, they spoke with the police defendants, and both officers were still present when the supervisor made the decision to transport plaintiff to Bellevue Hospital (Pl. Dep. 155:20–56:13, 166:19–67:11).

**\*420** Consequently, based on these circumstances, reasonable officers in the defendants' position would have believed that they had probable cause to seize plaintiff. It is undisputed that the police defendants acted in accordance with the EMS supervisor's ultimate decision to transport plaintiff to Bellevue Hospital, a decision that they believed

was not within their purview. Such a decision was akin to instructions or orders from a superior or fellow officer, which supports qualified immunity when such instructions or orders are "apparently valid." *See Anthony,* 339 F.3d at 138. Here, the EMS supervisor's decision was apparently valid in light of the two 911 calls, the change of the police radio call to an EDP, and the information provided to the police defendants and EMS personnel by Giordano, Hansen, and Neri. The police defendants reasonably could have concluded, given the EMS supervisor's decision, that probable cause existed to seize plaintiff, and therefore, they are entitled to qualified immunity. *See id.* (finding that because a sergeant's order to seize plaintiff for involuntary hospitalization was "an apparently valid order in light of the substance of the 911 call and all of the surrounding circumstances known to [the officers]," the officers reasonably could have concluded that probable cause existed to seize plaintiff and are thus entitled to qualified immunity). The City's motion for summary judgment is therefore granted as to the false arrest claim against the police defendants.

**2.** *Substantive Due Process*

Plaintiff asserted a substantive due process claim against the police defendants in his complaint. The Stipulation and Order of Dismissal dated May 7, 2009 specified that the parties agreed to the dismissal of "[p]laintiff's due process claims" against the police defendants (Stipulation and Order of Dismissal ii); however, in a parenthetical, it only cited plaintiff's fourth federal claim, which is his procedural due process claim. (*Id.*). In the City's Notice of Motion for Summary Judgment, the police defendants moved for summary judgment on all of plaintiff's claims (City Notice of Mot. for Summ. J.) but failed to assert any argument regarding substantive due process in their memoranda. For the reasons stated in Section C(1)(b), *supra,* and because no reasonable jury could find the police defendants liable for substantive due process violations against plaintiff, I dismiss, *sua sponte,* the substantive due process claim against the police defendants.

**D.** *Monell Claims Against the Municipal Defendants*

 **[15]**    Because I have concluded that no reasonable jury could find that the City doctor defendants violated any constitutional rights of plaintiff, his claim against the HHC under *Monell* is dismissed. *See Doe v. Smith,* 704 F.Supp. 1177, 1188 (S.D.N.Y.1988) ("[T]here can be no municipal liability where no constitutional violations are found to have occurred."); *Vassallo v. Lando,* 591 F.Supp.2d 172, 202

(E.D.N.Y.2008) (holding that "no *Monell* claim can lie" where a court finds no constitutional violation).

Plaintiff also alleges a *Monell* claim against the City based on the actions of the police defendants. A municipality cannot be held liable under § 1983 solely on a theory of *respondeat superior. Monell,* 436 U.S. at 691, 98 S.Ct. 2018. A municipality may, however, be liable under § 1983 when the alleged deprivation of constitutional rights is the result of action pursuant to an official municipal policy, *id.* at 690–91, 98 S.Ct. 2018, or the municipality exhibits deliberate indifference to the possibility of such a constitutional violation. *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir.1995). Plaintiff has not, however, **\*421** produced any evidence showing that any of the alleged constitutional violations were a result of a City policy or the City's deliberate indifference. Although plaintiff lists other cases in which other plaintiffs have made similar allegations with respect to their involuntary hospitalizations (Compl. ¶ 58; Pl. Mem. 29 & n. 9), plaintiff alleges no facts and provides no evidence supporting a *Monell* claim. Plaintiff's claim that the municipal defendants' unconstitutional customs and policies may be "inferred" (Compl.¶ 58) from the list of cases fails to "set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). The City's motion is therefore granted as to the *Monell* claim.

### E. *State Law Claims*

Plaintiff asserts eight state law claims against defendants for (1) false arrest, (2) false imprisonment, (3) malicious abuse of process, [6] (4) intentional infliction of emotional distress ("IIED"), (5) negligent infliction of emotional distress ("NIED"), (6) prima facie tort, (7) negligent hiring and retention, and (8) negligent training and supervision. These claims arise from the same core facts set forth above. Because I conclude that based on these facts a reasonable jury could only find that defendants' actions with respect to plaintiff's transport and admission to Bellevue Hospital were proper, defendants' motions for summary are granted as to the state law claims against them. [7]

[6]     Pursuant to the Stipulation and Order of Dismissal dated May 7, 2009, the malicious abuse of process claim against the police defendants was dismissed.

[7]     Because I dismiss plaintiff's state law claims on the merits, I do not reach the City's argument that dismissal with respect to certain defendants is

appropriate based on plaintiff's alleged failure to file a proper and complete Notice of Claim under General Municipal Law § 50–e.

### 1. *False Arrest and False Imprisonment Claims* [8]

[8]     "In New York, the tort of false arrest is synonymous with that of false imprisonment." *Posr,* 944 F.2d at 96 (citing *Jacques v. Sears, Roebuck & Co.,* 30 N.Y.2d 466, 473, 334 N.Y.S.2d 632, 285 N.E.2d 871 (1972)). As stated in Section C(1)(a), *supra,* the elements of false arrest under New York law are identical to those under § 1983.

#### a. *City Defendants*

Because I have already concluded that the doctor defendants had probable cause and reasonable grounds for believing plaintiff was subject to seizure under the M.H.L., *see supra* Section B(2)(b), and because reasonable officers in the police defendants' position would have believed that they had probable cause to seize plaintiff, *see supra* Section C(1) (b), plaintiff's state law claims for false arrest and false imprisonment against the doctor and police defendants also fail. The City's motion for summary judgment is therefore granted as to the state law claims for false arrest and false imprisonment against the doctor and police defendants.

