UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

WAYNE R. SMITH,

Plaintiff,

v. 6:24-CV-0687 (GTS/MJK)

CONNELLY, Oneida County Sheriff Deputy;
and B. PETRIE, Oneida County Sheriff Deputy,

Defendants.

---

APPEARANCES: OF COUNSEL:

WAYNE R. SMITH, 24-B-3346
Plaintiff, *Pro Se*
Orleans Correctional Facility
3531 Gaines Basin Road
Albion, NY 14411

FELT, EVANS, LLP KENNETH L BOBROW, ESQ.
Counsel for Defendants
4-6 North Park Row
Clinton, NY 13323

GLENN T. SUDDABY, United States District Judge

**<u>DECISION and ORDER</u>**

Currently before the Court, in this *pro se* civil rights action filed by Wayne R. Smith ("Plaintiff") against Oneida County Sheriff Deputies Jayme Connelly and Benjamin Petrie ("Defendants"), is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 45.) For the reasons set forth below, Defendants' motion is granted.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Claims

Generally, liberally construed, Plaintiff's Fourth Amended Complaint alleges that, on

November 15, 2023,[1] around 4:58 P.M., at 6106 Lowell Road, Westmoreland, New York, Defendants violated Plaintiff's rights under the Fourth Amendment of the United States Constitution by falsely arresting Plaintiff at his place of residence. (Dkt. No. 34, at 6.)[2] Familiarity with the factual allegations supporting these claims in Plaintiff's Fourth Amended Complaint is assumed in this Decision and Order, which is intended primarily for review by the parties. (*Id.*)

**B. Procedural History**

Plaintiff filed the original Complaint in this action on May 20, 2024. (Dkt. No. 1.) Following the filing of an Amended Complaint on June 7, 2024, United States Magistrate Judge Mitchell J. Katz recommended, upon conducting an initial review, that the Amended Complaint be dismissed other than as to the false arrest claims against Defendant Connelly and an unidentified John Doe Defendant, which recommendations this Court adopted on November 15, 2024. (Dkt. Nos. 7, 12.) Before the Court issued its decision, Plaintiff filed a proposed second

---

1 In the Fourth Amended Complaint, Plaintiff states the date of incident was November 5, 2023. (Dkt. No. 10, at 34.) Defendants instead assert that the date of incident was November 16, 2023. (Dkt. No. 45, Attach. 19.) The exhibits Defendants proffered in support of this motion for summary judgment, including the police reports and declarations, all uniformly indicate the date of incident was November 15, 2023. (Dkt. No. 45, Attachs. 2-3, 5 [Oneida County Sheriff Incident Reports]; Attach. 15 [Benjamin E. Petrie Declaration]; Attach. 16 [Jayme L. Connelly Declaration]; Attach 17 [Daniel J. Walts Declaration].) Based on the Oneida County Sheriff's Department's reports, as "matters of public record," *Taveras v. Semple*, 15-CV-00531, 2023 WL 112848, at *1 (D. Conn. Jan. 5, 2023), the Court takes judicial notice of the November 15, 2023, date of incident, and also notes that the specific date is immaterial to the resolution of Defendants' motion. *See also Williams v. Roberts*, 11-CV-0029, 2011 WL 7468636, at *2 n.4 (N.D.N.Y. Dec. 15, 2011) (Treece, M.J.), *report and recommendation adopted*, 11-CV-0029, 2012 WL 760777 (N.D.N.Y. Mar. 7, 2012) (Suddaby, J.) (noting that, although there was a discrepancy between the Complaint and an exhibit as to the date of the incident, that discrepancy "has no bearing on our overall analysis").

2 Citation to specific page numbers refer to the header numbers generated by CM/ECF, not the pagination of the individual documents.

amended complaint on August 1, 2024, and a proposed third amended complaint on August 23, 2024. (Dkt. Nos. 8, 10.) On December 11, 2024, Magistrate Judge Katz recommended both that the proposed third amended complaint be accepted as the operative pleading and that all claims other than the false arrest claims against Defendant Connelly and the John Doe Defendant be dismissed. (Dkt. No. 15.) The Court adopted those recommendations in their entirety on March 28, 2025. (Dkt. No. 16.)

On May 30, 2025, Plaintiff wrote to inform the Court he had identified the John Doe Defendant and sought to serve Oneida County Sheriff's Deputy "B. Petrie" with the Third Amended Complaint. (Dkt. No. 26.) Pursuant to the Court's order of June 13, 2025, Plaintiff filed the Fourth Amended Complaint replacing the John Doe Defendant with Defendant Petrie on July 2, 2025. (Dkt. Nos. 29, 34.) Defendants filed their Answer on August 15, 2025. (Dkt. No. 39.)