#### b. *CGC and CUCS Defendants*

[16]     [17]     For a private defendant to be liable for false arrest or imprisonment in New York " '[t]he defendant must have affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal to the point where the officer is not acting of his own volition.' " *Curley v. AMR Corp.,* 153 F.3d 5, 13–14 (2d Cir.1998) (quoting 59 N.Y. Jur.2d *False Imprisonment* § 37 (1987)). While "the plaintiff must prove that the defendant *intended* or *instigated* [his] confinement," **\*422** *King v. Crossland Sav. Bank,* 111 F.3d 251, 257 (2d Cir.1997) (emphasis in original), " '[a] civilian complainant, by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed, will not be held liable for false arrest or malicious prosecution.' " *Carmellino v. N.Y. City Dep't of Educ.,* No. 03 Civ. 5942(PKC), 2006 WL 2583019, at \*61 (S.D.N.Y. Sept. 6, 2006) (quoting *Levy v. Grandone,* 14 A.D.3d 660, 789 N.Y.S.2d 291, 293 (2d Dep't 2005)), *aff'd in part sub nom. Mauskopf v. Dist. 20 of N.Y. City Dep't of Educ.,*

299 Fed.Appx. 100 (2d Cir.2008) *and Papasmiris v. Dist. 20 of N.Y. City Dep't of Educ.,* 299 Fed.Appx. 97 (2d Cir.2008).

 **[18]**   Here, plaintiff fails to offer sufficient evidence that his transport and admission to Bellevue Hospital had been induced by the CGC or CUCS defendants to the point where Officers Bara and Bueno, the EMS workers and their supervisor, or the doctors at Bellevue were not acting of their own volition. While CGC and CUCS defendants did call 911 and provide information that led to plaintiff's seizure, Officer Bara specifically testified that plaintiff appeared disturbed enough to him that *he felt* a call for EMS was warranted. (Bara Dep. 42:6–9) (emphasis added). Officer Bara further testified that plaintiff was yelling and screaming at the top of his lungs (*id.* at 29:18–21), and though plaintiff denies this, he admits that he was talking loudly (Pl. Dep. 142:9–11), was "totally upset and livid" (*id.* at 142:24–43:4), and Officers Bara and Bueno had to tell him to calm down. (*Id.* at 140:10–12, 141:10–11, 142:9–10). Further, doctors at Bellevue Hospital stated that they not only relied on information from collateral sources like Neri in deciding to keep and later admit plaintiff, but also on what they learned about plaintiff through their own observations and interactions with him. (Greenberg Decl. ¶ 11; Haddad Decl. ¶ 14; Maloy Decl. ¶ 13).

Plaintiff's argument that CGC defendants Giordano and Franklin provided false information to police and EMS—specifically, that plaintiff pushed Giordano and was seen punching Hansen—and that Nancy Porcaro, another CGC employee, adopted such alleged falsities in her conversations with Neri and police (Pl. Mem. 13–15) is without merit. Plaintiff, himself, admits to pushing Giordano (Pl. Dep. 90:6–7) and attempting to punch Hansen several times. (*Id.* at 17:19–23). Whether plaintiff's actions were described to police and EMS as "attempting to punch" or actually "punching" Hansen is immaterial. Further, plaintiff's contention that Franklin failed to note in her security report that she did not see the start of the altercation where Hansen was the alleged instigator and that she erroneously noted that Hansen was sitting in his wheelchair (and not standing up) at the time (Pl. Mem. 14–15) is similarly insignificant.

Plaintiff's asserts that CUCS defendants Bradford and Neri were instrumental in his hospitalization due to the fact that Neri provided information to doctors at Bradford's direction, Neri and Bradford failed to report that Giordano had pushed plaintiff three times before plaintiff pushed him back, and since both defendants were social workers, police officers and EMS workers gave "great weight" to their conclusion that

plaintiff needed to be psychiatrically evaluated. (*Id.* at 17–18). Plaintiff's contention is without merit. The fact that Giordano pushed plaintiff first does not change the undisputed fact that plaintiff shoved a CGC employee who was attempting to intervene and separate plaintiff and Hansen. (Giordano Dep. 92:11–25, 99:13–20). Further, as stated above, doctors at Bellevue Hospital did not rely solely on information provided by Neri in deciding   **\*423**  to confine plaintiff. (*See* Greenberg Decl. ¶ 11; Haddad Decl. ¶ 14; Maloy Decl. ¶ 13). Finally, plaintiff offers no evidence that Bradford's or Neri's position with CUCS unduly influenced the judgment or decision of EMS or police to transport plaintiff to Bellevue Hospital.

Consequently, no reasonable jury could conclude that the actions of the CGC and CUCS defendants affirmatively induced plaintiff's seizure to the point where Officers Bara and Bueno, the EMS workers and their supervisor, or the doctors at Bellevue Hospital were not acting of their own volition in the hospitalization of plaintiff. The CGC and CUCS defendants' motions for summary judgment are therefore granted as to the state law claims for false arrest and false imprisonment.

### 2. *Malicious Abuse of Process Claims* [9]

[9]   The elements of a malicious abuse of process claim under § 1983 outlined in Section B(3)(a), *supra,* are identical to those under New York law. *See Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994) (internal citations omitted).

#### a. *Doctor Defendants*

For the same reasons discussed in Section B(3)(b), *supra,* plaintiff's state law claim for malicious abuse of process against the doctor defendants also fails. The City's motion for summary judgment is therefore granted as to the state law claim for malicious abuse of process against the doctor defendants.

#### b. *CGC and CUCS Defendants*

 **[19]**   Plaintiff argues that the CGC and CUCS defendants sought his confinement at Bellevue Hospital because they wanted to be "free of plaintiff at least for a while, and perhaps permanently." (Pl. Mem. 26–27). Even assuming that the CGC and CUCS defendants had an improper *motive* in seeking plaintiff's confinement at Bellevue Hospital, the *objective* or *purpose* of their actions—removal of plaintiff from the premises for psychiatric evaluation and commitment

—is not outside the legitimate ends of the legal process at issue here, which is arrest and involuntary hospitalization. The CGC and CUCS defendants' motions for summary judgment are therefore granted as to the state law claim for malicious abuse of process. [10]

[10]   Because I dismiss plaintiff's malicious abuse of process claims on the merits, I do not reach the CGC and CUCS defendants' arguments that dismissal is appropriate because plaintiff supposedly did not plead or prove special damages with the requisite level of specificity.

### 3. IIED Claim

[20]   To prevail on a claim for IIED under New York law, plaintiff must prove the following four elements: (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal relationship between the conduct and the resulting injury; and (4) severe emotional distress. *See Bender v. City of New York,* 78 F.3d 787, 790 (2d Cir.1996); *Howell v. N.Y. Post Co.,* 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993). In analyzing an IIED claim, courts usually focus on the first element-whether the conduct was extreme or outrageous. *See Stuto v. Fleishman,* 164 F.3d 820, 827 (2d Cir.1999). Without "sufficiently outrageous" conduct, no claim for IIED can be established. *Howell,* 81 N.Y.2d at 122, 596 N.Y.S.2d 350, 612 N.E.2d 699 ("[T]he 'requirements of the rule are rigorous, and difficult to satisfy.' ") (quoting W. Page Keeton et al., Prosser & Keeton on Torts § 12, at 60–61 (5th ed. 1984)).