**C. Undisputed Material Facts**

Under N.D.N.Y. Local Rule 56.1, a party opposing summary judgment must file a response to the moving party's Statement of Material Facts that "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs," supported by "a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 56.1(b). This requirement is not a mere formality; rather "this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties." *LaFever v. Clarke*, 17-CV-1206, 2021 WL 921688, at *6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting *Frantti v. New York*, 414 F. Supp. 3d 257, 284 [N.D.N.Y. 2019] [Hurd, J.]). Indeed, "[a] proper response to a movant's

statement of material facts streamlines the summary judgment analysis 'by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves.'" *LaFever*, 2021 WL 921688, at *7 (quoting *Alke v. Adams*, 16-CV-0845, 2018 WL 5297809, at *2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]). "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 56.1(b).

As an initial matter, the Court notes that Plaintiff failed to file either a response memorandum of law or a response to Defendants' Statement of Material Facts within the time period permitted. Specifically, Plaintiff was required to file his response papers by May 11, 2026, but there is no indication of any response filed on the docket until June 8, 2026. (Dkt. No. 50.) Defendants note in their reply memorandum of law that, although nothing was ever filed on the docket, they did receive, at their counsel's office, documents purporting to be a response to their Statement of Material Facts that were dated April 27, 2026, and received by that office on May 6, 2026. (Dkt. No. 49, at 4.) In a "response" filed by Plaintiff on the docket on June 8, 2026, he indicates that the submission is a revised version of his response to Defendants' Statement of Material Facts, acknowledging that the first one was "not done correctly." (Dkt. No. 50, at 1.) Under the circumstances, although Plaintiff did not file his response papers in a timely manner, the Court will nonetheless consider his submitted response to Defendants' Statement of Material Facts in light of both his *pro se* status and the fact that he made a documented attempt to submit a timely response to Defendants (albeit in an incorrect manner).

Applying the relevant legal standard here, the following facts have been asserted and supported by Defendants' record citations, and either expressly admitted or denied without a supporting record citation by Plaintiff. (Dkt. No. 45, Attach. 18; Dkt. No. 50.)

1. On November 15, 2023, at approximately 4:18:45 P.M., a process server called 911 claiming that a man at 6106 Lowell Road, Westmoreland, New York 13490 ("Residence") had tried to get his dog to attack the caller. The caller later stated that the man tried to assault him in his car and hit him. The caller was identified as Jakeem Penn.[3]

2. On November 15, 2023, at approximately 4:22 P.M., Defendant Benjamin Petrie ("Petrie") was dispatched to a reported dispute at the Residence. The dispatch information provided was that a process server had gone to the Residence and the homeowner tried to use a dog to attack him.[4]

3. Defendant Jayme Connelly ("Connelly") and Deputy Daniel Walts ("Walts") were dispatched to the Residence to assist Defendant Petrie with a dispute in progress.

---

[3] Plaintiff denies the portion of this asserted fact "as it pertains to Plaintiff trying to assault…Jakeem Penn, [his] car or hitting him." (Dkt. No. 50, at ¶ 1.) Plaintiff provides no specific citation to support his objection, as is required by Local Rule 56.1(b). Instead, Plaintiff asserts that he will prove that he did not assault Penn by "show[ing]…Penn['s] own body cam if or when it is supplied to me by Defendant's Attorneys." (*Id.*) However, it does not appear that Plaintiff possesses or has even seen that footage, and it is not presented to this Court for review. (*Id.*) Moreover, Plaintiff's assertion that he did not assault Penn does not address the fact actually asserted, which is not directed to the truth of what occurred, but rather to what Penn reported to the 911 dispatcher. Therefore, the Court deems this asserted fact admitted based on Plaintiff's failure to provide a specific citation to any materials in the record that supports a proper denial. (*See* L.R. 56.1[b].)

[4] Plaintiff denies the portion of this asserted fact concerning how "[Plaintiff] used [his] dog to try to attack Penn, and only tried to get Penn off [his] porch which [Penn] was trespassing on." (Dkt. No. 50, at ¶ 2.) Plaintiff indicates his fiancé has Arlo camera footage to support his objection. Defendant Petrie did view the Arlo camera footage on-scene that Plaintiff references, as discussed, *infra*, in Part III of this Decision and Order. Nevertheless, Plaintiff's denial of the 911 narrative as it was provided to dispatch (and to Defendant Petrie) is not supported by any evidence. (*Id.*; *see* L.R. 56.1[b].) Therefore, similar to above, the Court deems this asserted admitted as a result of the failure to provide a specific record citation that supports a proper denial.

4. The person who placed the call to 911 was Jakeem E. Penn Sr. ("Penn").[5]

5. Penn called 911 at approximately 4:18:45 P.M. Plaintiff called 911 at approximately 4:19:59 P.M.[6]

6. Defendant Petrie was designated the primary officer. Defendant Connelly and Deputy Walts were the assisting officers.

7. Defendant Petrie was dispatched to the scene at approximately 4:22 P.M., and went to the Residence. He was joined there by Defendant Connelly. Deputy Walts responded to assist Defendant Petrie and located the caller, Penn, who was parked on Jenkins Road near Lowell Road.