[21]   Here, plaintiff has not produced evidence sufficient for a reasonable jury to **\*424** conclude that defendants' actions were extreme and outrageous or that he suffered severe emotional distress. As previously discussed, plaintiff's expert failed to find that the doctor defendants' decision to confine plaintiff substantially departed from accepted judgment, practice, or standards and even implies that plaintiff's initial confinement under M.H.L. § 9.40 was justified. *See supra* Section B(1)(b) and note 5. Further, I have already concluded that reasonable officers in the police defendants' position would have believed that they had probable cause to seize plaintiff. *See supra* Section C(1)(b). Finally, in light of what the CGC and CUCS defendants observed at Prince George regarding the incidents involving plaintiff, their actions, as alleged by plaintiff, do not amount to the sort of extreme conduct necessary to support plaintiff's claim here. Defendants' motions for summary judgment are therefore granted as to the IIED claim.

### 4. NIED Claim

[22]   Under New York law, a cause of action for NIED under the "direct duty theory" [11] arises "if [the plaintiff] suffers an emotional injury from defendant's breach of a duty which unreasonably endangered her own physical safety," *Mortise v. United States,* 102 F.3d 693, 696 (2d Cir.1996) (citing *Kennedy v. McKesson Co.,* 58 N.Y.2d 500, 504, 462 N.Y.S.2d 421, 448 N.E.2d 1332 (1983); *Green v. Leibowitz,* 118 A.D.2d 756, 500 N.Y.S.2d 146, 148 (2d Dep't 1986)), or if the breach "causes the plaintiff to fear for his or her own safety." *Matthews v. Malkus,* 377 F.Supp.2d 350, 361 (S.D.N.Y.2005) (internal citations omitted). "The duty in such cases must be specific to the plaintiff, and not some amorphous, free-floating duty to society." *Mortise,* 102 F.3d at 696 (citing *Johnson v. Jamaica Hosp.,* 62 N.Y.2d 523, 526–27, 478 N.Y.S.2d 838, 467 N.E.2d 502 (1984)). *See, e.g., Hazan v. City of New York,* No. 98 Civ. 1716(LAP), 1999 WL 493352, at *5 (S.D.N.Y. July 12, 1999) ("Although the City [of New York] has a general duty to prevent its police force from inflicting unreasonable harm on society at large, this duty was not a special one owed specifically to the plaintiff.") (internal citations omitted); *Cucchi v. N.Y. City Off–Track Betting Corp.,* 818 F.Supp. 647, 656 (S.D.N.Y.1993) ("The termination of an employee does not give rise to a claim for negligent infliction of emotional distress because a corporation owes the same duties to all employees.") (internal citations omitted).

[11]   In New York, a plaintiff may establish an NIED claim through either the "bystander theory" or the "direct duty theory." *Mortise,* 102 F.3d at 696. Though plaintiff fails to articulate which theory he is asserting, based on the facts here, plaintiff seems to be alleging his NIED claim under a direct duty theory.

Here, plaintiff has provided no evidence of any *specific* duty owed to him by defendants, particularly the CGC and CUCS defendants and the police defendants. Plaintiff's complaint is void of any reference to such a duty (*see* Compl. 94–99), and plaintiff's assertion in his memorandum that "[t]here is no question that plaintiff can satisfy [the duty-owed] prong" (Pl. Mem. 39) is insufficient. Further, while the police defendants may owe a general duty to the public, they did not owe any specific duty to plaintiff. *See Hazan,* 1999 WL 493352, at *5. Moreover, for the same reasons and facts discussed in Section B, *supra,* I conclude that no reasonable jury could find that the doctor defendants breached their duty of care

to plaintiff by admitting him to the psychiatric ward. Even assuming they did, plaintiff fails to offer sufficient evidence that such a breach unreasonably endangered his physical **\*425** safety or caused him to fear for his physical safety. Though plaintiff makes the bald assertion that he "was afraid for [his] physical safety" while at Bellevue (Kraft Decl. ¶ 6), he cites only two examples that fail to sufficiently support his claim. In the first, he describes a tall, muscular patient who was "very aggressive and threatening" towards one of the guards and who "frequently looked at [plaintiff] in a menacing manner." (*Id.* at ¶ 7). In the second, he alleges that when he refused to take his medication, a tall, muscular guard told him, " 'We can make you take it.' " (*Id.* at ¶ 8). These instances do not amount to unreasonable endangerment, and no reasonable jury could conclude that plaintiff legitimately feared for his safety. Defendants' motions for summary judgment are therefore granted as to the NIED claim.

### 5. *Prima Facie Tort, Negligent Hiring and Retention, and Negligent Training and Supervision Claims*

Plaintiff asserted additional state law claims for prima facie tort, negligent hiring and retention, and negligent training and supervision in his complaint. Defendants moved for summary judgment on these claims, devoting multiple pages in their memoranda to them. (City Mem. 23–25; CGC Mem. 13–16; CUCS Mem. 12–13). In his opposition, plaintiff does not address any of these claims, and they are therefore deemed abandoned. *See Di Giovanna v. Beth Isr. Med. Ctr.,* 651 F.Supp.2d 193, 208 & n. 108 (S.D.N.Y.2009) (citing cases for proposition that plaintiff's failure to respond to argument made in summary judgment brief constitutes abandonment of claim).

### F. *Claims Against the Unnamed EMS Supervisor*

In his complaint, plaintiff asserted all of the foregoing claims against an unnamed EMS supervisor. As of yet, plaintiff has failed to identify the EMS supervisor by name. The City did not move for summary judgment with respect to the claims against the EMS supervisor. For similar reasons stated above regarding the police and doctor defendants, and because no reasonable jury could find the EMS supervisor liable for his actions concerning plaintiff, I dismiss, *sua sponte,* all claims against the EMS supervisor.

### *CONCLUSION*

For the foregoing reasons, defendants' motions for summary judgment are granted and all claims against defendants are dismissed. The Clerk of the Court shall enter judgment dismissing the complaint, with prejudice.

SO ORDERED.