8. Defendant Petrie spoke with Plaintiff and Patricia Valente ("Valente") at the scene. Defendant Petrie was informed, by them, that a person (later identified as Penn) attempted to serve Plaintiff with legal papers, after which Plaintiff had retrieved his German

---

[5] Plaintiff expressly admits that Penn called 911, but denies "the facts of Jakeem E. Penn's statement/deposition made…used to arrest [Plaintiff.]" (Dkt. No. 50, at ¶ 4.) Again, Plaintiff has failed to cite a specific part of the record before the Court to support that denial, and his "dispute" with Penn's statements is not related to what is actually asserted in this fact and therefore irrelevant. (*Id.*; *see* L.R. 56.1[b].) For those reasons, the Court deems this asserted fact admitted.

[6] Plaintiff denies this asserted fact that Penn called 911 at 04:18:56 P.M., because Plaintiff is "sure [he] called 911 before Penn called 911," which he asserts the 911 call logs will prove. (Dkt. No. 50, at ¶ 5.) The call logs are not before the Court, and a call time of 04:18:56 P.M., aligns with the timeline established by the accompanying exhibits. (Dkt. No. 45, Attachs. 2-3, 5.) Thus, the Court deems this asserted fact admitted based on Plaintiff's failure to cite to any specific portion of the record. (*Id.*; *see* L.R. 56.1[b].) Moreover, the precise time of each of the 911 calls and which call occurred first is immaterial to the issues underlying Plaintiff's claim.

Shepherd and opened the front door with the dog leashed, at which point Penn used a chemical spray on the dog.[7]

9. Penn identified himself to Plaintiff as an officer prior to the incident.

10. Valente told Defendant Petrie that she informed Plaintiff someone was approaching the door of the Residence and that the person identified himself as an officer.

11. Defendant Petrie was provided Arlo camera footage by Plaintiff and Valente. The footage showed Plaintiff's front door and the recorded incident. In the footage, Plaintiff's dog could be heard barking and the plaintiff was yelling, "get him, get him."[8]

---

[7] Plaintiff denies this asserted fact insofar as he disputes what Plaintiff and "Miss Valente…said to Deputy Petrie upon his arrival at [their] home." (Dkt. No. 50, at ¶ 8.) Specifically, Plaintiff asserts he and his fiancé told Defendant Petrie "that Penn ID'd himself as an officer." (*Id.*) Plaintiff and Valente "view[ed] their Arlo camera [and] could see a big black male with no identifying marks to show he was an officer and [they] became worried about him being on [their] front porch." (*Id.*) Again, Plaintiff fails to support this denial with a specific citation to the record. (*Id.*; *see* L.R. 56.1[b].) Moreover, this assertion does not controvert any part of the asserted fact, and Defendant Petrie's body-worn camera information corroborates Defendants' assertion that this altercation occurred when Penn was attempting to serve legal papers. Plaintiff's arguments that Penn identified himself as an officer as well as that Penn did not appear to be a uniformed officer merely attempt to add facts rather than address the fact actually asserted. For those reasons, the Court deems this asserted fact admitted.

[8] Plaintiff denies this asserted fact merely as incomplete and lacking the full context of Plaintiff's interaction with Penn at the Residence door. (Dkt. No. 50, at ¶ 11.) Namely, Plaintiff asserts that Penn was trespassing and had opportunities to leave the premises, but instead waited outside the door to deploy a chemical spray on Plaintiff and his dog, and therefore "obviously" did not fear for his life. (*Id.*) Notably, Plaintiff does not deny that his dog was barking and that he said, "get him," twice. (*Id.*) Because Plaintiff's denial is first and foremost an attempt to add facts that do not address the actual fact asserted, it is ineffective. Moreover, although Plaintiff appears to rely on Defendant Petrie's declaration and body-worn camera footage to support the denial, (*Id.* [citing Dkt. No. 45, Attach. 15, at ¶ 9; Dkt. No. 45, Attach. 12, at 20:24.]), paragraph 9 of Defendant Petrie's declaration and the cited timestamp of his body-worn camera footage provide evidence entirely congruent with the asserted fact. (*Id.*) The declaration paragraph cited describes Valente showing the Arlo camera footage to Defendant Petrie wherein Penn was standing at the doorway, "fidgeting" with the pepper spray can, and then spraying "something" at the barking dog once the door opened and Plaintiff yelled "get him" "a number of

12. Deputy Walts then went and spoke with the complainant, Penn.

13. Penn told Deputy Walts that he was a process server and had gone to the Residence to serve legal papers on Plaintiff. The papers were regarding an eviction proceeding.[9]