### *MEMORANDUM DECISION*

In an opinion dated March 18, 2010, I granted defendants' motions for summary judgment and dismissed plaintiff's complaint pursuant to Federal Rule of Civil Procedure 56. *Kraft v. City of New York,* No. 07 Civ. 2978(DC), 2010 WL 1009548 (S.D.N.Y. Mar. 18, 2010). Plaintiff moves for reconsideration. For the reasons set forth in the March 18 opinion, the motion for reconsideration is denied. I add the following:

Plaintiff contends that this Court's March 18 opinion "misconstrued legal precedent and therefore utilized a heightened legal standard that virtually no plaintiff could ever hope to meet" with respect to the false arrest and false imprisonment state law claims against the CGC and CUCS defendants. (Pl. 3/28/ 2010 Ltr. at 1). Plaintiff cites language that appears in two sentences of Section E(1)(b) of the March 18 opinion that concludes there was insufficient evidence that the Common Ground Community H.D.F.C., Inc. ("CGC") defendants and the Center for Urban Community Services (§ "CUCS") **\*426** defendants had induced the police and doctor defendants to act to a point where their actions were not of their "own volition." (*Id.*). He argues that the 'not acting of their own volition' standard is extreme, only marginally supported by case law, and creates an impossible hurdle for plaintiff herein and plaintiffs in general." (*Id.*). Plaintiff also submitted two letters to the Court, independent of his counsel, in which he makes various factual assertions about defendants, the incident at the Prince George, and his confinement at Bellevue Hospital.

First, plaintiff ignores the bulk of this Court's discussion under Section E(1)(b) of the March 18 opinion regarding the applicable law for private defendant liability for false arrest and imprisonment in New York. There, I outline the various factors courts consider in determining whether such a claim has been established. *Kraft,* 2010 WL 1009548, at \*15. My discussion encompassed more than whether arresting authorities must act of their "own volition" and included many of the same substantive points of law and cases that

plaintiff cites in his March 28 letter. *See id.* (*See also* Pl. 3/28/2010 Ltr. at 2–3).

**[23]**  Second, to the extent that plaintiff argues that the language regarding "own volition" is some sort of an "extreme" and "heightened legal standard" (Pl. 3/28/2010 Ltr. at 1), this argument is rejected. A private defendant cannot be liable for his active role in an arrest unless his role rises to a point where the arresting authorities are not exercising " 'their own judgment,' " but rather, are acting on the " 'advice and encouragement or importuning' " of the defendant. *See Levy v. Grandone,* 14 A.D.3d 660, 789 N.Y.S.2d 291, 293 (2d Dep't 2005) (quoting *Mesiti v. Wegman,* 307 A.D.2d 339, 763 N.Y.S.2d 67, 69 (2d Dep't 2003)). Thus, in pages thirty-six through thirty-nine of the March 18 opinion, I discuss how the actions of the CGC and CUCS defendants did not rise to such a level because both the police and doctor defendants not only relied on the information provided by CGC and CUCS personnel, but also on their own observations of and interactions with plaintiff as well as their own judgment. *Kraft,* 2010 WL 1009548, at **16–17.

Third, plaintiff's contention that the "own volition" language is "poorly reasoned" and "only marginally supported by the case law" (Pl. 3/28/ 2010 Ltr. at 1–2) is without merit. The Second Circuit instructed in *Curley v. AMR Corp.* that for a private defendant to be liable for false arrest or imprisonment in New York " '[t]he defendant must have affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal to the point where the officer is not acting of his own volition.' " 153 F.3d 5, 13–14 (2d Cir.1998) (quoting 59 N.Y, Jur.2d *False Imprisonment* § 37 (1987)). Plaintiff cites to the Second Circuit's opinion in *Raysor v. Port Auth. of N.Y. & N.J.,* 768 F.2d 34, 39 (2d Cir.1985), for the argument that the "own volition" language is an overstatement of New York law. (Pl. 3/28/2010 Ltr. at 2). [1] *Raysor,* however, predates *Curley* and thus cannot be considered an abrogation of the "own **\*427** volition" language. Indeed, numerous other courts in this Circuit and in New York rely on the "own volition" language (and often *Curley* ) when stating the law of false arrest in New York. *See, e.g., Morgan v. Nassau County,* No. 03 Civ 5109(SLT)(WDW), 2009 WL 2882823, at *16 (E.D.N.Y. Sept. 2, 2009); *Carmellino v. Dist. 20 of N.Y. City Dep't of Educ.,* No. 03 Civ. 5942(PKC), 2006 WL 2583019, at *61 (S.D.N.Y. Sept. 6, 2006), *aff'd in part sub nom. Mauskopf v. Dist. 20 of N.Y. City Dep't of Educ.,* 299 Fed.Appx. 100 (2d Cir.2008), *and Papasmiris v. Dist. 20 of N.Y. City Dep't of Educ.,* 299 Fed.Appx. 97 (2d Cir.2008);

*Smith v. Reid,* No. 98 Civ 1429(SJ), 2004 WL 528437, at *8 (E.D.N.Y. Mar. 9, 2004); *Nevin v. Citibank, N.A.,* 107 F.Supp.2d 333, 348 (S.D.N.Y.2000); *Oszustowicz v. Admiral Ins. Brokerage Corp.,* 49 A.D.3d 515, 853 N.Y.S.2d 584, 586 (2d Dep't 2008); *Levy,* 789 N.Y.S.2d at 293; *Mesiti,* 763 N.Y.S.2d at 69 (2d Dep't 2003).

[1]    The Second Circuit in *Raysor* briefly addressed a New York court's holding that " 'a defendant in a false arrest action will not be held liable for police detention unless it is shown that the police are not acting on their own volition but rather were carrying out the express directions or demands of the defendant.' " 768 F.2d at 39 (internal citation omitted). The Second Circuit stated that "[w]hile this may be overstating the law of New York, it at least demonstrates that the courts are fully aware of the principle that for a third-party defendant or complainant to be liable for false arrest by the police there has to be an unequivocal complaint or request to arrest." *Id.*

**[24]**   Fourth, plaintiff's claim that the CGC and CUCS defendants "encourag[ed] and importun[ed] the authorities to act, while also providing false and inflammatory information" (Pl. 3/28/2010 Ltr. at 2), fails. "When police independently act to arrest a suspect on information provided by a party, that party is not liable for false imprisonment —*even if the information provided is later found to be erroneous.*" *King v. Crossland Sav. Bank,* 111 F.3d 251, 257 (2d Cir.1997) (emphasis added) (internal citation omitted); *see also Levy,* 789 N.Y.S.2d at 293 (" '[A] civilian complainant, by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed, will not be held liable for false arrest or malicious prosecution.' " (quoting *Mesiti,* 763 N.Y.S.2d at 69)); *Du Chateau v. Metro– North Commuter R.R. Co.,* 253 A.D.2d 128, 688 N.Y.S.2d 12, 15 (1st Dep't 1999) (same). Here, the CGC and CUCS defendants' actions amounted to furnishing information to and seeking the assistance of authorities regarding an individual who might be a danger to himself or others if untreated. *See Kraft,* 2010 WL 1009548, at **16–17. As discussed in Section E(1)(b) of the March 18 opinion and above, the authorities exercised their own judgment and made the ultimate decision, based in part on information provided to them and their own observations, to transport plaintiff to Bellevue Hospital and keep him for further observation.