14. Penn told Deputy Walts that he had gone to the home earlier that day but had no contact with anyone. At that time, Penn observed a German Shepherd located on the side of the house which was barking and seemed aggressive.[10]

---

times." (Dkt. No. 45, Attach. 15, at ¶ 9.) Similarly, the cited timestamp of Defendant Petrie's body-worn camera footage shows Defendant Petrie watching the Arlo camera footage, holding Valente's cell phone to his ear, and stating, "He's saying, 'get him,'" referring to Plaintiff, before handing the cell phone back. (Dkt. No. 45, Attach. 12, at 20:24-20:35.) Neither source supports Plaintiff's contention that Penn had opportunities to leave the premises or did not fear for his life. To the extent Defendant Petrie's statement that Penn was "fidgeting" with the pepper spray can reinforces Plaintiff's assertion that Penn was "getting ready" to use the chemical spray (Dkt. No. 50, at ¶ 11), Defendant Petrie's characterization favors the conclusion that Penn, apprehensive of the barking dog he had already seen at the Residence's side door, was alert and prepared to use the spray if confronted with the dog. However, Plaintiff's contention that Penn was "getting ready" to use the chemical spray, implying Penn had premeditated his using of the chemical spray (Dkt. No. 50, at ¶ 11), is immaterial because the spray is not addressed in the asserted fact and thus renders that portion of Plaintiff's denial nonresponsive. (Dkt. No. 45, Attach. 18, at ¶ 11.) Additionally, Plaintiff's assertion that Penn was trespassing is a legal conclusion and does not merit discussion. (*Id.*) For those reasons, the Court deems the asserted fact admitted.

[9] Plaintiff expressly admits this asserted fact with the exception that Plaintiff denies the paperwork was related to an eviction but rather a foreclosure. (Dkt. No. 50, at ¶ 13.) This is consistent with the ten-day notice to quit from MidFirst Bank concerning a foreclosure judgment, as provided by Defendants. (Dkt. No. 45, Attach. 6.) Nevertheless, regardless of whether the notice was part of a formal eviction proceeding, it was a notice for Plaintiff to leave the premises within ten days or legal action would be taken to evict him. (*Id.*) Further, the distinction of whether this notice was related to a foreclosure or eviction proceeding is immaterial to the Court's determination of this motion for summary judgment. For those reasons, the Court deems this asserted fact admitted.

[10] Plaintiff denies the asserted fact insofar as Plaintiff's dog was "being aggressive" and that the "deputies knew Penn['s] statement was flawed when he declared [the] dog to be aggressive yet he still proceeded to antagonize Plaintiff at his home." (Dkt. No. 50, at ¶ 14.) As before, Plaintiff fails to provide a specific citation to counter the assertion that his dog seemed aggressive when Penn first attempted service of process earlier on November 15, 2023. (*Id.*; *see* L.R. 56.1[b].) Moreover, the Court interprets Plaintiff's assertion that Penn "still proceeded to

15. Later that day, around 4:10 P.M., Penn again drove by the Residence, saw another vehicle there, and decided to attempt service. The dog was still outside so Penn grabbed a can of pepper spray he had with him and walked up to the Residence's front door.[11]

16. Penn knocked on the door and a person behind the door started screaming. Penn identified himself as an officer and heard Plaintiff opening a door on the side of the house where the dog was located.[12]

17. A few moments later, the front door opened and the German Shepherd was at the door barking. Penn was afraid he was going to be attacked. The dog began moving towards

---

antagonize Plaintiff" as a reference to Penn returning to the Residence despite his earlier recognition of Plaintiff's dog. (*Id.*) The asserted fact concerns Penn's observations of Plaintiff's dog, who he characterizes as aggressive, during the first visit to the Residence, not during the second encounter underlying Plaintiff's claims. (Dkt. No. 45, Attach. 18, at ¶ 14.) Because Plaintiff's denial is nonresponsive and still fails to provide a specific record citation, the Court deems this asserted fact admitted.

[11] Plaintiff responds to this asserted fact by stating he is "not disputing Penn bringing an unknown chemical as a weapon to trespass and assaulting home owners and pets," before asserting this is grounds for "further investigation" of Penn's "malicious" actions. (Dkt. No. 50, at ¶ 15.) The Court treats this response as neither an express admission nor denial because while Plaintiff does not deny Penn brought an item to the Residence's door, he appears to deny that it was pepper spray by characterizing the chemical used as "unknown." (*Id.*) Nevertheless, Plaintiff does not provide any specific citation to support his denial that Penn used pepper spray specifically. (*Id.*; *see* L.R. 56.1[b].) Thus, the Court deems this asserted fact admitted based on Plaintiff's failure to provide a specific record citation for his denial.