Fifth, though plaintiff asserts that there is a "lower threshold" for liability of a private defendant on a false arrest or imprisonment claim (Pl. 3/28/2010 Ltr. at 2)—"that the defendant *intended* or *instigated* the confinement of the plaintiff," *Crossland,* 111 F.3d at 257, or that there must be "a request that [plaintiff] be arrested or prosecuted," *Raysor,* 768 F.2d at 39,—the Second Circuit has characterized this as "the *minimal action* necessary to sustain a claim of false arrest or malicious prosecution," *id.* (emphasis added). Hence, despite CGC and CUCS defendants initially calling 911 for police and EMS, and Stacey Neri recommending that plaintiff be psychiatrically assessed, the CGC and CUCS defendants' subsequent actions "cannot be said to have risen to the level of directing or instigating an arrest" of plaintiff. *See Crossland,* 111 F.3d at 257.

**[25]  [26]**   Finally, plaintiff's two additional letters sent independent of his counsel do not change the result. "[A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995). "[T]o be entitled to reconsideration, a movant must demonstrate that the **\*428** Court overlooked controlling decisions or factual matters that were put before it on the underlying motion, which, had they been considered 'might reasonably have altered the result reached by the court.' " *Keiser v. CDC Inv. Mgmt. Corp.,* No. 99 Civ. 12101(WHP), 2004 WL 516212, at \*1 (S.D.N.Y. Mar. 17, 2004) (internal citation omitted).

Here, plaintiff's own submissions largely rearticulate previous assertions already considered and rejected by this Court. They also raise certain different factual allegations that, had they been considered, would not have altered the result

reached in the March 18 opinion. In some instances, plaintiff even makes assertions that are contradictory to what he previously alleged. For example, plaintiff claims to have never spoken with Dr. Greenberg (Pl. 4/3/2010 Ltr. at 1), but plaintiff's response to the City defendants' statement of material facts admits to meeting Dr. Greenberg on the evening of May 18, 2006. (Pl. Resp. to City Def. Statement ¶ 31). In another instance, plaintiff states that Oretha Franklin recanted in her deposition that she saw plaintiff hitting Thomas Hansen, thus contradicting her security report. (Pl. 4/3/2010 Ltr. at 3). Franklin's deposition testimony is void of any such contradiction, however, and makes reference to plaintiff attempting to punch Hansen. (*See* Franklin Dep. 31:13–32:14). Whether Franklin described it as "punching" or "attempting to punch" or "throwing punches" is immaterial. *Kraft,* 2010 WL 1009548, at \*16.

The parties briefed the summary judgment motion on the existing facts, including those in the depositions, declarations, exhibits, and statements of material facts. Plaintiff's own letters seek to relitigate issues not based on any newly acquired facts, but rather, facts that were apparently known at the time but were either (1) not raised by any of the parties or (2) already addressed in the March 18 opinion.

For the reasons set forth above and those in the March 18 opinion, the motion for reconsideration is HEREBY DENIED.

SO ORDERED.

### All Citations

696 F.Supp.2d 403

                  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:24-cv-00687-GTS-MJK    Document 7    Filed 06/20/24    Page 91 of 96

2014 WL 2526620
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Arsharan SETHI, Plaintiff,

v.

NASSAU COUNTY, Nassau County Police Department,
Nassau County P.O. Jeff Bigger, sued herein individually
and in his official capacity, P.O. Eviscerate, sued herein
in his individual and official capacity, Rxr Security Guard
Randy Lnu, Rxr Management Company, Defendants.

No. 11–CV–6380 (SJF)(GRB).
|
Signed June 3, 2014.

**Attorneys and Law Firms**

Harsharan Sethi, Plainview, NY, pro se.

Liora M. Ben-Sorek, Mineola, NY, Heath Adam Bender,
Eustace & Marquez, White Plains, NY, for Defendants.

**ORDER**

FEUERSTEIN, District Judge.

**\*1** On December 30, 2011, plaintiff Harsharan Sethi
("plaintiff") commenced this action pursuant to 42 U.S.C.
§ 1983 ("Section 1983") against Nassau County, Nassau
County Police Department, Police Officer Jeff Biggers
(s/h/a "P.O. Jeff Bigger"), and Police Officer Gregory
Echevarria (s/h/a "P.O. Eviscerate") (collectively, the
"County Defendants"), and RXR Management Company and
"RXR Security Guard Randy" (together, "RXR"). [1] Compl.
On March 23, 2012, the County Defendants answered and
asserted a cross-claim against RXR. [Docket Entry No. 2].
On March 13, 2013, this Court granted RXR's motion for
summary judgment and dismissed all claims and cross-
claims against RXR with prejudice. [Docket Entry No. 26].
Now before the Court is the County Defendants' motion for
summary judgment. [Docket Entry No. 45]. For the reasons
that follow, the County Defendants' motion is GRANTED.

[1]     Specifically, plaintiff asserts three (3) "causes of
        action." First, plaintiff claims that Officer Biggers

and Officer Echevarria "confined plaintiff and
assaulted him without probable cause." Complaint
("Compl.") [Docket Entry No. 1], ¶ 30. The
Court will address this "cause of action" as
two (2) separate claims: (i) false arrest or false
imprisonment (the "false arrest claim"); and (ii)
excessive force. Second, plaintiff alleges that
the "failure of [Nassau County and the Nassau
County Police Department] to provide training
and supervision regarding when a seizure of
a private citizen is appropriate and what is
reasonable force to be used in connection with
such seizure constitutes gross negligence and/or
deliberate indifference to the rights and safety
of the citizens of the state of New York and
the County of Nassau (the *"Monell* claim"
or "municipal liability claim"). Compl. ¶ 34.
Third, plaintiff asserts that RXR assisted Officer
Biggers and Officer Echevarria "in assaulting
plaintiff, unlawfully seizing plaintiff and forcefully
removing him from the premises without reason or
probable cause." Compl. ¶ 40.