[12] Plaintiff denies this asserted fact "as to what was said between the assailant and the Plaintiff and Miss Valente." (Dkt. No. 50, at ¶ 16.) Plaintiff then asserts that the Arlo camera footage will "give this exchange more clarity, which was shown to the Deputies at the scene." (*Id.*) Again, Plaintiff has not provided any specific record citation to support his denial of the asserted fact (*Id.*; *see* L.R. 56.1[b]), which is itself ambiguous: it is unclear what specific statements made by Plaintiff, Penn, or Valente are in dispute. Therefore, the Court deems this asserted fact admitted based on Plaintiff's failure to provide a specific record citation for his denial or to clearly identify what portion of the asserted fact he is attempting to deny.

Penn and Plaintiff was yelling, "get him, get him," to the dog. Penn sprayed the dog with the pepper spray he was carrying.[13]

18. Penn then retreated to his car and Plaintiff followed, screaming at him.[14]

19. Plaintiff ran into Penn's car door causing it to hit Penn. Plaintiff then swung his open hand striking Penn on the top of his head, on the left side.[15]

---

13 Plaintiff denies this asserted fact "as to the availability of Penn's body-worn camera at the scene." (Dkt. No. 50, at ¶ 17.) Plaintiff proceeds to describe that his Arlo camera footage that was reviewed on-scene "tells a different story." (*Id.*) Plaintiff also asserts Penn used a "weapon [which] was not verified as being pepper spray, and the label on the canister used was unreadable." (*Id.*) Plaintiff again asserts that "Penn was not in fear of his life, after several warnings he waited to confront the Plaintiff," which was "a sign of aggression, not fear." (*Id.*) Plaintiff has not provided any specific record citation to support his denial that Penn did not use pepper spray and was not in fear of his life when confronted with Plaintiff's dog. (*Id.*; *see* L.R. 56.1[b].) Moreover, the Arlo camera footage referred to by Plaintiff (as documented in Defendant Petrie's body-worn camera footage) corroborates the asserted fact's account of the German Shepherd's appearance and actions, as well as Plaintiff's commands to "get him" and the use of the pepper spray. The Court therefore deems this asserted fact admitted.

14 Plaintiff denies this asserted fact that he "followed" Penn back to his vehicle as Penn asserted; instead, according to Plaintiff, he was "putting his dog back" outside where Penn had originally seen the dog. (Dkt. No. 50, at ¶ 18.) Plaintiff has not provided any specific record citation to support his denial. (*Id.*; *see* L.R. 56.1[b].) Moreover, Plaintiff does not deny that he was "screaming" at Penn. (*Id.*) Thus, the Court deems this asserted fact admitted based on Plaintiff's failure to provide a specific record citation for his denial.

15 Plaintiff denies this asserted fact that he struck Penn, "although Penn did spray Plaintiff in the face with the canister of chemical spray." (Dkt. No. 50, at ¶ 19.) Plaintiff asserts "Penn's body-worn camera should verify" that he did not strike Penn, who "was still trespassing on Plaintiff's property 47 mins after the incident." (*Id.*) Setting aside Plaintiff's assertion about Penn's time spent "trespassing" at the Residence, Penn's body-worn camera footage is not part of this record and therefore cannot be used to support the denial that he ran into Penn's car door which contacted Penn or that he struck Penn with an open hand. (*Id.*; *see* L.R. 56.1[b].) Moreover, Plaintiff's attempt to add facts regarding Penn spraying him with the "chemical spray" does not address the fact actually asserted. For those reasons, the Court deems this asserted fact admitted.

20. Plaintiff then threw a small light and a butternut squash, striking Penn's vehicle.[16]

21. Defendant Petrie spoke with Deputy Walts and also received the supporting deposition sworn to by Penn.[17]

22. Based upon his conversations with Plaintiff, Valente, and Walts, viewing the Arlo camera footage, and receipt of the supporting deposition, Defendant Petrie made the determination that sufficient evidence existed to charge Plaintiff with a violation of N.Y. Pen. Law § 240.26 (second-degree harassment) and a violation of N.Y. Pen. Law § 120.15 (third-degree menacing).[18]

23. Plaintiff was arrested and transported to the Law Enforcement Building where he was processed, issued two appearance tickets, and released from custody.

### D. Summary of Parties' Arguments on Defendants' Motion for Summary Judgment

---

[16] Plaintiff expressly admits that he "was throwing things at Penn" after the incident at the Residence's front door in an effort to "keep[ ] the trespasser Penn from following him and doing more harm to him." (Dkt. No. 50, at ¶ 20.) Plaintiff does not deny that the "things" he threw were a small light and butternut squash and that those items struck Penn's vehicle. (*Id.*) Therefore, the Court deems this asserted fact admitted.

[17] Plaintiff denies this asserted fact insofar as "Penn lied in his deposition and did not have video footage available to back up his claims at the scene." (Dkt. No. 50, at ¶ 21.) While Plaintiff objects to the substance of Penn's statement given to the sheriff's deputies, Plaintiff does not deny that Penn provided a sworn statement to Defendant Petrie. (*Id.*) Therefore, the Court deems this asserted fact admitted.