I. Factual Background [2]

[2]     The facts are taken from the undisputed statements
        in the County Defendants' Statement of Material
        Facts Pursuant to Local Civil Rule 56.1 ("Defs.'
        56.1 Stmt.") [Docket Entry No. 47], plaintiffs'
        Response to Defendants' Statement of Material
        Facts Pursuant to Rule 56.1 ("PL' 56.1 Stmt.")
        [Docket Entry No. 49], the declaration of
        Liora M. Ben–Sorik in support of the County
        Defendants' motion for summary judgment ("Ben–
        Sorik Decl.") [Docket Entry No. 46] and the
        exhibits attached thereto, and my review of the
        record.

On December 1, 2011, Michelle Trabucchi ("Trabucchi") [3]
called 911 to report that a former employee of Cambridge,
whom she identified as plaintiff Harsharan Sethi, was seen
taking photographs of employees in the lobby level of the
office building, located at 498 RXR Plaza, Uniondale, New
York ("RXR Plaza"). (Defs.' 56.1 Stmt. ¶¶ 2–4; Nassau
Cnty. P.D. Event Search, at 1–2). Trabucchi informed the
911 operator that Cambridge "has an ongoing lawsuit with
[plaintiff]," that plaintiff was "now pacing back and forth"
and "looks a little off," and that employees were "very upset"
and "very nervous." (Defs.' 56.1 Stmt. ¶ 3; Nassau Cnty. P.D.
Event Search, at 2).

3    Plaintiff contends that Trabucchi "was an employee of Worldwide Who's Who ... and was calling for Worldwide Who's Who." (Pl.' 56.1 Stmt. ¶ 2). This is belied by the record. Nassau County Police Department records identify the caller as "Cambridge Who's Who." (Ben–Sorik Decl., Ex. C ("Nassau Cnty. P.D. Event Search"), at 1). Trabucchi testified that she has never worked for Worldwide Who's Who, which is the "umbrella company" for four (4) companies-Cambridge Who's Who Publishing ("Cambridge"), Elite American Publishing ("Elite"), Professional Biographers, and Who's Who Publishers-that are all in the same building and are owned by the same person. (Ben–Sorik Decl., Ex. J ("Trabucchi Depo."), at 6, 25–26). Trabucchi worked for Cambridge as a senior human resources generalist from February 2008 through November 2011, and then began working for Elite. (*Id.* at 6–7). Trabucchi was working for Elite when she made the 911 call on December 1, 2011. (*Id.* at 7). While employed as a senior human resources generalist for both Cambridge and Elite, Trabucchi reported to Deb Morrissey, a Cambridge employee. (*Id.*).

In response to Trabucchi's 911 call, Officer Biggers and Officer Echevarria (together, the "Officers") arrived at RXR Plaza and spoke with Cambridge personnel. (Defs.' 56.1 Stmt. ¶¶ 7, 9). The Officers were told that plaintiff had been fired from his position at Cambridge. (Ben–Sorik Decl., Ex. H ("Biggers Depo."), at 30). The Officers were informed that "one of [Cambridge's] employees was down in the cafeteria and being followed by [plaintiff] and he was taking pictures ... of her." (Ben–Sork Decl., Ex. G ("Echevarria Depo."), at 12–13). The Officers were shown a postcard with "derogatory statements" about Cambridge, purportedly sent by plaintiff to Cambridge employees and/or clients, which included photographs of Cambridge employees. (Biggers Depo., at 29–31; Echevarria Depo., at 12–13; Trabucchi Depo., at 30–32). Following their conversation with Cambridge personnel, the Officers returned to the lobby level of RXR Plaza, where a female Cambridge employee identified plaintiff. (Defs.' 56.1 Stmt. ¶¶ 10–11; Echevarria Depo., at 13–15).

The Officers approached plaintiff and asked him for identification, but plaintiff refused to provide identification and "became very agitated." (Echevarria Depo., at 15–17; Defs.' 56.1 Stmt. ¶¶ 13–17). According to Officer Biggers, plaintiff "was immediately being combative with us" and

"[r]efused to show us his I.D." (Biggers Depo., at 22). At some point, plaintiff told the Officers that he was at RXR Plaza for a dental appointment and presented an appointment card for a future date.[4] (Defs.' 56.1 Stmt. ¶¶ 18; Biggers Depo., at 23–24; Transcript, at 4–5). Officer Biggers went to the dentist's office and was informed that "[plaintiff] was not a patient, [and] was not there for an appointment." (Biggers Depo., at 28; Defs.' 56.1 Stmt. ¶¶ 19–20). Upon concluding that plaintiff "had no legitimate reason to be in the building," the Officers asked plaintiff to leave RXR Plaza. (Biggers Depo., at 28–29; Defs.' 56.1 Stmt. ¶¶ 21–23).

4    On December 1, 2011, plaintiff carried a recording device in the breast pocket of his shirt, which recorded all of his interactions at RXR Plaza. (Ben–Sorik Decl., Ex. I ("Sethi Depo."), at 68–75). The transcript of the audio recording reveals that plaintiff was at the dentist's office for approximately nine (9) minutes, during which time he spoke with the receptionist about insurance coverage and x-rays, and scheduled an appointment for January 11, 2011. (Ben–Sorik Decl., Ex. F ("Transcript"), at 1–3). Plaintiff was not treated by a dentist on December 1, 2011. (Sethi Depo., at 66).

**\*2** When plaintiff did not immediately leave RXR Plaza following the Officers' request, the Officers escorted plaintiff outside, with Officer Echevarria holding plaintiffs right wrist and triceps, and Officer Biggers with a hand on plaintiff's back.[5] (Defs.' 56.1 Stmt. ¶¶ 24–27; Echevarria Depo., at 28–30; Biggers Depo., at 36–41). Once outside, the Officers instructed plaintiff to "get in [his] car" and "leave the property." (Transcript, at 11–12).

5    During the encounter, plaintiff accused the Officers of "hitting" him while he was escorted from the building. (Transcript, at 6). However, plaintiff admitted during his deposition that he used the word "hitting" to describe that one of the officers "pulled my hand and he extended all the way back and twist it." (Sethi Depo., at 134).

Plaintiff did not seek medical treatment for any injuries alleged to have been incurred during the December 1, 2011 encounter with the Officers, nor has plaintiff sought any mental health counseling. (Sethi Depo. at 138, 141). Plaintiff did not file a complaint with any agency regarding the events of December 1, 2011. (*Id.* at 145).