[18] Plaintiff denies this asserted fact insofar as the "Arlo footage showed Penn being asked to leave, warned to leave, and he (Penn) pulled out a weapon while on Plaintiff's front porch and assaulted him as soon as the door opened." (Dkt. No. 50, at ¶ 22.) Plaintiff asserts Defendant Petrie arrested Plaintiff "on Penn['s] word" and exhibited "flawed" judgment in doing so. (*Id.*) This denial is nonresponsive to the asserted fact which describes only the information Defendant Petrie gathered before deciding to charge Plaintiff with second-degree harassment and third-degree menacing. (Dkt. No. 45, Attach. 18, at ¶ 22.) For those reasons, the Court deems this asserted fact admitted.

### 1. Defendants' Memorandum of Law

Generally, in support of their motion for summary judgment, Defendants assert the following two arguments: (1) Defendants had probable cause to arrest Plaintiff based on the undisputed facts presented and thus no false arrest claim can survive; and (2) in the alternative, Defendants' entitlement to qualified immunity requires the dismissal of Plaintiff's false arrest claim as a matter of law. (Dkt. No. 45, Attach. 19.)

### 2. Plaintiff's Submission in Opposition

Plaintiff failed to respond to Defendants' motion for summary judgment with any memorandum, as his "response" submission dated June 8, 2026, consists only of his mandatory disclosures pursuant to Fed. R. Civ. P. 26 (which should not have been filed), as well as a Rule 56.1 Statement in response to Defendants' Statement of Material Facts. (Dkt. No. 50.) However, to the extent that his response to Defendants' Statement of Material Facts contains legal and factual arguments, the Court has considered those despite the untimeliness of their filing for the reasons already discussed in Part I.C of this Decision and Order and for the additional reasons that will be discussed in Part III.

### 3. Defendants' Reply Memorandum of Law

Generally, in their reply, Defendants assert the following two arguments: (1) Plaintiff's failure to timely file a response, particularly to the Statement of Material Facts, entitles Defendants to summary judgment; and (2) the fact that the charges for which Plaintiff was arrested were ultimately dismissed does not negate the fact that probable cause existed at the time of Plaintiff's arrest. (Dkt. No. 49.)

## II. RELEVANT LEGAL STANDARDS

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that

there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[19] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*.[20] (This is because the Court extends special solicitude to the *pro se*

---

[19] As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

[20] *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[21] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[22]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(a)(3), 56.1(a). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement[23]–even where the non-movant was proceeding *pro se*.[24]

Similarly, in this District, where a non-movant has willfully failed to respond to a

---

21 *Cusamano*, 604 F. Supp.2d at 426 & n.3 (citing cases).

22 *Cusamano*, 604 F. Supp.2d at 426-27 & n.4 (citing cases).

23 Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1(b).

24 *Cusamano*, 604 F. Supp.2d at 427 & n.6 (citing cases).

movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[25] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III. ANALYSIS

After carefully considering whether probable cause existed related to Plaintiff's arrest, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law. *See*, *supra*, Part I.D.1 and 3 of this Decision and Order. To those reasons, the Court adds the following points.

"A section 1983 claim for false arrest is substantially the same as a claim for false arrest

---

[25] *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

under New York law." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (citing *Weyant v. Okst*, 101 F.3d 845, 852 [2d Cir. 1996]). "Under New York law, the elements of a false arrest…claim are: '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Hernandez v. United States*, 939 F.3d 191, 199 (2d Cir. 2019) (quoting *McGowan v. United States*, 825 F.3d 118, 126 [2d Cir. 2016]). "Police officers are empowered to effect an arrest based on probable cause, and 'the existence of probable cause to arrest ... is a complete defense to an action for false arrest.'" *Picciano v. McLoughlin*, 723 F. Supp. 2d 491, 501 (N.D.N.Y. 2010) (Suddaby, J.) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 157 [2d Cir.2001]).

As an initial matter, the Court disagrees that the motion is entirely unopposed as a consequence of Plaintiff's untimely filing of a response. (Dkt. No. 49, at 5.) Because courts in this District have consistently found an "unopposed" motion to be one where no response is ever filed, finding Defendant's motion to be unopposed would be an overstatement. *Starke v. Cnty. of Clinton*, 22-CV-0422, 2023 WL 5380430 (N.D.N.Y. Aug. 22, 2023) (Sharpe, J.); *Ahmed v. Frazer & Jones Co.*, 13-CV-0573, 2015 WL 470648 (N.D.N.Y. Feb. 4, 2015) (Suddaby, J.). As discussed above in Parts I.C and I.D.2 of this Decision and Order, Plaintiff did eventually submit response papers that contain at least some arguments in opposition to Defendants' motion.