2014 WL 2526620

## II. Analysis

### A. Standard of Review

"Summary judgment must be granted where the pleadings, the discovery and disclosure materials on file, and any affidavits show 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' ' *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir.2011) (quoting Fed.R.Civ.P. 56(a)). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 202 (2d Cir.2007) (internal quotation marks omitted). "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ramos v. Baldor Specialty Foods, Inc.,* 687 F.3d 554, 558 (2d Cir.2012) (internal quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano,* 557 U.S. 557, 586, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009) (internal quotation marks and citation omitted); *see also Fabrikant v. French,* 691 F.3d 193, 205 (2d Cir.2012).

"The moving party bears the burden of establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't,* 613 F.3d 336, 340 (2d Cir.2010) (citation omitted). If this burden is met, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown,* 654 F.3d at 358 (citation omitted). In order to defeat summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (internal quotation marks and citations omitted); *see also Jeffreys v. City of N.Y.,* 426 F.3d 549, 554 (2d Cir.2005) ("At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." (internal quotation marks and citation omitted)).

### B. Section 1983

**\*3** Section 1983 of Title 42 of the United States Code provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured

42 U.S.C. § 1983. "Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law." *Filarsky v. Delia,* —— U.S. ——, ——, 132 S.Ct. 1657, 1661, 182 L.Ed.2d 662 (2012). Thus, to state a Section 1983 claim, a plaintiff must allege: (1) that the challenged conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States," and (2) that such challenged conduct was "committed by a person acting under color of state law." *Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir.2010) (quoting *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994)); *see also Rehberg v. Paulk,* —— U.S. ——, ——  ——, 132 S.Ct. 1497, 1501–02, 182 L.Ed.2d 593 (2012). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of [federal] rights established elsewhere." *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999).

#### 1. Claims Against the Officers

##### a. False Arrest Claim

Plaintiff claims that the Officers subjected "him to an illegal seizure and forc[ed] him from the building without probable cause or reason." Compl. ¶ 3. A claim for false arrest, based on the Fourth Amendment right to be free from unreasonable seizures, is "substantially the same as a false arrest claim under New York law." *Weyant v. Okst,* 101 F.3d 856 (2d Cir.1996). To state a claim for false arrest, a plaintiff must show that: "(1) the defendant[s] intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Jocks v. Tavernier,* 316 F.3d 128, 134–35 (2d Cir.2003) (internal quotation marks and citation omitted).

The County Defendants contend that plaintiff was merely "temporarily stopped to enable Police Officers Biggers and Echevarria in investigating a 911 call of harassment," and that plaintiff was not arrested because he "was free to leave, and even encouraged to leave, the RXR premises." Memorandum of Law in Support of the County Defendants' Motion for Summary Judgment ("Defs.' Mot.") [Docket Entry No. 48], at 6–7. Alternatively, defendants argue that even if plaintiff's detention constituted an arrest, it was privileged "in light of the existence of probable cause." *Id.* at 7.

Police officers may conduct investigatory stops if they have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.' " *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Arrests, on the other hand, must be supported by probable cause. *See United States v. Vargas,* 369 F.3d 98, 101 (2d Cir.2004). "Whether an arrest supportable by probable cause occurs, as distinct from a form of Fourth Amendment intrusion supportable by less than probable cause, depends on the seizure's level of intrusiveness, and on the corresponding degree of justification required to effect each level of intrusiveness." *Posr v. Doherty,* 944 F.2d 91, 98 (2d Cir.1991). "A permissive investigative stop may become an unlawful arrest if the means of detention are 'more intrusive than necessary.' " *United States v. Tehrani,* 49 F.3d 54, 61 (2d Cir.1995) (quoting *United States v. Perea,* 986 F.2d 633, 644 (2d Cir.1993)). "In determining whether an investigatory stop is sufficiently intrusive to ripen into a *de facto* arrest, the Second Circuit considers the 'the amount of force used by the police, the need for such force, and the extent to which the individual's freedom of movement was restrained.' " *Vargas,* 369 F.3d at 101 (quoting *Perea,* 986 F.2d at 645).

 **\*4** Assuming, *arguendo,* that plaintiff's brief encounter with the Officers constituted an arrest, plaintiff may not succeed on his false arrest claim if the Officers had probable cause. *See Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 118 (2d Cir.1995). Probable cause exists whenever "an arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Id.* at 119 (internal quotation marks and citation omitted). Probable cause may "exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information."

*Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994) (citation omitted). "The burden of establishing the absence of probable cause rests on the plaintiff." *Nelson v. Hernandez,* 524 F.Supp.2d 212, 220 (E.D.N.Y.2007) (citations omitted). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant,* 101 F.3d at 845.

The Officers arrived at RXR Plaza in response to a 911 call "for a suspicious person who was harassing and following his former employee and fellow employers," "videotaping them with his cell phone," and who "appeared to be nervous and acting erratically." (Biggers Depo., at 10–11). Upon speaking with Cambridge personnel, the Officers learned that plaintiff had harassed employees in the past. The Officers were shown cards, purportedly sent by plaintiff, which included derogatory comments and photographs of Cambridge employees. A Cambridge employee identified plaintiff to the Officers. Based on this information, the Officers had "reasonably trustworthy information" to believe that plaintiff had, and was presently, harassing CWW employees. [6] *See Singer,* 63 F.3d at 119. Plaintiff submits no evidence other than his own unsubstantiated conclusion, which is insufficient to satisfy his burden to establish that the Officers lacked probable cause. *See Nelson,* 524 F.Supp.2d at 220.

[6]    Under New York law, a person who "intentionally and repeatedly harasses another person by following such person in or about a public place" is guilty of harassment in the first degree. N.Y. Penal Law § 240.25. A person is guilty of harassment in the second degree when, "with intent to harass, annoy or alarm another person ... [he] follows a person in or about a public place," or "engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose." N.Y. Penal Law § 240.26. A person who, "with intent to harass, annoy, threaten or alarm another person ... communicates with a person, anonymously or otherwise, by ... mail, or by transmitting or delivering any other form of written communication, in a manner likely to cause annoyance or alarm" is guilty of aggravated harassment in the second degree. N.Y. Penal Law § 240.30.