Moreover, the Court finds that excusing the *pro se* Plaintiff's untimeliness as to the filing of that response will not prejudice Defendants. *See Robinson v. Harder*, 21-CV-01322, 2024 WL 1469076, at *5 (N.D.N.Y. Feb. 20, 2024) (Hummel, M.J.), *report and recommendation adopted*, 21-CV-1322, 2024 WL 1218983 (N.D.N.Y. Mar. 21, 2024) (Hurd, J.), *appeal dismissed*, 24-1156, 2024 WL 4677424 (2d Cir. Aug. 28, 2024) (recognizing that although

"plaintiff's opposition papers are untimely… plaintiff's delay did not result in any appreciable harm or prejudice to defendants"); *see also Brown v. City of Syracuse*, 11-CV-0668, 2013 WL 1294085 (N.D.N.Y. Mar. 28, 2013) (Scullin, J.) (Plaintiff's counsel's untimely response still considered). As was discussed previously, Defendants acknowledge that Plaintiff sent a response to their Statement of Material Facts to their counsel's office by mail on May 6, 2026, despite its nonappearance on the docket. (Dkt. No. 51.) As a result, Defendants were able to address at least a version of Plaintiff's response to the motion in their reply, namely how Plaintiff's response does not show that there is any genuine dispute of material fact regarding the existence of probable cause as to his arrest. (Dkt. No. 49, at 5.) Defendants therefore had the benefit of reviewing and responding to Plaintiff's submission (which was mailed to their counsel's office within the required timeline, if not filed on the docket) and thus will suffer no prejudice in the Court's consideration of that filing. Moreover, while Local Rule 7.1(b)(3) states that the Court does not consider untimely papers, "it is well-established that *pro se* plaintiffs are 'entitled to certain latitude,' especially when facing a dispositive motion." *McAdoo v. Jagiello*, 10-CV-0355, 2011 WL 1577236, at *2 (N.D.N.Y. Apr. 26, 2011) (Hurd, J.) (quoting *Jemzura v. Pub. Serv. Comm'n*, 961 F. Supp. 406, 415 [N.D.N.Y.1997] [McAvoy, C.J.]). Therefore, Plaintiff's response to the motion, insofar as it offers a response to the arguments raised by Defendants, will be considered.

As to the merits of the remaining claims, the Court finds that there is no genuine dispute of material fact that Defendants had probable cause to arrest Plaintiff on November 15, 2023. "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under § 1983." *Weyant*, 101 F.3d at 852 (quoting *Bernard v. United States*, 25 F.3d 98, 102 [2d Cir.1994]). "An

officer has probable cause to arrest when he or she has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006) (Sotomayor, J.) (quoting *Weyant*, 101 F.3d at 852) (holding no reasonable juror could find officers lacked probable cause to arrest plaintiff for second-degree harassment).

Here, Plaintiff has asserted that Penn lied to Defendants when they spoke with Penn at his parked vehicle on Jenkins Road near Lowell Road. (Dkt. No. 50, at ¶¶21-22.) Specifically, Plaintiff asserts that Penn "lied in his deposition," referencing his on-scene statement to Defendants, did not provide his body-worn camera footage to "back up his claims," which allowed Defendant Petrie to arrest Plaintiff "on Penn['s] word." *(Id.)*

However, Plaintiff offers no evidence to support his assertion that Penn's account was untruthful, and the fact that Penn did not provide the footage from his body-worn camera to officers at the scene does not preclude reasonable reliance on his statements by Defendants when making the decision to arrest Plaintiff. Indeed, the portion of the video from Plaintiff's Arlo camera that Defendant Petrie watched prior to Plaintiff's arrest appears to show only the portion of the encounter when Plaintiff opened the door through when Penn deployed his pepper spray and left the porch. That video notably does show the face of Plaintiff's German Shepherd emerging from the doorway (which corroborates Penn's account), and it does not show anything related to the events that Penn alleged occurred after that encounter, and thus the Arlo camera video does not contradict his statements regarding the dog being present or whether Plaintiff threatened him or threw objects at his car after the confrontation at the door. As a result, there was no evidence presented to Defendants at the relevant time that would have made their

reliance on Penn's statements unreasonable.