2014 WL 2526620

Furthermore, plaintiff was not restrained during the encounter with the Officers, and was in fact, encouraged to leave RXR Plaza. (Defs.' Mot., at 7). It was not until plaintiff ignored the Officers' request that plaintiff leave the premises that the Officers physically touched plaintiff and escorted him out of the building. Under these specific circumstances, plaintiff's encounter with the Officers constituted an investigatory stop, and not an arrest. At the very least, based upon the totality of the circumstances and the facts as told to them, the Officers had a reasonable basis to support an investigatory stop. *See United States v. Gori,* 230 F.3d 44, 53 (2d Cir.2000) (police officer may stop a person to investigate possible criminal behavior based upon reasonable suspicion, even if there is no probable cause to make an arrest); *Floyd v. City of N.Y.,* 959 F.Supp.2d 540, 648 (S.D.N.Y.2013) ("The police has reasonable suspicion to forcibly stop [the suspect] for suspected harassment because he matched a specific description provided by an identified victim, and was in close proximity to the reported harassment just minutes after it allegedly occurred."); *United States v. McCargo,* 464 F.3d 192, 197 (2d Cir.2006) (officers had reasonable suspicion for investigatory stop, where defendant was within proximity of reported crime, even though officers had no physical description of the suspect). Accordingly, the County Defendants' motion for summary judgment is granted with respect to plaintiff's false arrest claim.

b. Excessive Force Claim

**\*5** Plaintiff complains that he was subjected to excessive force during his encounter with the Officers on December 1, 2011. Claims "that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' " are "analyzed under the Fourth Amendment's 'objective reasonableness standard.' " *Graham v. Connor,* 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see also Terranova v. New York,* 676 F.3d 305, 308 (2d Cir.2012), *cert. denied,* ––– U.S. ––––, 133 S.Ct. 414, 184 L.Ed.2d 156 (2012) ("Claims that the police used excessive force are judged under the Fourth Amendment's 'objective reasonableness' standard." (internal quotation marks and citations omitted)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham,* 409 U.S. at 396–97; *see also Tracy v. Freshwater,* 623 F.3d 90, 96 (2d Cir.2010) (accord).

The force used by the Officers to remove plaintiff from RXR Plaza was reasonable under the circumstances where, as discussed above, plaintiff refused to provide identification, became "agitated" and "combative," and failed to comply with the Officers' request that he leave RXR Plaza. (Echevarria Depo., at 17; Biggers Depo., at 22). While plaintiff complained that the Officers were "hitting" him as he was escorted from RXR Plaza, plaintiff later admitted that he used the word "hitting" to describe that one of the officers "pulled [his] hand and [ ] extended all the way back and twist[ed] it." (Transcript at 6; Sethi Depo. at 134). Furthermore, plaintiff admits that he sustained no injuries as a result of the encounter and did not require any medical treatment. Therefore, as a matter of law, "such amount of force cannot be considered excessive ." *Petway v. City of N.Y.,* No. 02–CV–279, 2014 WL 839931, at \*8 (E.D.N.Y. Mar. 4, 2014) (granting summary judgment and dismissing excessive force claim where officer's "slight shove" caused plaintiff no injury and required no medical treatment); *see also Genia v. N, Y. State Troopers,* No. 03–CV–0870, 2007 WL 869594, at \*20 (E.D.N.Y. Mar. 20, 2007) (holding "alleged 'push' cannot constitute unreasonable excessive force in violation of the Fourth Amendment" where plaintiff did not seek medical attention and did not allege any specific injuries); *Roundtree v. City of N.Y.,* 778 F.Supp. 614, 622 (E.D.N.Y.1991) ("[T]o conclude that a 'push' that does not cause the slightest of physical injuries to the plaintiff is nonetheless an actionable use of excessive force would be to hold that *any* physical contact by the arresting officer with an arrested person is actionable."). Accordingly, the County Defendants' motion for summary judgment is granted with respect to plaintiff's excessive force claim. [7]

[7]    Defendants argue that even if the Officers' brief detention and minimal physical contact with plaintiff constitute a constitutional deprivation, the Officers are entitled to qualified immunity. (Defs .' Mot., at 14–15). "As a general rule, police officers are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Kerman v. City of N.Y.,* 374 F.3d 93, 108 (2d Cir.2004) (citations omitted). However, "[i]f the plaintiff fails to establish a constitutional violation, the qualified immunity inquiry ends and the plaintiff may not recover." *Cowan v. Breen,* 352 F.3d 756, 761 (2d Cir.2003) (internal quotation marks and citations

omitted). Because plaintiff has failed to establish a constitutional violation, plaintiff's false arrest and excessive force claims fail and no qualified immunity analysis is required.

### C. Municipal Liability Claim

**\*6** Under *Monell v. Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), "a municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven,* 691 F.3d 72, 80 (2d Cir.2012). In order to prevail on such a claim against a municipal defendant, the plaintiff must establish as a prerequisite an underlying constitutional violation on the part of individual municipal actors. *See Segal v. City of N.Y.,* 459 F.3d 207, 219 (2d Cir.2006) ("*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."); *Askins v. Doe No. 1,* 727 F.3d 248, 253 (2d Cir.2013) (same).

Plaintiff asserts a *Monell* claim against Nassau County and the Nassau County Police Department. Compl. ¶¶ 32–38. "Under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued." *Davis v. Lynbrook Police Dep 't,* 224 F.Supp.2d 463, 477 (E.D.N.Y.2002) (citations omitted). The Nassau County Police Department is an administrative arm of Nassau County,

and thus, lacks capacity to be sued. *See id.* (dismissing claim against police department because it is merely administrative arm of municipality); *Sorell v. Inc. Vill. of Lynbrook,* No. 10–cv–49, 2012 WL 1999642, at \*5 (E.D.N.Y. June 4, 2012) (dismissing claims against the Nassau County Police Department because it is merely an administrative arm of Nassau County, which had been named separately as a defendant for each of plaintiff s claims); *Wharton v. Cnty. of Nassau,* No. 07–cv–2137, 2010 WL 3749077, at \*3 (E.D.N.Y. Sep.20, 2010) (dismissing claims against the Nassau County Police Department because, as an administrative arm of Nassau county, it lacked capacity to be sued). Accordingly, all claims against the Nassau County Police Department are dismissed.

Furthermore, plaintiff has not established an underlying constitutional violation to which *Monell* liability can extend. *See Segal,* 459 F.3d at 219. Therefore, plaintiff's *Monell* claim against Nassau County is dismissed.

### III. Conclusion

For the foregoing reasons, the County Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 is granted. The Clerk of the Court shall enter judgment accordingly and close this case.

### SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 2526620

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.