Further, the undisputed record demonstrates that probable cause existed specifically as to the charge for menacing. Plaintiff himself admits that he informed Penn that he was getting his "guard dog" and that he brought the dog on a leash with him before he opened the door. (Dkt. No. 34, at 3; *see also* Dkt. No. 50, at ¶ 11 ["Mr. Penn knew I was going to get my dog, after telling Mr. Penn, several times to leave and get off my property."].) This is also documented in Defendant Petrie's police report. (Dkt. No. 45, Attach. 3, at 12 [noting that, "He stated that he told the person to leave his property and that he would be getting his dog," and that Valente also reported that "Wayne had threated [sic] to go get his dog. She stated that Wayne got the dog and put it on a leash. She stated that Wayne did open the door but that the dog never made it outside and was being controlled by Wayne"].) Defendant Petrie further stated in his police report that, when watching the footage from Plaintiff's Arlo camera, "I observed … Jakeem Penn, to be standing in front of the door fidgeting with what appeared to be a cannister of OC spray. I then observed the door open and what sounded like Wayne's voice yelling 'get him, get him' multiple times. I observed the dog peak [sic] out of the door and appeared to be barking at the male," although the dog "seemed to be held back by Wayne." (Dkt. No. 45, Attach. 3, at 13.) This interpretation of the video is notably consistent with Penn's own statement given to police that "the male opened up the front door and was holding the dog by a leash out in front of him and was yelling 'get him, get him'" before "[t]he dog began moving in my direction with his head coming out of the doorway." (Dkt. No. 45, Attach. 11.)

As shown by the body-worn camera footage that Defendants have provided to the Court, Defendant Petrie and Deputy Walts, convening away from Plaintiff and Penn near their patrol vehicles, spent several minutes comparing the accounts of the incident offered by Plaintiff and

Penn. (Dkt. No. 45, Attach. 12 [Petrie BWC Footage], at 13:04-18:05; Dkt. No. 45, Attach. 13 [Walts BWC Footage], at 12:08-17:09.) In their discussion, Deputy Walts first shared how Penn described the incident, (Dkt. No. 45, Attach. 12, at 13:16-15:18),[26] and Defendant Petrie indicated Plaintiff should be charged with "harassment" because Plaintiff "slapped" Penn. (Dkt. No. 45, Attach. 13, at 14:25-14:29.) Defendant Petrie and Walts debated whether Plaintiff should also be charged with menacing based on what Defendant Petrie observed of Plaintiff's use of the dog in Plaintiff's Arlo camera footage. (*Id.*, at 14:30-15:32.) Defendant Petrie then indicated that Deputy Walts should take Penn's statement while Defendant Petrie rewatched Plaintiff's camera footage to hear to what Plaintiff said when Penn was at the door of the Residence. (*Id.*, at 15:39-15:53.) Defendant Petrie and Deputy Walts again discussed whether Plaintiff's conduct constituted menacing, primarily about if the use of a dog "classifies" as menacing based on Plaintiff's "control" of the dog and if what Plaintiff said showed his intent to threaten Penn with the dog. (*Id.*, at 16:29-16:45.) They parted ways indicating that, for Plaintiff's conduct at the Residence door to merit a charge for criminal menacing, they needed to verify that Plaintiff had said, "get him," to the dog. (*Id.*, at 16:46-17:06.) Defendant Petrie then viewed the video a second time and determined that Plaintiff had indeed said "get him" while he had the door open with the dog; as a result, he and another officer agreed that, based on that confirmation, a charge for menacing was appropriate, and Plaintiff was immediately arrested on that charge. (*Id.*, at 20:30-21:12.) Defendant Petrie therefore reasonably relied on his own

---

[26] Deputy Walts also indicates that Penn was wearing his own body-worn camera and would be able to "download" and share that footage later. (Dkt. No. 45 Attach. 12, at 14:59-15:10.) As discussed, *supra*, in Part I.C of this Decision and Order, because none of the officers reviewed Penn's body-worn camera footage on scene (and thus could not have factored the content of that footage into their assessment when deciding whether to arrest Plaintiff), the Court will not consider it.

perception and interpretation of the content of that video along with the other available evidence when making the decision to arrest Plaintiff, and, after reviewing Defendant Petrie's body-worn camera footage, the Court cannot say that his perception or interpretation was unreasonable.

Defendant Petrie and Deputy Walts' deliberations away from the incident demonstrate a thoughtful, reasonable assessment of the facts available to them at the relevant time, informed by the statements of Plaintiff, Valente, and Penn, and camera footage from Plaintiff's own device. Even if there was a genuine dispute about whether Plaintiff's statements of "get him" and presentation of his dog caused Penn to fear for his life, there is no dispute that Penn's sworn statement given to Deputy Walts, Defendant Petrie's conversations with Plaintiff and Valente, and Defendant Petrie's review of Plaintiff's Arlo camera footage constituted "reasonably trustworthy information," *Weyant* at 852, to inform the ultimate decision to arrest Plaintiff for menacing and harassment. Therefore, the clear existence of probable cause at the time of Plaintiff's arrest defeats the claim for false arrest against Defendants.

For these reasons, the Court finds that there is no genuine dispute of material fact presented as to whether Defendants possessed probable cause to arrest Plaintiff, and therefore grants Defendants' motion for summary judgment as to the remaining claims for false arrest against Defendant Connelly and Defendant Petrie.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 45) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Fourth Amended Complaint (Dkt. No. 34) is **DISMISSED**.

Dated: November 5, 2026
Syracuse, New York

Glenn T. Suddaby
U.S. District Judge